**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Charles Bradley Rienhardt,<br><br>      Petitioner,<br><br>vs.<br><br>Charles L. Ryan, et al.,[1]<br><br>      Respondents. | No. CV-03-290-TUC-DCB<br><br>DEATH PENALTY CASE<br><br>**MEMORANDUM OF DECISION AND ORDER** |

Petitioner Charles Bradley Rienhardt is a state prisoner under sentence of death. He has filed a Petition for Writ of Habeas Corpus alleging that he is imprisoned and sentenced in violation of the United States Constitution. (Dkt. 38.) In a prior order, the Court assessed the procedural status of each claim in the Amended Petition and dismissed any claims or portions of claims it found to be procedurally defaulted. (Dkt. 80.) The Court also denied evidentiary development as to each claim. (*Id.*) In this Order, the Court reviews the merits of Petitioner's remaining claims and concludes, for the reasons set forth herein, that Petitioner is not entitled to relief.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 22, 1996, Petitioner was convicted of kidnapping, attempted transfer of a dangerous drug, attempted arson, and first degree murder. The following summary of the facts surrounding the crimes is taken from the opinion of the Arizona Supreme Court

---

[1]      Charles L. Ryan, Interim Director of the Arizona Department of Corrections, is substituted as Respondent pursuant to Federal Rule of Civil Procedure 25(d).

affirming Petitioner's convictions and sentences, *State v. Rienhardt*, 190 Ariz. 579, 582-83, 951 P.2d 454, 457-58 (1997), and this Court's review of the record.

On the evening of September 4, 1995, Petitioner sought to purchase a large quantity of methamphetamines in Tucson. He arranged to meet two men – Michael Ellis, the victim in this case, and James Breedlove – at the apartment of co-defendant Charles Nadeau. Once the deal was made, Petitioner gave Breedlove $1,180 with the understanding that Breedlove would return to the apartment with the drugs. In order to secure Breedlove's return, the parties agreed that Michael Ellis would remain in the apartment with Petitioner.

Breedlove never returned. As the evening progressed, Petitioner became increasingly agitated. He threatened Ellis and insisted that Ellis locate Breedlove by telephone. At one point, Petitioner called Breedlove's girlfriend, Micki Rowlan, and told her that if Breedlove did not return, he would take Ellis on a hike in the desert, blindfold him, hang him over the edge of a cliff, remove the blindfold, and drop him. After midnight, Nadeau arrived at the apartment. For reasons that are unclear, Nadeau struck Ellis across the face hard enough to make him bleed. Eventually, Breedlove phoned the apartment with news that the deal was taking longer than expected. Petitioner told Breedlove that for every 10 minutes that Breedlove did not return, Petitioner would hurt Ellis further.

Petitioner and Nadeau eventually left the apartment with Ellis. When two witnesses returned to the apartment, they discovered a trail of blood leading from the apartment, blood on the living room carpet and on a chair where Ellis had been seated, and pieces of teeth on the floor. They also discovered a shotgun on a couch near Ellis's chair.

Later that evening, Petitioner contacted Christina George, his girlfriend, and told her to meet him at a Circle K market near Reddington Pass because there was an emergency and he needed a ride. George drove to the appointed spot in a stolen Toyota MR-2, waited for some time, and then decided to drive up Reddington Pass to a place where she and Petitioner had recently been jumping off of rocks. Less than a mile up the dirt road, she encountered Petitioner and Nadeau on foot. Petitioner told her that their vehicle had gotten stuck on a rock. He also told her that Ellis had not died from his shotgun wounds, that they had dropped

a rock on his head, and that, "I have brains all over my pants."

The group dislodged the vehicle, a white Buick, and drove both cars to a nearby shopping plaza. They decided to burn the Buick. As George and Nadeau prepared to burn the car, a sheriff's deputy approached the group. The three jumped into the stolen Toyota, a chase ensued, and the three were arrested. The Buick, left at the shopping plaza, had blood smeared on the driver's side, a bloody towel inside, and a large blood stain in the back seat. Police found Michael Ellis's wallet in the Buick, and a shotgun with a missing stock.

The next night, Nadeau led police to Ellis's body near the dirt road leading to Reddington Pass. Ellis had been severely beaten about the head and torso. He had shotgun wounds. One or two large rocks had been dropped on his head. Pieces of a wood shotgun stock were found around a pool of blood near the body. The pieces matched the make and model of the shotgun found in the abandoned Buick.

Nadeau's trial on the above charges was severed from Petitioner's. Christina George was charged with attempted arson and hindering prosecution. She also faced unrelated felony charges. George entered into a plea agreement in return for her testimony against Petitioner.

Pima County Superior Court Judge Michael D. Alfred sentenced Petitioner to death for the first degree murder and to a term of imprisonment for the other counts. With respect to the murder count, the judge found three aggravating circumstances: that Petitioner was previously convicted of a serious offense; that the murder was committed for pecuniary gain; and that the crime was especially cruel, heinous or depraved. Petitioner waived the presentation of mitigating evidence. After an independent review of the record, the court found no mitigating circumstances sufficiently substantial to call for leniency.

On direct appeal, the Arizona Supreme Court struck the pecuniary gain aggravating factor. *Rienhardt*, 190 Ariz. at 591, 951 P.2d at 466. After reweighing the remaining aggravators and the mitigating evidence, the court affirmed the death sentence. *Id.* at 593, 951 P.2d at 468.

On November 15, 2000, Petitioner filed a petition for post-conviction relief (PCR)

with the trial court. (ROA-PCR 61.)[2] The petition was denied without a hearing on March 28, 2001. (*Id.*, 68.) On December 20, 2001, Petitioner filed a petition for review of that denial. (PR Doc. 1.) The Arizona Supreme Court granted review and remanded to the trial court with instructions to clarify which claims it found precluded and which claims it denied on the merits. (*Id.*, 7-8.) The court entered an order clarifying the basis for its dismissal of the PCR petition. (*Id.*, 9.) The Arizona Supreme Court summarily denied review of the clarified post-conviction ruling on May 28, 2003. (*Id.*, 11.)

## <u>LEGAL STANDARD FOR RELIEF UNDER THE AEDPA</u>

The AEDPA established a "substantially higher threshold for habeas relief" with the "acknowledged purpose of 'reducing delays in the execution of state and federal criminal sentences.'" *Schriro v. Landrigan*, 550 U.S. 465, 475 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)). The AEDPA's "'highly deferential standard for evaluating state-court rulings' . . . demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)).

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v.*

---

[2]     "ROA-PCR" refers to the three-volume record on appeal from post-conviction proceedings prepared for Petitioner's petition for review to the Arizona Supreme Court (Case No. CR-01-0468-PC). "PR Doc." refers to the Arizona Supreme Court's docket for Petitioner's petition for review of that denial to the Arizona Supreme Court. "RT" refers to court reporter's transcript. The original transcripts and certified copies of the trial and post-conviction records were provided to this Court by the Arizona Supreme Court on November 18, 2004. (Dkt. 63.)

*Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

"The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 549 U.S. 70, 74 (2006); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529 U.S. at 381; *see Musladin*, 549 U.S. at 77; *Casey v. Moore*, 386 F.3d 896, 907 (9th Cir. 2004). Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be "persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably. *Clark*, 331 F.3d at 1069.

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam). In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406; *see Lambert v. Blodgett*, 393 F.3d 943, 974 (9th Cir. 2004).

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. For a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *see Landrigan*, 550 U.S. at 473; *Visciotti*, 537 U.S. at 25.

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*). A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322, 340 (2003) (*Miller-El I*); *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). In considering a challenge under § 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Landrigan*, 550 U.S. at 473-74.

As the Ninth Circuit has noted, application of the foregoing standards presents difficulties when the state court decided the merits of a claim without providing its rationale. *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). In those circumstances, a federal court independently reviews the record to assess whether the state court decision was objectively unreasonable under controlling federal law. *Himes*, 336 F.3d at 853; *Pirtle*, 313 F.3d at 1167. Although the record is reviewed independently, a federal court nevertheless defers to the state court's ultimate decision. *Pirtle*, 313 F.3d at 1167 (citing *Delgado*, 223 F.3d at 981-82); *see also Himes*, 336 F.3d at 853.

# DISCUSSION

## Claim A(6)

Petitioner alleges that trial counsel performed ineffectively in violation of his rights under the Sixth and Fourteenth Amendments by failing to request a mistrial or obtain non-conflicted counsel for Petitioner after counsel became a witness. (Dkt. 38 at 22.)

### Background

Prior to Christina George's trial testimony, the prosecutor informed the court that she had become aware that defense counsel, Eric Larsen, had interviewed George prior to her becoming a cooperating witness. (RT 2/16/96 at 2.) According to the prosecutor, George indicated that she had implicated Petitioner in her interview with Larsen. (*Id*. at 2, 4.) No other witnesses were present and the interview with Larsen was not recorded. The prosecutor asserted that Larsen had "made himself a witness" by conducting the interview. (*Id*. at 4-5.) Larsen admitted that he conducted the interview. (*Id*. at 5-6.) The prosecutor then indicated that she was disclosing Larsen as a witness, explaining: "Mr. Larsen has set this case up as the only evidence that the State has against Mr. Rienhardt is Miss George. And clearly if she is implicating Mr. Rienhardt at a point in time to this attorney when she has absolutely no incentive to lie, then Mr. Larsen is a critical witness in this case for the State." (*Id*. at 6.) Outside the presence of the jury, George testified that defense counsel did in fact visit her, that she told him "everything [she] knew," but if it helped Petitioner, she would be willing to change her story. (*Id*. at 7-14.) The prosecutor moved for a mistrial on the grounds that defense counsel had become a witness for the State. (*Id*. at 16.) The court denied the motion but ruled that the prosecution could ask George about the interview on redirect if defense counsel "opened the door" on cross-examination. (*Id.* at 16-17.) Larsen's cross-examination of George, which emphasized the inconsistencies in her stories to the police, did open the door, and on redirect the prosecutor questioned George about the interview. (*Id.* at 86.) Larsen did not seek to re-cross-examine George, nor was he ever called as a witness.

In his PCR petition, Petitioner alleged that Larsen was ineffective because after becoming a witness against Petitioner he failed to move for a mistrial or to withdraw as counsel. (ROA-PCR 61 at 5-7.) The PCR court summarily denied the claim "on the merits." (PR Doc. 9.)

<u>Analysis</u>

The clearly established federal law governing claims of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. 466 U.S. at 687-88.

To demonstrate ineffectiveness, a petitioner must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689. In assessing whether counsel's performance was deficient under *Strickland*, the test is whether counsel's actions were objectively reasonable at the time of the decision. *Id.* at 689-90. In making this assessment, the court "must conduct an objective review of [counsel's] performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (citation and quotation marks omitted). With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Under the AEDPA, this Court's review of the state court's decision is subject to another level of deference. *Bell v. Cone*, 535 U.S. 685, 698-99 (2002); *see Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009) (noting that a "doubly deferential" standard applies to *Strickland* claims under AEDPA). Therefore, to prevail on this claim, Petitioner

must make the additional showing that the state court's ruling that counsel was not ineffective constituted an objectively unreasonable application of *Strickland*. 28 U.S.C. § 2254(d)(1).

Because an ineffective assistance of counsel claim must satisfy both prongs of *Strickland*, the reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." 466 U.S. at 697 ("if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed"). That is the course the Court will follow.

Petitioner contends that counsel's conduct in conducting the interview and then failing to withdraw or move for a mistrial impeded his ability to effectively cross-examine George. (Dkt. 38 at 22.) Petitioner also argues that Larsen, once the jury became aware of his interview with George, lost his credibility and implicitly "became a powerful witness for the state." (*Id.*)

Because the PCR court decided the merits of this claim without providing its rationale, this Court independently reviews the record to assess whether the state court decision was objectively unreasonable under controlling federal law. *See Himes*, 336 F.3d at 853; *Pirtle*, 313 F.3d at 1167. This Court concludes that the decision of the PCR court was not objectively unreasonable because Petitioner cannot meet his burden under *Strickland* of affirmatively proving that he was prejudiced by Larsen's performance.

During his cross-examination of George, Larsen mounted a vigorous attack on the witness's credibility. (RT 2/16/96 at 57-84.) He forced George to admit that she had changed her story about Petitioner's involvement in the crimes a number of times, that she had provided inconsistent information about her own crimes to the author of a presentence report, that she was testifying pursuant to a favorable plea bargain, and that she had a "good imagination." (*Id.*) In addressing a separate issue on appeal, the Arizona Supreme Court found that Larsen's decision not to force a mistrial was "strategic" and described Larsen's

cross-examination of George as "withering," noting that all of George's "inconsistencies were . . . brought to light" and that the defense had "created a strong inference that George had fabricated her story in exchange for leniency." *Rienhardt*, 190 Ariz. at 586, 951 P.2d at 461.

Petitioner criticizes Larsen for not moving for a mistrial or withdrawing from the case. It is not clear how either of these steps would have benefitted the defense. The State moved for a mistrial; the court denied the motion. There is no reason to believe that the court would have granted the same request if made by defense counsel. In addition, Petitioner has never contended that George's version of the interview was inaccurate. Therefore, if a mistrial had been granted or substitute counsel appointed, Larsen in fact would have become an adverse witness whose testimony would have confirmed George's testimony that she had implicated Petitioner in an interview prior to receiving any plea offers from the State. No matter what course Larsen took, George's testimony about the interview would have been presented. Arguably, Larsen's handling of the issue reduced the damage to the defense by emphasizing the inconsistencies in George's stories while avoiding having to testify himself about the interview. Although the prosecutor referred to the Larsen-George interview in her closing argument (RT 2/22/96 at 52), that circumstance was less prejudicial than the alternative now advocated by Petitioner, which likely would have resulted in a jury hearing testimony from Petitioner's former counsel corroborating the inculpatory information offered by the State's lead witness.

The second reason that Petitioner was not prejudiced under *Strickland* is because the State presented "overwhelming evidence of his guilt." *Rienhardt*, 190 Ariz. at 586, 951 P.2d at 461. Petitioner was apprehended "almost literally 'red-handed,'" *id.*, soon after the killing while fleeing from the police and leaving behind a car full of incriminating evidence which he and his accomplices had tried to burn. Blood consistent with the victim's was splattered on his clothes. Witnesses heard him threatening to kill the victim in the same manner in which the victim was in fact killed. After his arrest he wrote letters boasting about the murder and asking George to change her story in his favor. In these circumstances, Petitioner

cannot demonstrate a reasonable probability of a different verdict if Larsen had withdrawn or moved for a mistrial based on his interview with George.

In sum, the Court, having independently reviewed the record, concludes that Larsen's handling of the fact that George provided unfavorable evidence in her interview with him did not amount to constitutionally ineffective representation because Petitioner has not demonstrated that he was prejudiced thereby. Therefore, the PCR court's denial of this claim was not objectively unreasonable. Petitioner is not entitled to relief on Claim A(6).

**Claims B(1), B(3), and B(7)**

Petitioner alleges that counsel performed ineffectively at sentencing in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments by failing to conduct a mitigation investigation, failing to adequately advise Petitioner on whether to present mitigation, and failing to present any mitigation evidence. (Dkt. 38 at 41.)

Background

At the presentence hearing, the State presented testimony in support of the aggravating factor set forth in A.R.S. § 13-703(F)(2) (prior conviction for a serious offense). After the State rested, defense counsel indicated that he would not present any witnesses, explaining: "Based on conversation with my client we would decline to present mitigating information." (RT 4/22/96 at 6.) Counsel elaborated:

> My client for both personal reasons and for reasons regarding his appellate status in this particular instance believes that it is inappropriate [sic], best interest to not proceed presenting mitigating factors. I have spoken with him on three different occasions regarding this. He believes it's a reasonable strategy to proceed under and has instructed me to follow so through.

(*Id.*)

The court then asked Petitioner if he agreed with counsel's statement. (*Id.* at 7.) Petitioner answered that he did. (*Id.*) The court then engaged in the following colloquy with Petitioner:

> Court: You understand that basically today's procedure is an aggravation mitigation hearing at which the State has presented at least part of the evidence that it will use to seek to establish aggravating circumstances for the purpose of its intention to ask the Court to seek the death penalty in your case. You understand that?

Petitioner: Yes, sir, I do.

Court: This is also your opportunity to present any circumstances in mitigation that you may wish to present in order to establish the both statutory and nonstatutory mitigating circumstances to persuade the Court not to impose that penalty. You understand that?

Petitioner: Yes, I do.

Court: Knowing that, you wish to proceed as Mr. Larsen indicated?

Petitioner: Yes, sir.

(*Id.* at 7-8.)

At the sentencing hearing, the court discussed in detail Petitioner's decision not to offer mitigating evidence. (RT 5/20/96 at 14.) After noting that a capital defendant has the burden of establishing mitigating circumstances by a preponderance of the evidence, the court explained:

The defendant has made it clear to the Court that he did not wish to present any evidence in mitigation. The defendant did not present any mitigating evidence at the aggravation mitigation hearing in this case.

The Court informed the defendant that the defendant had an opportunity to present evidence in mitigation and that it was possible that the mitigation presented might affect the sentence the defendant might receive. The Court also told the defendant that if the Court was to find that the State has proven one aggravating factor and there was no mitigating evidence to rebut it, that the defendant would be – it would be required for the Court to sentence the defendant to death.

The defendant stated that he understood these possible ramifications if he did not present mitigating evidence, and his counsel stated it was defendant's specific request that no mitigation be presented.

The Court has asked the defendant personally if it was his decision not to put on mitigating evidence, and the defendant has assured this Court that it was the defendant's decision not to present any evidence in mitigation.

The Court believes based on its conversations with the defendant, after seeing defendant's demeanor, conduct when addressing the Court, that the defendant was not under the effect of any drugs, alcohol or mind altering substance, nor under any duress or other situation that would have affected the voluntary, knowing nature of his refusal to produce mitigating evidence. This Court concludes based on his conversations with defendant, viewing him in court, that the defendant's decision not to present any mitigating evidence was voluntary.

(*Id.* at 17-18.) The court indicated that it nevertheless

conducted an independent review of the evidence and including but not limited to the testimony at trial and the presentence report. The Court has examined the evidence and testimony to see if any statutory or nonstatutory mitigating factors exist, if so whether they are sufficient to overcome any one or more of the aggravating factors in this case.

(*Id.* at 18.)

The documents contained in the presentence report ("PSR") reviewed by the judge included information compiled for previous reports. (PSR 4/17/96 (sealed exhibit).) These reports featured social histories detailing Petitioner's childhood, education, family background, employment history, and history of drug and alcohol abuse. (*Id.*) One report stated that Petitioner's family suffered economic setbacks when his father lost his business, that his father would become physically abusive when intoxicated, and that Petitioner was an average student and involved in athletics until junior high school when he was incarcerated. (PSR 9/27/89 at 4-5.) The report also indicated that Petitioner began using alcohol and marijuana at age 11 and cocaine at age 17; he also used methamphetamine. (*Id.* at 5.) In the presentence report prepared for the murder case, Petitioner was quoted as saying that he "had a very serious drinking problem, not a drug problem." (PSR 4/17/96.)

A second report stated that Petitioner's behavior changed in 1983; at that time he came to the attention of juvenile authorities who noted that he was "extremely depressed" with feelings of "helplessness, alienation, and desire to be dead." (PSR 12/19/90 at 4-5.) He feared that he would become a "social deviant" like his incarcerated uncle. (*Id.* at 5.) His behavior was "totally out of control" and he was expelled from junior high and high school. (*Id.*) The report also stated that Petitioner's parents, particularly his mother, were overprotective and "unwittingly supportive" of his delinquency. (*Id.*) With respect to Petitioner's prior conviction for aggravated assault, the report contained information indicating that the victim of the assault believed Petitioner was easily led and that his older half-brother bore greater responsibility for the crime. (*Id.* at 4.)

In reviewing Petitioner's sentence on direct appeal, the Arizona Supreme Court noted: "Rienhardt expressly refused to present any mitigating evidence. In anticipation of Rienhardt's appeal to this court, the trial court conducted an independent review of the

- 13 -

evidence for statutory and nonstatutory mitigating factors." *Rienhardt*, 190 Ariz. at 591, 951 P.2d at 466.

In his PCR petition, Petitioner raised the allegations contained in Claims B(1), (3), and (7). (ROA-PCR 61 at 7-8.) In support of his claim that Larsen performed ineffectively at sentencing, Petitioner attached a psychological evaluation completed by Dr. Gina Lang. (*Id.*, Ex. A.) The evaluation discussed Petitioner's family background, noting that despite Petitioner's report of a happy, positive childhood, records indicated that he suffered physical abuse when his father was drunk and that his mother was overly controlling, protective, and an enabler. (*Id.* at 2.) The report also discussed Petitioner's substance abuse background, indicating that he began using alcohol and marijuana as early as age 11, that he was drinking seriously at age 15 or 16, that he had used cocaine and tried heroin, and that for a year prior to the crime he was smoking crystal methamphetamine on a daily basis. (*Id.* at 3.) The evaluation reported test results indicating that Petitioner had an average IQ; the results were "not indicative of cognitive impairment." (*Id.* at 4-5.) Dr. Lang diagnosed Petitioner with "Polysubstance Dependence, In a Controlled Environment" and "Personality Disorder NOS with Antisocial and Dependent Features." (*Id.* at 5.)

The PCR court denied Petitioner's claim of ineffective assistance at sentencing "on the merits" without further comment. (PR Doc. 9.)

<u>Analysis</u>

The right to effective assistance of counsel applies not just to the guilt phase but "with equal force at the penalty phase of a bifurcated capital trial." *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002) (quoting *Clabourne v. Lewis*, 64 F.3d, 1373, 1378 (9th Cir. 1995)). In assessing whether counsel's performance was deficient, the question is "not whether another lawyer, with the benefit of hindsight, would have acted differently, but 'whether counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment.'" *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998) (quoting *Strickland*, 466 U.S. at 687). With respect to prejudice, the *Strickland* Court explained that "[w]hen a defendant challenges a death sentence . . . the question is

whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." 466 U.S. at 695. In *Wiggins*, 539 U.S. at 534, the Court held that "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." The totality of the available evidence includes "both that adduced at trial, and the evidence adduced in the habeas proceeding." *Id.* at 536 (quoting *Williams v. Taylor*, 529 U.S. at 397-98).

The Court has independently viewed the record to determine if the PCR court's denial of this claim was objectively unreasonable under *Strickland*. Petitioner argues that counsel performed deficiently by failing to undertake a mitigation investigation. His argument focuses on the performance prong of his claim – i.e., Larsen's alleged failure to adhere to professional standards dictating that capital counsel is obligated to pursue mitigating evidence notwithstanding their client's stated desire not to present such evidence at sentencing. However, the Court has determined that this claim is more readily resolved on the basis of lack of prejudice, *see Strickland*, 466 U.S. at 697, and therefore will not address the performance prong. As detailed below, the Court finds that Petitioner has not met his burden under *Strickland* of affirmatively proving that he was prejudiced by counsel's performance at sentencing.

As an initial matter, the Court notes that a capital defendant may waive the presentation of mitigating evidence. In *Blystone v. Pennsylvania*, the United States Supreme Court found no constitutional violation when a defendant was allowed to waive all mitigation evidence after repeated warnings from the judge and advice from counsel. 494 U.S. 299, 306 & n.4. That principle was buttressed by the holding in *Schriro v. Landrigan*, which denied an ineffective assistance claim based on the defendant's refusal to allow the presentation of a mitigation case. 550 U.S. at 475. In *Landrigan*, the Court further stated that it had "never imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce evidence" and has "never required a specific colloquy to ensure that a defendant knowingly and intelligently refused to present mitigating evidence." *Id.* at 479. The Court

in *Landrigan* also addressed the issue of prejudice under *Strickland* when a defendant, like Petitioner, waives mitigation.

In *Landrigan*, the petitioner refused to allow defense counsel to present the testimony of his ex-wife and birth mother as mitigating evidence. He also interrupted as counsel tried to proffer other evidence and told the Arizona trial judge that he did not wish to present any mitigating evidence and to bring on the death penalty. The court sentenced him to death and the sentence was affirmed on direct appeal. *State v. Landrigan*, 176 Ariz. 1, 859 P.2d 111 (1993). The post-conviction court rejected Landrigan's request for a hearing and denied his claim that counsel was ineffective for failing to conduct further investigation into mitigating circumstances, finding that he had instructed counsel at sentencing not to present any mitigating evidence at all. Landrigan then filed a federal habeas petition. The district court denied the petition and refused to grant an evidentiary hearing because Landrigan could not make out a colorable claim of ineffective assistance of counsel. A panel of the Ninth Circuit affirmed the denial. *Landrigan v. Stewart*, 272 F.3d 1221 (9th Cir. 2001). The en banc Ninth Circuit reversed, holding that counsel's performance at sentencing was ineffective. 441 F.3d 638 (9th Cir. 2006). According to the court, Landrigan's "last-minute decision could not excuse counsel's failure to conduct an adequate investigation prior to sentencing." *Id.* at 647. The court then reiterated its view, echoed here by Petitioner, "that a lawyer's duty to investigate [mitigating circumstances] is virtually absolute, regardless of a client's expressed wishes." *Id.*

The Supreme Court reversed. *Schriro v. Landrigan*, 550 U.S. 465. The Court held that the district court did not abuse its discretion in failing to hold an evidentiary hearing on Landrigan's claim of sentencing-stage ineffectiveness and that the court was within its discretion in denying the claim based on Landrigan's unwillingness to present mitigation evidence.

*Landrigan* dictates that Petitioner is not entitled to habeas relief. *Landrigan* establishes the standard for evaluating the merits of a sentencing-stage ineffective assistance claim brought by a petitioner who directed counsel not to pursue a case in mitigation: "If [the

petitioner] issued such an instruction [not to offer mitigating evidence], counsel's failure to investigate further could not have been prejudicial under *Strickland*." *Id.* at 475; *see Owen v. Guida,* 549 F.3d 399, 406 (6th Cir. 2008) ("a client who interferes with her attorney's attempts to present mitigating evidence cannot then claim prejudice based on the attorney's failure to present that evidence"); *see also Wood v. Quarterman*, 491 F.3d 196, 203 (5th Cir. 2007) ("Neither the Supreme Court nor this court has ever held that a lawyer provides ineffective assistance by complying with the client's clear and unambiguous instructions to not present evidence."). Because Petitioner clearly and unambiguously instructed counsel that he did not wish to present a case in mitigation, Larsen's performance with respect to mitigation was not prejudicial.

In addition, Petitioner has failed to demonstrate prejudice because he has not shown that the mitigating evidence allegedly omitted by counsel, if presented, would have resulted in a reasonable probability of a different sentence. This case stands in stark contrast to cases such as *Rompilla*, *Wiggins*, and *Williams*, where counsel's failure to investigate mitigating evidence prejudiced the defendant. In *Rompilla*, for example, counsel failed to present evidence that his client was beaten by his father with fists, straps, belts, and sticks; that his father locked him and his brother in a dog pen filled with excrement; and that he grew up in a home with no indoor plumbing and was not given proper clothing. 545 U.S. at 391-92. In *Wiggins*, counsel failed to present evidence that the defendant suffered consistent abuse during the first six years of his life, was the victim of "physical torment, sexual molestation, and repeated rape during his subsequent years in foster care," was homeless for portions of his life, and had diminished mental capacities. 539 U.S. at 535. In *Williams*, counsel failed to discover "records graphically describing Williams's nightmarish childhood," including the fact that he had been committed at age eleven, had suffered dramatic mistreatment and abuse during his early childhood, and was "borderline mentally retarded." 529 U.S. at 370-71, 395.

Petitioner has not shown that this kind of compelling mitigation evidence was omitted at sentencing. With the exception of the evidence relating to Petitioner's use of methamphetamine in the year prior to the crime, as set forth in Dr. Lang's evaluation together

with her diagnoses of polysubstance dependence and a personality disorder, Petitioner has not identified additional mitigating information that was not before the sentencing judge in the presentence report. The evidence reviewed by the judge included information about Petitioner's family, educational, and employment background. This information indicated that Petitioner had a long history of substance abuse, that his father was abusive when drunk, while his mother failed to provide discipline and guidance. Despite Petitioner's protestations to the contrary, the judge also learned that Petitioner had been characterized as a "follower" by the victim of a previous crime.

Petitioner has failed to present mitigating evidence beyond that considered by the sentencing judge. To the extent that he offered new evidence in the PCR proceedings, such information was relatively "weak." *Landrigan*, 550 U.S. at 481 (describing as "poor quality," and therefore not supportive of a colorable claim of ineffective assistance, omitted mitigating evidence indicating that the petitioner suffered from fetal alcohol syndrome with attendant cognitive and behavioral defects, was abandoned by his birth mother, was raised by an alcoholic adoptive mother, began abusing alcohol and drugs at an early age, and had a genetic predisposition to violence); *see also Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005) ("to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way – in strength and subject matter – from the evidence actually presented at sentencing"); *Babbit*, 151 F.3d at 1176 (finding no prejudice where evidence omitted at sentencing was "largely cumulative of the evidence actually presented"); *Woratzeck v. Stewart*, 97 F.3d 329, 336-37 (9th Cir. 1996) (finding no prejudice from counsel's failure to investigate or call additional witnesses at mitigation phase because all of the information the witnesses would have presented was contained in the presentence report); *Strickland*, 466 U.S. at 699-700 (no prejudice where omitted evidence "would barely have altered the sentencing profile presented to the sentencing judge.").

The Court denied Petitioner's motion for evidentiary development with respect to these claims, finding that Petitioner had not been diligent in state court. (Dkt. 80 at 60-62.) This determination was based on the fact that Petitioner failed to seek an evidentiary hearing

during the PCR proceedings and failed to gather facts in support of his claims or seek the resources required to do so. (*Id.*) As a result, he presented no evidence concerning the circumstances of his waiver and only limited new information about his background, substance abuse history, and mental health.

Petitioner included a number of exhibits in support of his amended habeas petition. (Dkt. 39.) He later moved to "amend/correct" the petition. (Dkt. 89.) The Court denied the motion. (Dkt. 96.) Attached to the proposed second amended petition were additional exhibits, some of which – school records, a declaration by Christine George, a copy of Larsen's billing records – included information in support of his allegations that counsel performed ineffectively at sentencing. (Dkt. 88, Ex's 1, 24, 26.) Petitioner later filed several supplemental exhibits, which likewise contained mitigating information from friends and family about Petitioner's background. (Dkt. 98, Ex's 2-4.) The Court denied expansion of the record with respect to these exhibits, again based on lack of diligence. (Dkt. 100.)

As the Court noted in its previous orders denying evidentiary development, Petitioner, having failed to pursue this readily-available information in state court, is now prohibited from using such evidence to support his habeas claim. Nonetheless, even if the Court were to consider this new information, it would conclude that Petitioner has not shown prejudice under *Strickland*, *Rompilla*, *Wiggins*, and *Williams*.

Much of this new information about Petitioner's background simply indicates, as set forth in the record reviewed by the sentencing judge, that Petitioner had a substance abuse problem, that Petitioner's father was controlling and emotionally and physically abusive, that his mother was cold, distant, and uncaring, and that his older brother was a troublemaker. (Dkt. 88, Ex. 24 at 1; Dkt. 98, Ex. 2 at 1-3, Ex. 3 at 1-2, 5-7.) Other passages, in declarations by one of Petitioner's former girlfriends and her sister, suggest that Petitioner had been sexually molested by his aunt and uncle in a "demonic ritual." (Dkt. 98, Ex. 2 at 2-3; *see* Ex. 3 at 6-7.) This allegation is certainly distinct from any of the information before the sentencing judge. However, it is nothing more than speculation purportedly based on statements by Petitioner that something terrible had happened to him as a child that he did

not want to talk about. (*Id.*) Finally, Petitioner's sister submitted a declaration stating that it was their mother who was violent toward the children. (Dkt. 98, Ex. 4.) She also attested that their mother and all of the children suffered from mental illness or drug addiction. (*Id.*) This is not persuasive new information. Petitioner's history of substance abuse, as detailed in the presentence reports, was considered by the sentencing judge. Moreover, during the PCR proceedings, Petitioner presented a mental health evaluation that included a diagnosis of polysubstance dependence and a personality disorder with antisocial features. Neither of these diagnoses constituted significant new mitigating evidence given the information the sentencing judge was able to review concerning Petitioner's substance abuse and history of antisocial behavior. Petitioner has offered no evidence that he suffers from other mental health conditions or any form of cognitive deficit.

Having independently reviewed the record, the Court concludes that the PCR court's denial of Petitioner's allegations of sentencing-stage ineffective assistance of counsel was not objectively unreasonable. Under *Landrigan*, Petitioner cannot show prejudice because he expressly waived the presentation of a case in mitigation. Further, he has failed to prove that, if he had not waived mitigation, additional evidence could have been presented that would have resulted in a reasonable probability of a different sentence. This conclusion takes into account both the state court record and the information with which Petitioner sought, unsuccessfully, to expand that record. For the reasons set forth above, Petitioner is not entitled to relief on Claims B(1), (3), and (7).

**Claim C(1)**

Petitioner alleges that his rights to counsel, confrontation, and due process under the Sixth and Fourteenth Amendments were violated because his lawyer had a conflict of interest relating to witness Christina George. (Dkt. 38 at 48.)

As described above, defense counsel conducted an unrecorded interview of George, who implicated Petitioner in the crimes, causing counsel to become a potential witness. The trial court ruled that the prosecutor could inquire about that interview if defense counsel opened the door on cross-examination.

On direct appeal, Petitioner argued that his rights were violated by the trial court's decision to admit evidence of defense counsel's interview of George. (Opening Br. at 24-28.) The Arizona Supreme Court denied relief, holding that the evidence was properly admitted and that Petitioner "was not denied his right to confront George." *Rienhardt*, 190 Ariz. at 586-87, 951 P.2d at 461-62.

<u>Analysis</u>

The right to counsel guaranteed by the Sixth Amendment includes the "right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). "[I]n order to succeed on a claim based on an alleged conflict, there must be a showing of an *actual* conflict, namely that a defendant's attorney is representing conflicting interests." *Plumlee v. Masto*, 512 F.3d 1204, 1210 (9th Cir. 2008). Petitioner has made no showing that defense counsel represented conflicting interests. Moreover, a showing of *Strickland* prejudice is required in conflict claims not involving multiple representation. *Mickens v. Taylor*, 535 U.S. 162, 176 (2002). As described above in Claim A, Petitioner has failed to show that he was prejudiced by counsel's performance as it related to his interview with George.

Petitioner argues that the alleged conflict adversely affected Larsen's representation because it prevented him from properly cross-examining George. The record demonstrates, however, that Larsen thoroughly explored George's credibility notwithstanding the possibility that doing so would open the door to testimony that she had offered another, more damaging, version of events in her interview with him.

Petitioner also argues that a conflict existed because Larsen "became a witness in the case." (Dkt. 64 at 38.) In fact, Larsen did not become a witness and did not testify about his interview with George. Moreover, because Petitioner does not assert that George's account of the interview was untrue, there was no conflict between Larsen's potential testimony and that offered by George and thus no need for Larsen to become a witness.

Finally, Petitioner is not entitled to relief because admission of George's testimony about her interview with Larsen did not deny Petitioner a fundamentally fair trial, *Estelle v.*

*McGuire*, 502 U.S. 62, 68, 70 (1991). Nor did the testimony have a "substantial and injurious effect or influence in determining the jury's verdict" under *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). There is no probability that exclusion of George's testimony about the Larsen interview would have affected the verdict in light of the overwhelming evidence that Petitioner committed the murder. Claim C(1) is denied.

**Claim D**

Petitioner alleges that the sentencing court mischaracterized and understated the evidence that he was intoxicated at the time of the crime and as a result failed to consider his intoxication as a mitigating factor, thereby violating his rights under the Eighth and Fourteenth Amendments. (Dkt. 38 at 53-56.)

Background

Although Petitioner waived the presentation of mitigating evidence, the trial court "conducted an independent review of the evidence and including but not limited to the testimony at trial and the presentence report . . . to see if any statutory or nonstatutory mitigating factors exist." (RT 5/20/96 at 18.) The court first considered evidence of intoxication as a statutory mitigating factor under A.R.S. § 13-703(G)(1). The court made the following finding:

> testimony from the officers at trial show [sic] the defendant smelled of alcohol when he was arrested. Officer Sueme testified that the defendant was acting drunk and she could not tell whether the defendant was intoxicated or faking intoxication. The defendant displayed no outward signs of intoxication other than the odor of alcohol on his breath. Defendant told the probation officer, Sarah Hathaway, that he had a drinking problem at the time the offense took place.

(*Id.* at 18-19.)

The court determined that Petitioner's alcohol consumption did not impair his ability to appreciate the wrongfulness of his conduct. (*Id.* at 19.) The court based this determination on Petitioner's conduct after the crime, including the fact that he concealed his identity by providing police officers with a false name and was discovered in his jail cell trying to wash blood from his clothes. (*Id.* at 19-20.)

The court also concluded that even if intoxication had constituted a statutory

mitigating factor, it would have been "insufficient to overcome any of one of the aggravating factors." (*Id.* at 20.) The court finally considered and rejected intoxication as a nonstatutory mitigating circumstance. (*Id.*)

On appeal, the Arizona Supreme Court affirmed the trial court's finding that intoxication did not constitute a statutory mitigating factor:

> We have frequently found that a defendant's claim of alcohol or drug impairment fails when there is evidence that the defendant took steps to avoid prosecution shortly after the murder, or when it appears that intoxication did not overwhelm the defendant's ability to control his physical behavior. Here, there is evidence that Rienhardt had consumed some alcohol on the night of the murders. There is no evidence providing even a rough estimate of his level of intoxication. But the evidence showed that Rienhardt not only took steps to avoid prosecution, but also transported his victim to a remote location, dislodged his stuck vehicle from a rock, summoned Christina George to his aid, and placed a phone call to the owner of the broken vehicle in order to apologize for the damage done. We agree with the trial court that this factor does not exist.

*Rienhardt*, 190 Ariz. at 591-92, 951 P.2d at 466-467 (citations omitted).

The court likewise found intoxication insufficient to call for leniency as a nonstatutory mitigating circumstance, explaining that "the only evidence of this kind found by the trial court in its independent review was that Rienhardt had alcohol on his breath at the time of his arrest, and that Rienhardt told his probation officer that he had a drinking problem at the time the murder took place." *Id.* at 592, 951 P.2d at 467.

Analysis

Petitioner argues that the state court's handling of intoxication as a mitigating circumstance violated *Lockett v. Ohio*, 438 U.S. 586 (1978). The Court disagrees.

In capital sentencing proceedings, the sentencer must not be precluded, whether by statute or case law or any other legal barrier, from considering relevant mitigation evidence. *See Lockett*, 438 U.S. 586. In *Lockett* and later in *Eddings v. Oklahoma*, 455 U.S. 104 (1982), the Supreme Court emphasized that under the Eighth and Fourteenth Amendments, the sentencer may not be precluded from considering and may not refuse to consider any constitutionally relevant mitigating evidence. *Eddings*, 455 U.S. at 113-14. However, while the sentencer must not be foreclosed from considering relevant mitigation, "it is free to assess

- 23 -

how much weight to assign such evidence." *Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir. 1998); *see Eddings*, 455 U.S. at 114-15 ("The sentencer . . . may determine the weight to be given the relevant mitigating evidence."); *see also State v. Newell*, 212 Ariz. 389, 405, 132 P.3d 833, 849 (2006) (explaining that mitigating evidence must be considered regardless of whether there is a "nexus" between the mitigating factor and the crime, but the lack of a causal connection may be considered in assessing the weight of the evidence).

On habeas review, the court does not evaluate the substance of each piece of evidence submitted as mitigation; rather, it reviews the state court record to ensure that the court allowed and considered all relevant mitigation. *See Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994) (holding that when it is evident that all mitigating evidence was considered, trial court is not required to discuss each piece of such evidence); *see also Lopez v. Schriro*, 491 F.3d 1029, 1037 (9th Cir. 2007), *cert. denied*, 128 S. Ct. 1227 (2008) (rejecting claim that the sentencing court failed to consider proffered mitigation where the court did not prevent the defendant from presenting any evidence in mitigation, did not affirmatively indicate there was any evidence it would not consider, and expressly stated it had considered all mitigation evidence proffered by the defendant).

The thrust of Petitioner's argument is that the trial court so erred in its interpretation of the evidence that Petitioner was intoxicated that it amounted to a "total disregard" of such evidence as mitigation. (Dkt. 38 at 54.) He cites the trial testimony of officers, including Officer Sueme, who encountered Petitioner after he was apprehended and observed that he smelled of alcohol and appeared to be intoxicated. (*See* RT 2/15/96 at 91-92, 108.) Officer Sueme further testified that she discontinued her initial discussion with Petitioner because of his intoxicated state. (RT 2/15/96 at 92.) Also, Andrea Benz, Nadeau's live-in girlfriend, testified that Petitioner had been drinking throughout the night.[3] (RT 2/14/96 at 103.)

This evidence does not refute the findings by the trial court and the Arizona Supreme Court, nor does it indicate that the trial court failed to consider all of the trial testimony as

---

[3]     Benz married Nadeau prior to Petitioner's trial.

indicated in its special verdict. To the contrary, the state courts did not disregard evidence of Petitioner's intoxication; instead, they explicitly acknowledged the testimony suggesting that Petitioner was intoxicated but balanced that information with other evidence concerning his course of conduct during and after the killing. This evidence indicated that Petitioner, notwithstanding his apparent intoxication, was capable of carrying out his stated plan to murder Ellis while subsequently taking steps to avoid detection and capture.

As the Ninth Circuit explained in *LaGrand v. Stewart*, 133 F.3d 1253, 1263 (9th Cir. 1998), rejecting the petitioner's argument that the state courts failed to consider the mitigation evidence "fully":

> federal courts do not review the imposition of the sentence *de novo*. Here, as in the state courts' finding of the existence of an aggravating factor, we must use the rational fact-finder test of *Lewis v. Jeffers*. That is, considering the aggravating and mitigating circumstances, could a rational fact-finder have imposed the death penalty?

Here, the record demonstrates that the trial court as well as the Arizona Supreme Court were able to and did consider evidence of Petitioner's intoxication as both a statutory and a non-statutory mitigation circumstance. *See Lopez*, 491 F.3d at 1037. The fact that the state courts accorded evidence of intoxication less weight than Petitioner believes it was entitled to does not amount to a violation of *Lockett. See Eddings*, 455 U.S. at 114-15. A rational factfinder could have reached the same conclusion as the state courts in their interpretation of the record and sentenced Petitioner to death notwithstanding the equivocal evidence in the record concerning his level of intoxication. Claim D is denied.

**Claim E**

Petitioner alleges that his rights under the Eighth and Fourteenth Amendments were violated because there was insufficient evidence to establish beyond a reasonable doubt either the cruelty or the heinous/depraved prong of the aggravating factor set forth in A.R.S. § 13-703(F)(6).

With respect to the state court's application of an aggravating factor, habeas review "is limited, at most, to determining whether the state court's finding was so arbitrary and capricious as to constitute an independent due process or Eighth Amendment violation."

*Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). In making that determination, the reviewing court must inquire "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found that the factor had been satisfied." *Id.* at 781 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

<u>Cruelty</u>

The trial court made the following findings with respect to the cruelty prong of the (F)(6) aggravating factor:

> The offense was especially cruel because Michael Ellis was made to suffer tremendous physical pain and endure severe mental anguish associated with his uncertainty as to his fate during the course of events which took place on or about September 5th of 1995.

> The Court finds beyond a reasonable doubt that Michael Ellis was alive and conscious, feared for his life and was uncertain as to his fate during at least some portion of the brutal beating, shooting and skull crushing which ultimately lead to his death. This finding is based upon testimony at trial; that it's clearly established that, number one, Michael Ellis was beaten in the apartment prior to being taken to Reddington Pass to be killed, as evidenced from the blood found at the apartment along with pieces of teeth.

> Number two, Michael Ellis feared for his life as shown by his panicked and fearful statement to Micki Roland [sic] where he told her he was bleeding, frantically pleaded for her to tell Mr. Breedlove to return to the apartment.

> Number three, Michael Ellis was in fear for his life when being beaten in the apartment when the defendant told Micki Roland wouldn't it be terrible if Michael Ellis fell down dead, that the defendant was going to take Mike for a hike. After hearing those statements, Michael Ellis was taken on a 20 minute drive to Reddington Pass. During the beating, the 20 minute drive, the walk to the spot in the desert where he was ultimately killed, Michael Ellis must have been in terror for his life.

> Number four, Michael Ellis had a defensive wound on his thumb and wrist which were caused by a shotgun blast, and show that Michael Ellis was standing when he was shot, and in vain held his hand up to try to protect himself.

> Number five, Michael Ellis was alive during the severe beating, was alive during part of the beating to his head since he had aspired blood into his lungs.

> Number six, after shooting Mr. Ellis, defendant Reinhardt and/or his accomplice Charles Nadeau caused large rocks weighing more than 90 pounds each to be dropped on Michael Ellis's head, crushing his skull so severely. The beating and the rocks caused such severe trauma to Mike Ellis's skull that Michael's brain matter was in the depth of his wound in his hair. The testimony of Christina George established that the defendant told her Michael Ellis was alive when the rocks were dropped on Mr. Ellis's head.

It's the finding of [t]he Court that Michael Ellis suffered tremendously both physically and mentally during the extended beating, shooting and crushing of his skull.  Michael Ellis must have been in incredible fear as he watched the defendant raise the shotgun to kill him and could only stand there and raise his hand helplessly and try to prevent from being killed.  The Court finds that there was a period of time when Michael Ellis was conscious during the killing, uncertain as to his fate, and was suffering physically.

(RT 5/20/96 at 9-12.)

On appeal, the Arizona Supreme Court explained that especial cruelty is established if the defendant "inflicts mental anguish or physical abuse before the victim's death. . . . Mental anguish includes a victim's uncertainty as to his ultimate fate." *Reinhardt*, 190 Ariz. at 590, 951 P.2d at 465.  The Arizona Supreme Court summarized the trial court's findings regarding cruelty and agreed that the victim suffered "tremendously" prior to death and experienced "extreme mental anguish with respect to his ultimate fate."  *Id.*  The court concluded that the victim suffered physically and mentally in that Petitioner "took Ellis hostage, threatened him, beat him savagely, and, as he had promised, took him on a drive to the desert and killed him."  *Id.*

Petitioner contends that the State did not prove especial cruelty because the evidence did not establish when or in what order the victim was wounded, and the victim could have been rendered unconscious or killed in the apartment.[4]  Petitioner argues that there are "innumerable" scenarios that could have occurred and that the "evidence supports equally the conclusion that the victim was, in fact, unconscious" when he was taken from the apartment.  (Dkt. 38 at 59-60.)

These arguments are unpersuasive.  First, at a minimum, Ellis was alive when he told Micki Rowlan that he was bleeding and implored her to get Breedlove to return to the apartment.  Likewise, he was alive when Petitioner threatened to hurt him and to take him

---

[4]    To the extent Petitioner relies on new evidence regarding the victim's consciousness, the Court does not consider it because a sufficiency of the evidence claim is necessarily limited to the state court record. *See Jackson v. Virginia*, 443 U.S. 307, 322 (1979) (this type of claim almost never necessitates an evidentiary hearing); *Bashor v. Risley*, 730 F.2d 1228, 1233 (9th Cir. 1984) ("Whether the evidence was sufficient . . . must be determined from a review of the evidence in the record in the *state* proceedings.").

- 27 -

to the desert and kill him. Second, Petitioner's arguments that the evidence could be interpreted to support an inference that the victim was rendered unconscious in the apartment and experienced no mental anguish fails on its face to meet the *Jeffers* standard because it acknowledges that a rational factfinder, viewing the evidence in the light most favorable to the State, could also have inferred, as the state courts did, that Ellis was conscious and suffering for a period of time. Although Petitioner offers varying interpretations of the trial evidence, he has not demonstrated that the state court fact finding was unreasonable. Therefore, this Court must defer to those findings. 28 U.S.C. § 2254(e)(1).

Petitioner also argues there is no evidence that he knew or should have known the victim would suffer. (Dkt. 38 at 64.) Petitioner contends the shooting may have been accidental or that co-defendant Nadeau may have been solely responsible for the attack. Therefore, Petitioner contends, he cannot have foreseen the manner of the victim's death. Petitioner's conviction for premeditated first degree murder disposes of this argument. To the extent he could have been convicted as an accomplice, he was an active participant who was present for the entirety of the crime. Arizona courts have upheld application of the cruelty prong to accomplices who did not actually kill the victim, but who were present and participated extensively in the underlying felonies when it was reasonably foreseeable that the victim would suffer. *See State v. Miles*, 186 Ariz. 10, 17, 918 P.2d 1028, 1035 (1996); *State v. Dickens*, 187 Ariz. 1, 24-25, 926 P.2d 468, 491-92 (1996); *State v. Lacy*, 187 Ariz. 340, 354, 929 P.2d 1288, 1302 (1996) (upholding cruelty finding against unarmed accomplice, but reducing sentence on other grounds). This is entirely distinguishable from *State v. Carlson*, on which Petitioner relies, in which the defendant hired someone to commit the murder and could not foresee that it would be committed in such a way as to cause suffering. 202 Ariz. 570, 583, 48 P.3d 1180, 1193 (2002) (noting that the court had not previously addressed foreseeability for a defendant that was not present for the murder). Here, it was Petitioner who threatened the victim and actively participated in carrying out the murder.

Viewing the evidence in the light most favorable to the prosecution, the Arizona

Supreme Court's conclusion that the victim suffered physically and mentally was not unreasonable.

Heinousness and Depravity

The trial court made the following findings regarding the heinous/depraved prong of the (F)(6) aggravating factor:

> The Court further finds the offense was committed in an especially heinous, depraved manner. This finding is based upon evidence beyond a reasonable doubt of the following: Number one, the defendant relished the act of killing. This finding is based on a letter the defendant wrote to an inmate at the Department of Corrections where he talked about some dude ripping him off, how that dude got his arm blown off, his beating was three hours and decided to take flying lessons off a mountain.

> The defendant also told Christina George when he met her at Reddington Pass that he shot Michael Ellis, that rocks were dropped on Michael's head to make sure Michael would die, and that he had brain matter on his pants. The letter, the defendant's statements and his actions demonstrate that the defendant showed no remorse, took pride in the killing of Michael Ellis.

> Number two, the defendant inflicted gratuitous violence on the victim. This finding is based upon evidence which clearly established that Mike Ellis was beaten severely for a period of time in the apartment, leaving a pool of blood, trail of blood and some pieces of teeth. Mike Ellis was beaten so severely with the butt of a shotgun that the stock broke off the shotgun. He was beaten so badly that his ear was almost severed. The defendant shot Michael Ellis from a distance of approximately four feet, ultimately shooting Michael's shoulder; that the gunshot first traveled through his thumb and wrist of Mr. Ellis's helplessly outstretched hand.

> The shotgun blast ultimately would have been fatal. But to complete the job, two 90 pound boulders were dropped on Mr. Ellis's head, crushing his skull severely.

> Number three, the crime was senseless. The evidence supports the finding that Michael Ellis was murdered over a methamphetamine deal gone bad. Michael Ellis acted as human collateral to ensure that the deal would go through. However, the killing of Michael was totally unnecessary for the defendant to accomplish the criminal objective of obtaining methamphetamine. That Michael Ellis should lose his life over a small amount of drugs or money renders the offense among the more senseless encountered by the Court.

> The victim Michael Ellis was helpless, barely able to resist at all. His role as human collateral meant that he was helplessly left in the apartment for Mr. Breedlove to return, had no control over his fate. Mr. Ellis was unarmed and completely at the mercy of the defendant and co-defendant when he was beaten at the apartment, driven to Reddington Pass, ultimately killed in the desert. The fact that all Mr. Ellis could do was raise his hand in vain to try to protect himself from the shotgun blast evidences how helpless Michael Ellis was to prevent his death.

The Court therefore finds beyond a reasonable doubt that this offense was especially cruel, both mentally and physically, and especially heinous and depraved.

(RT 5/20/96 at 12-14.)

With respect to heinousness and depravity, the Arizona Supreme Court addressed only the element of gratuitous violence and found that it alone was sufficient to support a finding of heinousness or depravity. *Reinhardt*, 190 Ariz. at 590, 951 P.2d at 465. The court set forth the state law definition of gratuitous violence as "additional violence beyond that necessary to kill." *Id.* The court went on to find "the severe beating of Ellis at the murder scene with the butt end of a shotgun, and the dropping of at least one boulder on Ellis's head qualifies as additional violence beyond that necessary to kill. The rage inflicted upon Ellis was shockingly evil." *Id.*

Petitioner does not contest the state courts' findings that gratuitous violence was inflicted on the victim. Rather, he contends that this finding must be individualized and the evidence indicates that Petitioner's co-defendant inflicted all of the violence on the victim. While the Arizona Supreme Court has upheld application of the depravity prong to a non-triggerman accomplice, *see State v. Tison*, 129 Ariz. 526, 545, 633 P.2d 335, 354 (1981) (finding active participation leading up to, and presence at, the homicides sufficient for heinous/depraved finding), in this case the evidence supports a finding that Petitioner actively participated in the killing of Ellis. Petitioner brought shotguns to the scene of the drug deal; his money was at issue; he threatened to harm and kill the victim; he had blood on his clothes; he was present throughout the crime; and the jury found him guilty of premeditated first degree murder. Additionally, the trial court made an explicit finding that Petitioner intended to and did kill the victim. (ROA 307-08; *see* RT 5/20/96 at 7-9.)

Viewing the evidence in the light most favorable to the prosecution, the Arizona Supreme Court's conclusion that Petitioner committed the offense in an especially heinous or depraved manner was not unreasonable.

Conclusion

Even if one prong of the (F)(6) factor were rebutted, Petitioner would not be entitled

to relief. Arizona law indicates that the finding of either especial cruelty or especial depravity alone will establish the (F)(6) factor and that the validity, or lack thereof, of the other prong does not affect the weight given to the circumstance. *See, e.g.*, *State v. Djerf*, 191 Ariz. 583, 597, 959 P.2d 1274, 1288 (1998) (upholding (F)(6) circumstance based on cruelty alone without considering validity of depravity finding); *State v. Towery*, 186 Ariz. 168, 188, 920 P.2d 290, 310 (1996) (same); *State v. Bolton*, 182 Ariz. 290, 312, 896 P.2d 830, 852 (1995) (same); *State v. Roscoe*, 184 Ariz. 484, 500-01, 910 P.2d 635, 651-52 (1996) (upholding (F)(6) factor based on cruelty after invalidating depravity finding).

Claim F is denied.

## **Claim G**

Petitioner alleges that the trial court erred in admitting hearsay testimony regarding a voice identification, in violation of his right to due process under the Fourteenth Amendment. (Dkt. 38 at 78.) Specifically, Petitioner contends that the trial court erred in allowing Micki Rowlan, James Breedlove's girlfriend, to testify about a telephone conversation she had with a male caller.

Background

Rowlan testified that in the early morning hours of September 5 she spoke on the telephone with a male whose voice she could not identify.[5] (RT 2/16/96 at 163.) According to Rowlan's testimony, the caller said, among other things, that he hated all women; that he wanted Breedlove to return with his money; that if Breedlove did not return, he would take Ellis on a hike in the desert, blindfold him, hang him over the edge of a cliff, take the blindfold off, and drop him; and that he would be coming over to Rowlan's home with a gun. (*Id.* at 163-64.)

On appeal, Petitioner claimed that admission of the testimony violated his due process

_____

[5] The trial court initially ruled that the statements were inadmissable hearsay, then reversed itself after reviewing cases submitted by the prosecution standing for the proposition that the identity of a speaker on a telephone may be established by circumstantial evidence. (RT 2/16/96 at 106.)

rights. (Opening Br. at 29-30.) The Arizona Supreme Court rejected the claim, relying on

state evidentiary rules:

> We have held that circumstantial evidence may be used to prove the authenticity of a sound recording. *State v. Lavers*, 168 Ariz. 376, 388 n. 8, 814 P.2d 333, 345 n. 8 (1991). Rule 901(b)(6), Ariz. R. Evid., provides that telephone conversations may be authenticated by evidence that a call was made to a person to whom a number is assigned and that "*circumstances, including self identification, show the person answering to be the one called.*" (emphasis added). Even where, as here, there is no evidence of the particular number of the person called, Rule 901(b)(4) allows a party to establish the identity of a speaker on a telephone by circumstantial evidence. . . .

> The following circumstantial evidence was presented at trial: (1) Theresa Martinez testified that while she was in the apartment with Rienhardt and Ellis, she heard Rienhardt say, over the telephone, that he hated all women; (2) James Breedlove testified that during his telephone conversation with Rienhardt, Rienhardt told him that he was going to take Ellis for a hike; (3) Andrea Nadeau, present in the apartment with Ellis and Rienhardt, testified that Rienhardt was agitated and yelling into the telephone on two occasions; (4) Breedlove was in possession of Rienhardt's $1,180; and (5) Rienhardt was in possession of two shotguns during the evening in question.

> This is adequate circumstantial evidence that the person with whom Micki Rowlan spoke was in fact Rienhardt. The caller threatened to take Ellis on a hike, just as Rienhardt had. The caller stated that he hated women, just as Rienhardt had. The caller stated that he had a gun, as only Rienhardt did. Finally, the caller stated that he wanted his money back, and the undisputed evidence was that only Rienhardt's money was at stake in the drug deal. The out of court statements Rowlan recounted are therefore not hearsay, but rather admissions by a party opponent under Rule 801(d)(2), Ariz. R. Evid.

*Rienhardt*, 190 Ariz. at 587-88, 951 P.2d at 462-63.

<u>Analysis</u>

"[I]t is not the province of a federal habeas court to reexamine state-court

determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). This

principle dictates that a habeas petitioner cannot obtain relief for an erroneous state law

evidentiary ruling unless it rises to the level of a deprivation of due process. *Id.* at 70.

Therefore, to prevail on this claim, Petitioner must show that Rowlan's testimony about the

phone call resulted in an error so pervasive that it denied him a fundamentally fair trial. *See*

*Chambers v. Mississippi*, 410 U.S. 284 (1973); *see Jeffries v. Blodgett,* 5 F.3d 1180, 1193

(9th Cir. 1993) ("Habeas relief is available for wrongly admitted evidence only when the

questioned evidence renders the trial so fundamentally unfair as to violate federal due

process.").

The admission of Rowlan's testimony about the phone conversation does not meet this standard. Although Petitioner contends that the man Rowlan spoke with was more likely co-defendant Nadeau, trial testimony from other witnesses clearly supported the State's theory that it was Petitioner who spoke with Rowlan. For example, Theresa Martinez, a friend of Petitioner who was involved in the drug transaction, testified that Petitioner told her that same night that he hated all women. (RT 2/15/96 at 22.) The man on the phone made the same statement to Rowlan. Breedlove testified that during their phone conversation Petitioner stated that he had a shotgun and threatened to hurt Ellis and take him out for a hike if Breedlove did not return with the drugs or the money. (RT 2/14/96 at 56-57.) The man on the phone with Rowlan made similar threats. In addition, the money referred to by the caller belonged to Petitioner, not to Nadeau, just as it was Petitioner, not Nadeau, who brought the guns to the apartment. Petitioner contends that he was calm that night and that it was Nadeau who, like the man who spoke with Rowlan, was angry and upset. However, Nadeau's girlfriend testified that Petitioner became "mad" while waiting for Breedlove's return, and she heard him yelling into the phone on more than one occasion. (RT 2/14/96 at 92-93.)

Given this corroborative circumstantial evidence identifying Petitioner as the person with whom Rowlan spoke, the identity of the speaker was sufficiently authenticated and Rowlan's testimony about the conversation was admissible as a nonhearsay admission by Petitioner. Therefore, admission of the testimony was not erroneous, nor did it render Petitioner's trial fundamentally unfair.[6] Finally, given the other evidence establishing Petitioner's role in the murder, Rowlan's testimony about the phone call did not have a

---

[6]     Petitioner cites *Stovall v. Denno*, 388 F.3d 293 (1967), for the proposition that his due process right to a "fair identification procedure" was violated. (Dkt. 38 at 82.) In *Stovall*, the Supreme Court noted that the "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Id.* at 302. *Stovall* has no bearing on the evidentiary issue raised in Claim G.

"substantial and injurious effect or influence in determining the jury's verdict" under *Brecht*, 507 U.S. at 637. Claim G is therefore denied.

**Claim H**

Petitioner alleges that his right to due process under the Fourteenth Amendment was violated by the state's failure to disclose letters written by Petitioner to witness Christina George. (Dkt. 38 at 83.)

Background

During her direct examination of George, the prosecutor asked about a group of letters that George and Petitioner had written to one another in jail. (RT 2/16/96 at 51-52.) The prosecutor elicited testimony concerning one letter in particular, written by Petitioner in November 1995, in which he asked George to change her story on his behalf. (*Id.* at 52-53.) George had not turned this letter over to the prosecution, but instead had given it to her own lawyer. (*Id.* at 54, 57.) During redirect examination, the prosecutor informed the court that George's lawyer was in the hallway outside the courtroom. (*Id.* at 89-90.) The court instructed the prosecutor to obtain the letter from the lawyer, but the lawyer did not have it with him. (*Id.* at 91.) He gave the letter to the prosecutor a few days later. (RT 2/21/96 at 5.)

Defense counsel moved to exclude the letter under Rule 15 of the Arizona Rules of Criminal Procedure; alternatively, he sought a recess and an opportunity to depose George's lawyer along with disclosure of all undisclosed letters in the prosecution's possession. (*Id.* at 4.) The court precluded the State from using the letter in its case in chief, but ruled that the letter would be admitted if the defense presented any alibi evidence or any other evidence that contradicted the letter's contents. (*Id.* at 44.) After both sides had rested, defense counsel told the court that he and Petitioner had discussed the matter, and that the potential admission of the letter played a role in Petitioner's decision not to testify or call two alibi witnesses. (*Id.* at 43-44.) No recess was taken. The letter was never admitted into evidence.

The Arizona Supreme Court rejected Petitioner's claim that nondisclosure of the letters violated his due process rights. *Rienhardt*, 190 Ariz. at 585-86, 951 P.2d at 460-61.

The court held that no discovery violation occurred because the letters were not in the prosecutor's possession and that Petitioner was not prejudiced by the lack of disclosure. *Id.* With respect to prejudice, the court explained:

> The underlying principle of our disclosure rules is the avoidance of undue delay or surprise. The choice of sanction is within the discretion of the trial court, and will not be reversed on appeal absent a showing of prejudice. For error to be harmless, and therefore not prejudicial, this court must be able to say beyond a reasonable doubt that the error did not contribute to or affect the verdict.

> Rienhardt subjected George to withering cross-examination. Rienhardt was able to clearly demonstrate that George's story had changed after her plea agreement. Rienhardt's ability to effectively cross-examine George was not hampered. Furthermore, the letters had all been written by Rienhardt himself, and it is difficult to see (1) how Rienhardt's statements would be useful in attacking George's credibility, and (2) how Rienhardt could be surprised at trial by his own letters. While Rienhardt argues that it is impossible for him to provide this court with a specific account of the prejudice he suffered because the letters are not a part of the record, it is Rienhardt himself who wrote the letters, and he should therefore be able to present at least a single example of the prejudice he suffered. He has failed to do so.

> Finally, and most importantly, any error would have been harmless beyond a reasonable doubt. Rienhardt's conviction is supported by overwhelming evidence of his guilt. He was caught almost literally "red-handed" by an alert police officer shortly after the murder. Further cross-examination of Christina George with respect to his own letters could not have altered the jury's verdict.

*Id.* at 586, 951 P.2d at 461 (citations omitted).

<u>Analysis</u>

Under *Brady v. Maryland*, 373 U.S. 83 (1963), the government has a constitutional obligation to disclose material, favorable information to the defense. The government violates its obligation where (1) the evidence in question was favorable to the accused, (2) the government willfully or inadvertently suppressed the evidence, and (3) prejudice resulted from the suppression (i.e., the evidence was "material"). *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). Evidence is material for *Brady* purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)); *see Banks*, 540 U.S. at 699; *Strickler*, 527 U.S. at 280; *Giglio v.*

*United States*, 405 U.S. 150, 154 (1972). The duty to disclose includes impeachment as well as exculpatory material. *Bagley*, 473 U.S. at 676.

Petitioner cannot establish a *Brady* violation because the State did not "suppress" the letters. The existence and content of the letters were not "unknown to the defense," *United States v. Augurs*, 427 U.S. 97, 103 (1976), given that Petitioner himself was their author. No *Brady* violation occurs "where a defendant knew or should have known the essential facts permitting him to take advantage of the information, or where the evidence is available . . . from another source because in such cases there is really nothing for the government to disclose." *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998) (interior quotations omitted); *see United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995) ("evidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence"); *Lawrence v. Lensing*, 42 F.3d 255, 257-58 (5th Cir. 1994) ("a defendant cannot prevail on a claim that evidence was suppressed if he either knew or should have known about the essential facts permitting him to take advantage of any exculpatory evidence"); *United States v. Dupuy*, 760 F.2d 1492, 1502 n.5 (9th Cir. 1985) ("Where defendants had within their knowledge the information by which they could have ascertained the supposed *Brady* material, there is no suppression by the government."). If Petitioner's letters to George contained any exculpatory or impeachment information, he was in a position to take advantage of that information.

Petitioner has also failed to show that the letters were material under *Brady*. As the Arizona Supreme Court noted, Petitioner does not offer any specific allegation that access to the letters would in any reasonable likelihood have affected the verdict. *Giglio*, 405 U.S. at 154; *see Augurs*, 427 U.S. at 109-10 ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense.").

Claim H is denied.

**<u>Claim N</u>**

Petitioner alleges that his rights to due process and to be free of cruel and unusual punishment under the Eighth and Fourteenth Amendments were violated because his participation in the crimes did not satisfy *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987).

Supreme Court precedent holds that a felony-murder defendant can be sentenced to death only if he actually killed, attempted to kill, or intended to kill, or if he was a major participant in the underlying felony and acted with reckless indifference to human life. *Tison v*, 481 U.S. at 157-58; *Enmund*, 458 U.S. at 797. In light of these rulings, the trial court made the following findings at sentencing:

> THE COURT NOW FINDS that on or about the 5th of September, 1995, the defendant Charles Rienhardt took the victim, Michael Ellis, to a desert area near Reddington Pass in Tucson, that pursuant to cases in Edmund-Tison [sic],

> THE COURT FURTHER FINDS beyond a reasonable doubt that the defendant had planned and intended to take Michael Ellis to this remote area in the desert for the purpose of killing him. This is as established by the evidence at trial, including that the defendant made threats about killing the victim.

> The defendant also confessed to shooting Michael Ellis and being present when rocks were dropped on Mr. Ellis' skull, and later wrote a letter to an inmate at the Department of Corrections about the killing. The defendant took steps, including attempting to burn the car used to take Michael Ellis to Reddington Pass, to prevent the murder being detected. Therefore,

> THE COURT FURTHER FINDS beyond a reasonable doubt that the defendant killed and intended to kill Michael Ellis.

> THE COURT FURTHER FINDS beyond a reasonable doubt that the defendant was personally involved in the killing of Michael Ellis in a major and significant fashion, and the defendant's actions at the very least demonstrate reckless indifference for human life.

> THE COURT FURTHER FINDS beyond a reasonable doubt that the defendant, Charles Rienhardt, severely beat Mr. Ellis and shot him with a shotgun, causing a wound to the shoulder. After shooting Mr. Ellis with a shotgun, the defendant was present when large rocks were dropped on Mr. Ellis' head. Mr. Ellis had innumerable skull fractures and a broken rib. His ear was almost torn off from the severe beating. The victim's skull fractures were so numerous that his head was deformable and palpable and could be molded into any shape. The evidence further established that the gunshot wound alone would have been fatal given time.

(ROA 307-08; *see* RT 5/20/96 at 7-9.)

On direct appeal, the Arizona Supreme Court first held that Petitioner's *Enmund-Tison* challenge was meritless because the jury unanimously found Petitioner guilty of premeditated first degree murder. *Rienhardt*, 190 Ariz. at 589, 951 P.2d at 464. The court also held that the trial court's findings – that Petitioner was a major participant in the crime and demonstrated reckless indifference to human life – were "plainly supported by the evidence." *Id.*

A state court's findings regarding *Enmund-Tison* are factual determinations which are presumed correct and which Petitioner "bear[s] the heavy burden of overcoming." *Cabana v. Bullock*, 474 U.S. 376, 388 (1986), *overruled on other grounds by Pope v. Illinois*, 481 U.S. 497 (1987); *see Paradis v. Arave*, 20 F.3d 950, 959 (9th Cir. 1994). Additionally, to the extent Petitioner contends that only a jury can make the requisite mental state finding, the Supreme Court has held that findings pursuant to *Enmund* may be made by the trial or appellate court. *Cabana*, 474 U.S. at 387.

*Enmund-Tison* findings are only required for felony-murder defendants, because their culpability and state of mind as to the murder may be in question. *See Enmund*, 458 U.S. at 798-99, 801 (finding that culpability only as to a felony with no intent to cause death not sufficient for death sentence, and the death penalty can operate as a deterrent with respect to premeditated murder but not for those who have no intent to, or do not kill). As explained by the Arizona Supreme Court, because Petitioner was found guilty of premeditated first degree murder, *Enmund-Tison* is necessarily satisfied. Petitioner's suggestion that he cannot be subjected to the death penalty because the jury could have found him guilty based only on accomplice liability is unfounded. Although his conviction could have been based on accomplice liability, it was as an accomplice to premeditated murder, which requires "intent to promote or facilitate the commission" of that crime. (ROA 201.) This is not a case such as *Enmund*, in which the defendant was convicted only as an accomplice to the felony and therefore only as an accomplice to felony murder. 458 U.S. at 794, 797.

Additionally, this Court must defer to the fact findings of the trial court that Petitioner intended to and did kill the victim. Although Petitioner contests the trial evidence, he does not overcome those findings by clear and convincing evidence as required by 28 U.S.C. § 2254(e)(1). Thus, *Enmund* and *Tison* were satisfied and the Arizona Supreme Court's finding on that point was not objectively unreasonable. Claim N is denied.

**Claim O**

Petitioner argues that the premeditation instruction given to the jury violated his right to due process under the Fourteenth Amendment. Specifically, he alleges that the instruction was unconstitutional because it relieved the State of its burden to prove the actual reflection necessary for first degree murder, thereby allowing a conviction based merely on the passage of time.

The relevant jury instruction stated:

Premeditation means:

1.    That a person either intends or knows that his conduct will result in the death of another person; and

2.    His intention or knowledge exists before the killing long enough to permit reflection. An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion. But, no appreciable length of time must elapse between the formation of the intent to kill and the act; they may be as instantaneous as successive thoughts of the mind.

(ROA 192; *see* RT 2/22/96 at 59.) Petitioner raised this claim in his PCR petition (ROA-PCR 61 at 16-17), and the court summarily denied the claim on the merits (PR Doc. 9).

Contrary to Petitioner's argument, the Arizona Supreme Court has not found an identical instruction unconstitutional; rather, it found erroneous a premeditation instruction that stated "actual reflection is not required." *State v. Thompson*, 204 Ariz. 471, 480, 65 P.3d 420, 429 (2003). Although the court "discourage[d]" the use of the term "instantaneous as successive thoughts of the mind," *id.* at 479, 65 P.3d at 428, the use of an "undesirable, erroneous, or even 'universally condemned'" instruction does not equate to a constitutional violation, *Cupp v. Naughten*, 414 U.S. 141, 146 (1973). Furthermore, the Arizona Supreme

Court previously upheld a virtually indistinguishable instruction. *See State v. Guerra*, 161 Ariz. 289, 293-94, 778 P.2d 1185, 1189-90 (1989).

When a particular jury instruction is challenged, the question is whether the erroneous instruction "so infected the entire trial that the resulting conviction violates due process." *Cupp*, 414 U.S. at 147. This Court must assess "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Estelle v. McGuire*, 502 U.S. at 72 (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)).

Due process requires that the state prove every element of a crime beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970); *Sandstrom v. Montana*, 442 U.S. 510, 520-21 (1979). Petitioner alleges that the premeditation instruction relieved the prosecution of the burden of proving the actual reflection required for premeditation beyond a reasonable doubt.

The Court finds that the challenged jury instruction on its face does not permit a finding of premeditation based solely on the passage of time. First, the instruction explicitly distinguishes intent as existing before, and as something distinct from, reflection. Second, the exclusion of acts that are the "instant effect of a sudden quarrel or heat of passion" from a finding of premeditation clarifies that impulsive acts do not satisfy the premeditation requirement. *State v. Ramirez*, 190 Ariz. 65, 67-68, 945 P.2d 376, 378-79 (Ct. App. 1997), upon which Petitioner relies, is distinguishable because the instruction at issue in that case did not include the "sudden quarrel or heat of passion" language used at Petitioner's trial; the court in *Ramirez* found that such language would have balanced the remainder of the instruction by making clear that the act cannot be both impulsive and premeditated. Finally, nothing in the prosecutor's closing argument (RT 2/22/96 at 5-26, 43-54) or the court's instructions inaccurately suggested that the State needed only to prove the time element of reflection in lieu of actual premeditation.

The facts of this case are sufficient to support a finding of premeditation. As summarized by the Arizona Supreme Court, Petitioner threatened to take Ellis to the desert

and drop him over a cliff if Breedlove did not return with the drugs Petitioner was trying to buy. In a subsequent call, Petitioner threatened to hurt Ellis further for every 10 minute delay in Breedlove's return. After Petitioner and Ellis left the apartment, witnesses found pieces of teeth on the floor and blood inside and trailing out from the apartment. Ellis's body was found off a dirt road heading into the mountains. Petitioner told a witness that the Ellis did not die from the shotgun wounds and they had to drop a rock on his head to kill him. The evidence showed that Ellis had been beaten and shot, and one or two large rocks had been dropped on his head. *Rienhardt*, 190 Ariz. at 582-83, 951 P.2d at 457-58. Petitioner threatened to kill Ellis in the desert and carried out that threat, using multiple means of attack to ensure his death. The crime occurred over an extended period of time. Based on these circumstances, the Court finds there is not a reasonable likelihood that the jury applied the premeditation instruction in violation of due process by lessening the prosecution's burden to prove premeditation beyond a reasonable doubt.

Finally, even if the jury erroneously found premeditation, the error is harmless because the jury also unanimously found Petitioner guilty of felony murder. (ROA 247.) Therefore, Petitioner's conviction for first degree murder would stand, and any error did not have a substantial and injurious effect on the verdict. *See Brecht*, 507 U.S. at 637-38 (1993); *Neder v. United States*, 527 U.S. 1, 15 (1999) (applying harmless-error analysis to omission from jury instructions of an element of the offense). Claim O is denied.

## CERTIFICATE OF APPEALABILITY

In the event Petitioner appeals from this Court's judgment, and in the interests of conserving scarce resources that might be consumed drafting and reviewing a request for a certificate of appealability (COA) to this Court, the Court on its own initiative has evaluated the claims within the petition for suitability for the issuance of a certificate of appealability. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a COA or state the reasons why such a certificate should not issue. Pursuant to 28 U.S.C.

§ 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). The Court finds that reasonable jurists could debate its resolution of Claim A(6) and Claims B(1), (3), and (7). A COA is denied with respect to the remaining claims.

Accordingly,

**IT IS ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus (Dkt. 38) is **DENIED**. The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that the stay of execution entered on June 6, 2003 (Dkt. 3), is **VACATED**.

**IT IS FURTHER ORDERED GRANTING** a Certificate of Appealability as to the following issues:

Whether Claim A(6) – alleging that trial counsel performed ineffectively by failing to request a mistrial or obtain non-conflicted counsel for Petitioner after counsel became a witness – is without merit.

Whether Claims B(1), (3), and (7) – alleging that trial counsel performed ineffectively at sentencing – are without merit.

**IT IS FURTHER ORDERED** that the Clerk of Court forward a copy of this Order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

DATED this 3rd day of November, 2009.

David C. Bury
United States District Judge