1    **WO**

2

3

4

5    **IN THE UNITED STATES DISTRICT COURT**

6    **FOR THE DISTRICT OF ARIZONA**

7

8

9    Charles Bradley Rienhardt,                    No. CV-03-0290-TUC-DCB

10                          Petitioner,            <u>DEATH PENALTY CASE</u>

11   v.                                            **ORDER**

12   David Shinn, et al.,

13                          Respondents.

14

15          Petitioner Charles Bradley Rienhardt is an Arizona death row inmate. The Court

16   denied his amended petition for writ of habeas corpus on November 4, 2009. (Doc. 126.)

17          On December 1, 2014, the Court of Appeals for the Ninth Circuit granted

18   Rienhardt's request for a limited remand, ordering this Court to reconsider more than three

19   dozen of his habeas claims. (Doc. 145.) Specifically, the Court is directed to reconsider, in

20   light of *Martinez v. Ryan*, 566 U.S. 1 (2012), the ineffective assistance of trial counsel

21   allegations in Claims A(1)–(5), A(7)–(16), B(2), B(4)–(6), B(8), and C(2); to consider

22   whether reconsideration is warranted, in light of *Dickens v. Ryan*, 740 F.3d 1302 (9th Cir.

23   2014), as to Claims A(6), B(1), B(3), (B)(7), and C(1), also alleging ineffective assistance

24   of trial counsel; and to "consider in light of intervening law whether expansion of the record

25   and leave to amend the petition are warranted as to [Rienhardt's] recently exhausted

26   claims," which allege trial court error and other violations. (*Id.* at 1–2.)

27          The issues have been fully briefed. (Docs. 218, 259, 273.)

28   **I.    BACKGROUND**

1    In 1996, a Pima County jury convicted Rienhardt of first-degree murder among
2    other charges and he was sentenced to death. The following summary of the facts
3    surrounding the crimes is taken from the opinion of the Arizona Supreme Court affirming
4    Rienhardt's convictions and sentences, *State v. Rienhardt*, 190 Ariz. 579, 582–83, 951 P.2d
5    454, 457–58 (1997), and from this Court's review of the record.

6    On the night of September 4, 1995, Rienhardt sought to purchase a large quantity of
7    methamphetamine in Tucson. He arranged to meet two men, Michael Ellis and James
8    Breedlove, at the apartment of co-defendant Charles Nadeau. Rienhardt gave Breedlove
9    $1,180 with the understanding that Breedlove would return with the drugs. To secure
10   Breedlove's return, the parties agreed that Ellis would remain in the apartment with
11   Rienhardt.

12   Breedlove never returned. As the evening progressed, Rienhardt became
13   increasingly agitated. He threatened Ellis and insisted that Ellis locate Breedlove by
14   telephone. At one point, Rienhardt called Breedlove's girlfriend, Micki Rowlan, and told
15   her that if Breedlove did not return, he would take Ellis to the desert and drop him off a
16   cliff. Nadeau arrived at the apartment. For reasons that are unclear, Nadeau struck Ellis
17   across the face hard enough to make him bleed. Eventually, Breedlove phoned the
18   apartment stating that the deal was taking longer than expected. Rienhardt threatened to
19   inflict further injury on Ellis for every ten minutes Breedlove failed to return.

20   Rienhardt and Nadeau eventually left the apartment with Ellis. Two witnesses who
21   arrived at the apartment later discovered a trail of blood leading from the apartment, blood
22   on the living room carpet and on a chair where Ellis had been seated, and pieces of teeth
23   on the floor. They also discovered a shotgun on a couch near the chair.

24   Later that evening, Rienhardt contacted his girlfriend Christina George. He told her
25   there was a dead body in the car he was driving and asked her to meet him at a Circle K
26   near Reddington Pass. George arrived at the meeting place in a stolen Toyota and after
27   waiting some time for Rienhardt's arrival drove up the Pass where she encountered
28   Rienhardt and Nadeau on foot. Rienhardt told her that their vehicle had gotten stuck on

some rocks. Rienhardt also spoke about the victim, saying he did not die from his shotgun wounds so they had dropped a rock on his head. Rienhardt added, "I have brains all over my pants."

The group dislodged the vehicle, a white Buick, and drove both cars to a nearby shopping plaza.[1] They decided to burn the Buick. As they were preparing to do so, a sheriff's deputy approached them. The three jumped into the Toyota and a chase ensued. The car broke down and after a foot pursuit Nadeau was arrested. George and Rienhardt were arrested later that day.

Police found blood smeared on the driver's side of the Buick, a bloody towel inside the vehicle, and a large blood stain in the back seat. They also found Ellis's wallet and a shotgun with a missing stock.

The next night, Nadeau led police to Ellis's body. Ellis had been severely beaten about the head and torso and had suffered shotgun wounds. One or two large rocks had been dropped on his head. Pieces of a shotgun stock were found around a pool of blood near the body. The pieces matched the make and model of the shotgun found in the abandoned Buick.

Nadeau's trial was severed from Rienhardt's. George was charged with attempted arson and hindering prosecution. She also faced unrelated felony charges. George entered into a plea agreement in return for testifying against Rienhardt.

The jury found Rienhardt guilty of kidnapping, attempted transfer of a dangerous drug, attempted arson, and first-degree murder. The trial court sentenced him to death on the first-degree murder count.[2] The court found three aggravating factors: that Rienhardt

---

[1] The car was owned by Rienhardt's ex-girlfriend, Anjanette Ortiz.

[2] At the time of Reinhardt's trial, Arizona law required trial judges to make all factual findings relevant to the death penalty and to determine the sentence. Following the United States Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002), which held that a jury must determine the existence of facts rendering a defendant eligible for the death penalty, Arizona's sentencing scheme was amended to provide for jury determination of eligibility factors, mitigating circumstances, and sentence.

murdered Ellis in an especially heinous, cruel or depraved manner under A.R.S. § 13-703(F)(6); that he had previously been convicted of a serious offense, § 13-703(F)(2); and that he committed the murder for pecuniary gain, § 13-703(F)(5).[3] Rienhardt waived the presentation of mitigating evidence and the court, after conducting its own review, found no mitigating circumstances sufficiently substantial to call for leniency. On direct appeal, the Arizona Supreme Court struck the pecuniary gain aggravating factor, reweighed the remaining aggravators and the mitigating evidence, and affirmed the death sentence. *Rienhardt*, 190 Ariz. at 591, 593, 951 P.2d at 466, 468.

After unsuccessfully pursuing postconviction relief ("PCR") in state court,[4] Rienhardt initiated habeas proceedings in this Court, filing a petition for writ of habeas corpus in 2003 and an amended petition in 2004. (Docs. 1, 38.) He then filed a Notice of Unexhausted Claims. (Doc. 42.)

On September 29, 2004, while the amended habeas petition was pending, Rienhardt filed a second PCR petition, which the state court denied on March 30, 2006, finding the claims precluded under Arizona Rule of Criminal Procedure 32.2(a)(3) because they could have been raised on appeal or during the first PCR proceedings. (Doc. 259-2, Ex. E; Doc. 259-3, Ex. F, ME 3/30/96.) On November 28, 2006, the Arizona Supreme Court summarily denied review.

On September 28, 2005, this Court issued a procedural ruling on Rienhardt's amended habeas petition. (Doc. 80.) The Court dismissed Claims A(1)–(5), A(7)–(16), B(2), B(4)–(6), B(8), C(2), H (in part), I, L, P, and Q–U based on a procedural bar; dismissed the Fifth Amendment aspects of every claim and the Eighth Amendment aspects

---

[3] Section 13-703 has been renumbered as § 13-751. The Court uses the version in place at the time of the murder.

[4] Pima County Superior Court Judge Michael D. Alfred presided over Reinhardt's trial and sentencing and the subsequent PCR proceedings.

of Claims A, C, and G as not cognizable; denied Claims F, J, K, M, and N (in part) on the merits; and denied Rienhardt's request for evidentiary development. (*Id.*)

On October 18, 2005, Rienhardt moved for leave to file a second amended habeas petition, seeking to add eighteen claims. (Docs. 88, 89.) The Court denied the motion on April 26, 2006, concluding that sixteen of the proposed claims were unexhausted and likely procedurally defaulted because they had not yet been presented to the Arizona Supreme Court and two claims were procedurally defaulted because the PCR court had previously found them precluded. (Doc. 96.) Therefore, amending the habeas petition to add those claims would have been futile. (*Id.*) The Court also concluded that Rienhardt had unduly delayed bringing his new claims and that Respondents would suffer prejudice if amendment were permitted. (*Id.*) On November 29, 2006, the Arizona Supreme Court denied Rienhardt's petition for review of the denial of his second PCR petition. (Doc. 251-1, Ex. F.)

On November 4, 2009, this Court denied relief on the merits of the remaining claims in Rienhardt's amended habeas petition—Claims A(6), B(1), B(3), B(7), C(1), D, E, G, H, N, and O—and denied the amended petition. (Doc. 126.) Rienhardt filed his notice of appeal to the Ninth Circuit on January 1, 2010. (Doc. 134.)

The Ninth Circuit issued its limited remand order in December 2014, and this Court set a briefing schedule. (Docs. 145, 147.) Rienhardt filed his opening brief on October 15, 2014. (Doc. 218.)

On December 4, 2015, Rienhardt filed a motion for reconsideration of the Court's 2006 order denying his motion for leave to file an amended petition. (Doc. 238.) The Court denied the motion for reconsideration as outside the scope of the limited remand and alternatively as untimely and meritless. (Doc. 270.)

## II. APPLICABLE LAW

### A. *Martinez v. Ryan*

Federal review is generally unavailable for a claim that has been procedurally defaulted. In such situations, review is barred unless the petitioner can demonstrate cause

and prejudice or a fundamental miscarriage of justice that excuses the default. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). *Coleman* held that ineffective assistance of counsel in post-conviction proceedings cannot establish cause for a claim's procedural default. *Id.* In *Martinez*, however, the Supreme Court announced a new, "narrow exception" to that rule. The Court explained that:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

566 U.S. at 17; *see also Trevino v. Thaler*, 569 U.S. 413, 418 (2013).

Accordingly, under *Martinez* an Arizona habeas petitioner may establish cause and prejudice for the procedural default of a claim of ineffective assistance of trial counsel by demonstrating that (1) PCR counsel was ineffective and (2) the underlying ineffective assistance claim has some merit. *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (citing *Martinez*, 566 U.S. at 14); *Atwood v. Ryan*, 870 F.3d 1033, 1059–60 (9th Cir. 2017).

To establish "cause" under *Martinez*, a petitioner must demonstrate that PCR counsel was ineffective according to the standard set out *Strickland v. Washington*, 466 U.S. 668 (1984). *Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014), *overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798, 819 (9th Cir. 2015). *Strickland* requires a demonstration "that both (a) post-conviction counsel's performance was deficient, and (b) there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different." *Clabourne*, 745 F.3d at 377 (citation omitted).

To establish "prejudice" under the second prong of *Martinez*'s "cause and prejudice" analysis, a petitioner must demonstrate that his underlying ineffective assistance of trial counsel claim is "substantial." *Id.* In *Martinez* the Supreme Court defined a "substantial" claim as a claim that "has some merit," noting that the procedural default of a claim will not be excused if the ineffective assistance of counsel claim "is insubstantial,

i.e., it does not have any merit or . . . it is wholly without factual support." *Martinez*, 566 U.S. at 14–16.

The *Martinez* Court stated that the standard for finding a claim "substantial" is analogous to the standard for issuing a certificate of appealability. *Id.* at 14; *see Detrich v. Ryan*, 740 F.3d 1237, 1245 (9th Cir. 2013). Under that standard, a claim is "substantial" if "reasonable jurists could debate whether the issue should have been resolved in a different manner or that the claim was adequate to deserve encouragement." *Id.* (citing *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003)).

A finding of "prejudice" for purposes of the "cause and prejudice" analysis, which requires only a showing that the underlying claim of ineffective assistance of trial counsel is substantial, "does not diminish the requirement . . . that petitioner satisfy the 'prejudice' prong under *Strickland* in establishing ineffective assistance by post-conviction counsel." *Clabourne*, 745 F.3d at 377.

The Ninth Circuit has offered guidance in assessing whether "cause" exists under *Martinez*. In *Atwood*, for example, the court explained:

> In evaluating whether the failure to raise a substantial claim of ineffective assistance of trial counsel in state court resulted from ineffective assistance of state habeas counsel under *Strickland*, we must evaluate the strength of the prisoner's underlying ineffective assistance of trial counsel claim. If the ineffective assistance of trial counsel claim lacks merit, then the state habeas counsel would not have been deficient for failing to raise it. Further, any deficient performance by state habeas counsel would not have been prejudicial, because there would not be a reasonable probability that the result of the post-conviction proceedings would have been different if the meritless claim had been raised.

870 F.3d at 1059–60; *see Hooper v. Shinn*, 985 F.3d 594, 627 (9th Cir. 2021); *see also Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012) ("PCR counsel would not be ineffective for failure to raise an ineffective assistance of counsel claim with respect to trial counsel who was not constitutionally ineffective.").

In *Runningeagle v. Ryan*, 825 F.3d 970 (9th Cir. 2016), the court again addressed the standard for finding PCR counsel's performance prejudicial. The court explained that under *Martinez*:

> Although the prejudice at issue is that in PCR proceedings, this is a recursive standard. It requires the reviewing court to assess trial counsel's as well as PCR counsel's performance. This is because, for us to find a reasonable probability that PCR counsel prejudiced a petitioner by failing to raise a trial-level IAC [ineffective assistance of counsel] claim, we must also find a reasonable probability that the trial-level IAC claim would have succeeded had it been raised.

*Id.* at 982; *see Murray (Roger) v. Schriro*, 882 F.3d 778, 816 (9th Cir. 2018).

The *Martinez* exception to procedural default applies only to claims of ineffective assistance of trial counsel. It has not been expanded to other types of claims. *See Hurles v. Ryan*, 914 F.3d 1236, 1238 n.3 (9th Cir. 2019); *Martinez (Ernesto) v. Ryan*, 926 F.3d 1215, 1225 (9th Cir. 2019) ("[I]neffective assistance of PCR counsel can constitute cause only to overcome procedurally defaulted claims of ineffective assistance of trial counsel."); *Pizzuto v. Ramirez*, 783 F.3d 1171, 1177 (9th Cir. 2015) (explaining that the Ninth Circuit has "not allowed petitioners to substantially expand the scope of *Martinez* beyond the circumstances present in *Martinez*")[5]; *Hunton v. Sinclair*, 732 F.3d 1124, 1126–27 (9th Cir. 2013) (noting that only the Supreme Court can expand the application of *Martinez* to other areas); *see Davila v. Davis*, 137 S. Ct. 2058, 2062–63, 2065–66 (2017) (holding that the *Martinez* exception does not apply to claims of ineffective assistance of appellate counsel).

**B.     *Dickens v. Ryan***

While *Martinez* addressed claims that were not raised in state court, *Dickens* considered claims that were raised but later received additional evidentiary support. In *Dickens,* the Ninth Circuit held that factual allegations not presented to a state court may render such a claim unexhausted, and thereby subject to analysis under *Martinez*, if the

---

[5] In *Pizzuto* the Ninth Circuit held that claims of conflict of interest "go to the same injury as standard ineffective assistance claims" and therefore are subject to analysis under *Martinez*. 783 F.3d at 1178.

1  new allegations "fundamentally alter" the claim or place the case in a significantly different
2  and stronger evidentiary posture than it was when the state court considered it. 740 F.3d at
3  1318–19 (citing *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986); *Aiken v. Spalding*, 841 F.2d
4  881, 883 (9th Cir. 1988); and *Nevius v. Sumner*, 852 F.2d 463, 470 (9th Cir. 1988)).

5      In state court, Dickens had argued that sentencing counsel provided ineffective
6  assistance by failing to direct the work of a court-appointed psychologist and failing to
7  adequately investigate Dickens's background for evidence of impairment. *Dickens v. Ryan*,
8  688 F.3d 1054, 1068 (9th Cir. 2012), *op. withdrawn*, 740 F.3d 1302 (9th Cir. 2014), *on
9  reh'g en banc* 740 F.2d 1302 (9th Cir. 2014). In his federal habeas petition, by contrast,
10 Dickens included extensive factual allegations suggesting that he suffered from Fetal
11 Alcohol Syndrome (FAS) and organic brain damage. *Id.* at 1068–69. The Ninth Circuit
12 found that "the new allegations and evidence Dickens presented to the federal district court
13 fundamentally altered Dickens's previously exhausted IAC claim." *Id.* at 1319.

14     The *Dickens* court then addressed the effect of *Cullen v. Pinholster*, 563 U.S. 170
15 (2011), on fundamentally-altered claims. In *Pinholster* the Supreme Court held that where
16 the state court has denied a petitioner's claim on the merits under 28 U.S.C. § 2254(d),
17 review by the federal court "is limited to the record that was before the state court that
18 adjudicated the claim."[6] *Id.* at 180. According to *Dickens*, however, a fundamentally-
19 altered claim is not subject to these strictures because it was never adjudicated on the
20 merits. 740 F.3d at 1320. The court thus "reject[ed] any argument that *Pinholster* bars the
21 federal district court's ability to consider Dickens's new IAC claim." *Id.* The court
22 concluded that "[w]hile the Arizona courts did previously adjudicate a similar IAC claim,
23 the new allegations and evidence 'fundamentally altered' that claim." *Id.*

24     Because *Martinez* applies to the new, procedurally defaulted claim, a district court
25 may consider new evidence in determining whether the petitioner can show that the claim's

26
27 _____
28     [6] This case is governed by the Antiterrorism and Effective Death Penalty Act of
1996, 28 U.S.C. § 2254 ("AEDPA").

default was excused. *Id.* at 1321; *see Detrich*, 740 F.3d at 1246–47 ("*Pinholster*'s predicates are absent in the context of a procedurally defaulted claim in a *Martinez* case.").

In *Dickens,* the court also rejected the argument that 28 U.S.C. § 2254(e)(2) barred evidentiary development in federal court, explaining that a petitioner seeking to show "cause" under *Martinez* is not asserting a "claim."[7] 740 F.3d at 1321. ("A federal court's determination of whether a habeas petitioner has demonstrated cause and prejudice . . . is not the same as a hearing on a constitutional claim for habeas relief."); *see Woods v. Sinclair*, 764 F.3d 1109, 1138 n.16 (9th Cir. 2014) (explaining that neither *Pinholster* nor § 2254(e)(2) "categorically bar [a petitioner] from obtaining such a hearing or from presenting extra-record evidence to establish cause and prejudice for the procedural default. . . .").

C.     Ineffective of assistance of counsel

Claims of ineffective assistance of counsel are governed by the principles set out in *Strickland*, 466 U.S. 668. To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id.* at 687–88. The inquiry under *Strickland* is highly deferential. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. The "standard is necessarily a general one," *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009), because "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant," *Strickland*, 466 U.S. at 688–89.

---

[7] Section 2254(e)(2) severely limits the circumstances in which a federal habeas court may hold an evidentiary hearing on claims not developed in state court.

To establish deficient performance a petitioner must "show[] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. A petitioner must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (quotation omitted). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Strickland*, 466 U.S. at 690).

With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694. The petitioner "bears the highly demanding and heavy burden [of] establishing actual prejudice." *Allen (Clarence) v. Woodford*, 395 F.3d 979, 1000 (9th Cir. 2005) (quoting *Williams (Terry) v. Taylor*, 529 U.S. 362, 394 (2000)). For claims of ineffective assistance of counsel at sentencing in capital cases, prejudice is assessed by "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).

Because an ineffective assistance of counsel claim must satisfy both prongs of *Strickland*, a reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.*; *see Rhoades v. Henry*, 638 F.3d 1027, 1049 (9th Cir. 2011).

D.     Amendment

In its remand order, the Ninth Circuit directed the Court to determine "in light of intervening law whether expansion of the record and leave to amend the petition are warranted as to Petitioner's recently exhausted claims." (Doc. 145 at 1–2.)

1    A habeas petition may be amended pursuant to the Federal Rules of Civil Procedure.

2    28 U.S.C. § 2242; *see also* Rule 11, Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

3    Therefore, the Court looks to Rule 15 of the Federal Rules of Civil Procedure to address a

4    party's motion to amend a pleading in a habeas action. *See Bonin v. Calderon*, 59 F.3d 815,

5    845 (9th Cir. 1995). Leave to amend shall be freely given "when justice so requires," Fed.

6    R. Civ. P. 15(a), and courts must review such motions in light of the strong policy

7    permitting amendment, *Gabrielson v. Montgomery Ward & Co.*, 785 F.2d 762, 765 (9th

8    Cir. 1986). Factors that may justify denying a motion to amend include undue delay, bad

9    faith or dilatory motive, futility of amendment, and undue prejudice to the opposing party.

10   *Foman v. Davis*, 371 U.S. 178, 182 (1962). If the proposed habeas claims are unexhausted,

11   procedurally defaulted, or otherwise fail as a matter of law, amendment may be denied as

12   futile. *See Bonin*, 59 F.3d at 845. As noted above, the Court previously denied Rienhardt's

13   motion to amend on the grounds of futility, undue delay, and prejudice to Respondents.

14   (Doc. 96 at 10.)

15   **III.    DISCUSSION**

16   On remand this Court is to consider three categories of claims: ineffective assistance

17   of trial counsel claims not raised in state court, ineffective assistance claims this Court

18   previously denied but for which Rienhardt has developed new evidence, and claims raised

19   during Rienhardt's second round of PCR proceedings. For the reasons set forth below, the

20   Court finds the default of the first set of claims is not excused under *Martinez*,

21   reconsideration is not warranted under *Dickens* with respect to the second set of claims

22   because they have not been fundamentally altered, and amendment is futile with respect to

23   the last set of claims because they are procedurally defaulted and barred from federal

24   review.

25   **A.    *Martinez* Analysis**

26   In Claims A(1)–(5), A(7)–(16), Rienhardt alleges ineffective assistance of counsel

27   at the guilt stage of trial. In Claims B(2), B(4)–(6), B(8), and C(2), he alleges ineffective

28   assistance of counsel at sentencing. Because Rienhardt did not raise these allegations in

1    state court, this Court found the claims procedurally defaulted and barred from federal

2    review. (Doc. 80.) The Ninth Circuit has directed the Court to reconsider that ruling in light

3    of *Martinez*. To excuse the claims' default under *Martinez*, Rienhardt must show that PCR

4    counsel performed ineffectively under *Strickland* by failing to raise the underlying claims

5    of ineffective assistance of trial counsel and that the claims themselves were substantial or

6    had some merit. *Martinez*, 566 U.S. at 14–16.

7         The Court will assume without deciding that the claims are substantial, thereby

8    satisfying *Martinez*'s prejudice prong. With respect to the cause prong, the Court will

9    assume that PCR counsel's failure to raise the claims constituted deficient performance

10   under *Strickland*. Accordingly, the Court's analysis will focus on whether PCR counsel's

11   failure to raise the claims was prejudicial; that is, whether there was a reasonable

12   probability of a different outcome during the PCR proceedings if counsel had raised the

13   claims. To make that determination, the court evaluates the strength of the underlying

14   claims of ineffective assistance of trial counsel. *See Hooper*, 985 F.3d at 627; *Atwood*, 870

15   F.3d at 1059–60; *Runningeagle*, 825 F.3d at 982.

16        ***1.    Guilt-stage ineffectiveness***

17             a.    Claims A(1)–(3)

18        Rienhardt was represented at trial by attorney Eric Larsen. His first three claims

19   challenge Larsen's performance during jury selection. In Claim A(1), Rienhardt alleges

20   that counsel performed ineffectively by failing to "adequately conduct voir dire" and ask

21   "case-specific questions." (Doc. 38 at 19; *see* Doc. 218 at 29.) In Claim A(2), Rienhardt

22   alleges that counsel performed ineffectively by failing to "engage[] in a line of questioning

23   regarding jurors' positions on the death penalty." (*Id.* at 20; Doc. 218 at 30.) In Claim A(3),

24   Rienhardt alleges that counsel performed ineffectively by "fail[ing] to object when the state

25   used 80% of its peremptory strikes to exclude women." (*Id.* at 20–21; Doc. 218 at 31.) For

26   the reasons explained below, PCR counsel did not perform ineffectively in failing to raise

27   these claims.

28

"The conduct of voir dire 'will in most instances involve the exercise of a judgment which should be left to competent defense counsel.'" *Hovey v. Ayers*, 458 F.3d 892, 910 (9th Cir. 2006) (*quoting Gustave v. United States*, 627 F.2d 901, 906 (9th Cir. 1980)); *see Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001) ("Counsel is also accorded particular deference when conducting *voir dire.* An attorney's actions during *voir dire* are considered to be matters of trial strategy.").

"Establishing *Strickland* prejudice in the context of juror selection requires a showing that, as a result of trial counsel's [error], the jury panel contained at least one juror who was biased." *Davis v. Woodford*, 384 F.3d 628, 643 (9th Cir. 2004). Prejudice exists if counsel fails to question a juror during voir dire or move to strike a juror and that juror is found to be biased, because this evinces "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Fields v. Brown*, 503 F.3d 755, 776 (9th Cir. 2007) (en banc) (quoting *Strickland*, 466 U.S. at 694); *see Ruderman v. Ryan*, 484 F.Appx. 144, 145 (9th Cir. 2012).

Rienhardt, noting that counsel asked no questions during voir dire, asserts that counsel in a capital case "must prepare a case-specific set of questions which allows counsel to identify jurors who are able to fairly consider the particular evidence in the case." (Doc. 38 at 19–20.) He also argues that trial counsel failed to implement "techniques to rehabilitate jurors who were subject to removal based on initial answers to questions regarding the death penalty." (*Id.* at 20.) These allegations are meritless.

First, Rienhardt's claim that Larsen performed ineffectively by failing to ask "case-specific" questions fails. Rienhardt contends that counsel should have "probe[d] the superficial answers of potential jurors regarding their views on voluntary intoxication, illegal drug use or sales, carrying weapons, and prior convictions." (Doc. 38 at 19; Doc. 218 at 29.) In its questioning of the panel, however, the trial court addressed some of these topics. The court asked, for example, whether any prospective juror "feels that any person who either uses a gun or associates with someone who uses a gun is automatically guilty of a crime, that it would be a crime to even have a gun," and no juror answered in the

affirmative. (RT 2/13/96 at 64.) The court also asked whether any juror "has feelings about drugs such that it would not allow them to be fair and impartial as a juror," and excused jurors who answered in the affirmative. (*Id.* at 65–66.) The court did not ask specific questions about the jurors' views on voluntary intoxication or prior convictions, but it did instruct them to "set aside [their] own opinions about the law and follow the law given" in the jury instructions. (*Id.* at 41.)

Larsen did not perform deficiently by relying on the jurors' responses to the court's questions. *See Floyd v. Filson*, 949 F.3d 1128, 1143 (9th Cir. 2020); *Fields v. Woodford*, 309 F.3d 1095, 1108 (9th Cir. 2002) ("[W]e cannot say that failure to inquire beyond the court's voir dire was outside the range of reasonable strategic choice or that it would have affected the outcome.") In *Wilson v. Henry*, 185 F.3d 986, 991 (9th Cir. 1999), the Ninth Circuit rejected a claim that petitioner's counsel performed ineffectively at voir dire by failing to specifically question prospective jurors about the petitioner's criminal history and thereby discover potential juror prejudice. The court held that counsel's reliance on jurors' statements that they would be fair and follow the law "merits deference as a tactical decision." *Id.*

Moreover, Rienhardt has not demonstrated that he was prejudiced by Larsen's failure to question the prospective jurors because "he has not shown that any juror who harbored an actual bias was seated on the jury as a result of counsel's failure to voir dire" on specific topics. *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011) (citing *Davis*, 384 F.3d at 643). In his reply brief Rienhardt cites *Miller v. Webb*, 385 F.3d 666 (6th Cir. 2004), but that case does not aid Rienhardt's argument. There, the court found that counsel performed ineffectively by allowing a juror with actual bias to be seated. *Id.* at 676. Here, by contrast, Rienhardt has offered no evidence a biased juror was seated.

There is also no merit to Rienhardt's claim that Larsen performed ineffectively by failing to rehabilitate anti-death-penalty jurors. In *Wainwright v. Witt*, 469 U.S. 412 (1985), the Supreme Court set out the standard for determining whether a prospective juror must be excluded for cause because of his view on capital punishment. The question is "whether

the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* at 424 (quotation marks omitted).

Rienhardt cites three prospective jurors the court dismissed after they expressed their opposition to the death penalty. (RT 2/13/96 at 11, 13.) During voir dire the trial court asked prospective jurors if they "have any conscientious or religious scruples or feelings that would prevent you from voting for first degree murder because of the possible imposition of the death penalty . . . even though you yourself would have nothing to do with the imposition of that penalty." (RT 2/13/96 at 11.) The judge dismissed the first juror when she responded in the affirmative and, upon further questioning, stated that the possible imposition of the death penalty "would affect [her] ability to serve as a juror." (*Id.* at 11–12.) The judge dismissed the second prospective juror after she indicated she "would feel uncomfortable with the decision, with the death penalty and so forth" and agreed it "would affect her ability to serve as a fair and impartial juror." (*Id.* at 13.) The third juror cited by Rienhardt was dismissed after she told the court she did not "agree with the conclusions that will have to be reached in this trial." (*Id.* at 22.)

Larsen did not perform ineffectively in failing to rehabilitate these prospective jurors. "Based on their answers, the trial court could have been 'left with the definite impression that [the three prospective jurors] would be unable to faithfully and impartially apply the law.'" *Hale v. Gibson*, 227 F.3d 1298, 1318–19 (10th Cir. 2000) (quoting *Wainwright*, 469 U.S. at 426). Rienhardt "has produced no evidence to rebut the trial court's finding that the jurors should be removed for cause, and he has advanced no evidence to suggest that further cross-examination of these witnesses would have been helpful." *Id.* at 1319. He has not shown, therefore, that he was prejudiced by counsel's failure to rehabilitate these prospective jurors. "Unsupported allegations and pleas for presumptive prejudice are not the stuff that *Strickland* is made of." *Sawyer v. Butler*, 848 F.2d 582, 589 (5th Cir. 1988) ("Sawyer also alludes to the prejudice which resulted from counsel's failure to rehabilitate veniremen who were excused because of their views

1  contrary to the death penalty. Sawyer fails, however, to demonstrate that rehabilitation was

2  possible."), *on reh'g*, 881 F.2d 1273 (5th Cir. 1989), *aff'd sub nom. Sawyer v. Smith*, 497

3  U.S. 227 (1990); *see Stamper v. Muncie*, 944 F.2d 170, 177 (4th Cir. 1991) ("Questions of

4  the rigor of trial counsel's voir dire aside, Stamper fails utterly to demonstrate how any

5  shortcoming on trial counsel's part constituted prejudice sufficient to satisfy the second

6  prong of the *Strickland* test. . . ."); *see also Bridge v. Lynaugh*, 838 F.2d 770, 776 (5th Cir.

7  1988) (explaining that counsel's decision not to attempt to rehabilitate potential jurors who

8  were "unequivocal in their feelings against the death penalty" does not constitute

9  ineffective assistance).

10      Finally, Rienhardt alleges that Larsen performed ineffectively by failing to object

11  when the prosecutor used 80% of her peremptory strikes to remove female jurors. (Doc. 38

12  at 20–21; Doc. 218 at 31.) To be entitled to relief on this claim, Rienhardt must "overcome

13  the strong presumption that defense counsel's decision not to challenge the prosecutor's

14  challenges was strategic." *Carrera v. Ayers*, 670 F.3d 938, 949 (9th Cir. 2011), *on reh'g en*

15  *banc*, 699 F.3d 1104 (9th Cir. 2012). In *Carrera,* the Ninth Circuit explained that there

16  may have been reasons defense counsel supported the removal of Hispanic jurors, that

17  counsel may in fact have been "pleased with the resulting jury," and that when the

18  prosecutor challenged the Hispanic jurors, defense counsel "may have made a split second

19  decision" that the challenge was on permissible grounds and an objection would have been

20  futile. *Id.*

21      Several factors support a finding that Larsen did not perform ineffectively by failing

22  to object to the prosecutor's use of peremptory challenges. First, the jury ultimately was

23  composed of six women and eight men, which may suggest a non-discriminatory, and

24  therefore unobjectionable, basis for the prosecutor's strikes. *See Castellanos v. Small*, 766

25  F.3d 1137, 1149–50 (9th Cir. 2014). In addition, the prosecutor had a non-gender-based

26  reason for striking one of the female jurors, who told the court she "would have difficulty

27  with the death penalty as well." (RT 2/13/96 at 12.) Finally, as Respondents note, counsel

28  could reasonably have believed that three other female jurors struck by the prosecution

1   may not have been favorable to the defense given their ties to law enforcement. (*Id.* at 34,

2   35, 46.)

3       Like the petitioner in *Carrera*, Rienhardt "does not address these possibilities."

4   *Carrera*, 670 F.3d at 949. Carrera supported his claim of ineffective assistance with a

5   declaration from an expert who was not present to observe voir dire. *Id.* The Ninth Circuit

6   noted that it had previously rejected such evidence as unpersuasive. *Id.* at 949–50 (citing

7   *Paradis v. Arave*, 954 F.2d 1483, 1491 (9th Cir. 1992), *rev'd on other grounds,* 507 U.S.

8   1026 (1993)). That is more evidence than Rienhardt has offered in support of his claim of

9   ineffective assistance.[8]  Rienhardt has not overcome *Strickland*'s presumption that counsel

10  performed reasonably.

11      PCR counsel did not perform ineffectively in failing to raise Claims A(1), (2), and

12  (3) because these claims are meritless. *See Atwood*, 870 F.3d at 1059–60; *Runningeagle*,

13  825 F.3d at 982; *Hooper*, 985 F.3d at 627. The default is not excused, and the claims are

14  barred from federal review.

15          **b.      Claims A(4) and A(5)**

16      In Claim 4(A), Rienhardt alleges that Larsen performed ineffectively by failing to

17  move for a mistrial or a continuance when the prosecutor disclosed a letter Rienhardt wrote

18  to Christina George. (Doc. 38 at 21; *see* Doc. 218 at 32.) In Claim A(5), Rienhardt alleges

19  that counsel performed ineffectively by failing to present an intoxication defense. (*Id.* at

20  21–22; Doc. 218 at 32–33.)

21      At trial, George testified about receiving a letter from Rienhardt in which he

22  "suggest[ed] a story [she] should tell." (RT 2/16/96 at 52.) Rienhardt wanted George to say

23  that she was picking him up at the shopping center when Nadeau arrived driving

24

25

---

26      [8] In his reply brief, Rienhardt discusses the elements of a claim under *Batson v.
27  Kentucky*, 476 U.S. 79 (1986). (Doc. 273 at 15–18.) The issue before the Court, however,
    is not whether the prosecutor violated *Batson* by striking female jurors based solely on their
28  sex. The question is whether PCR counsel performed at a constitutionally ineffective level
    by failing to raise a claim that trial counsel performed at a constitutionally ineffective level
    by not objecting to the prosecutor's use of her peremptory challenges.

1   Anganette's car. (*Id.*) The contents of this letter, according to Rienhardt, rendered his

2   proposed alibi defense "unpresentable."[9] (Doc. 38 at 21; *see* Doc. 218 at 32.)

3       The prosecutor told the court that George's lawyer had the letter. (*Id.* at 89.) Defense

4   counsel twice objected to further questioning about the letter "on Rule 15 grounds."[10] (*Id.*

5   at 90, 93.) The court overruled the objections. On the next day of trial, counsel moved to

6   preclude the letter or, alternatively, to depose George's counsel and move for disclosure of

7   other letters under Rule 15 and *Brady*.[11] (RT 2/21/96 at 4.) He also asked for a recess "to

8   determine [his] course of conduct . . . depending on the Court's ruling with this letter" and

9   told the court he needed "to do some investigation regarding the letter." (*Id.* at 8.)

10      After an off-the-record discussion with counsel, the court precluded the prosecutor

11  from using the letter in her case-in-chief but held that if defense counsel presented an "alibi

12  or other defense that contradicts what is contained in the letter," the prosecutor would be

13  allowed to recall George and introduce the letter. (*Id.* at 44.) In response, defense counsel

14  told the court that he had made a strategic decision to avoid introduction of the letter. (*Id.*)

15  There was no further testimony about the letter.

16      Although Larsen succeeded in having the letter excluded, Rienhardt argues in Claim

17  A(4) that counsel performed ineffectively by failing to move for a mistrial or a continuance

18  so that he could develop another defense to replace the proposed alibi defense. (Doc. 38 at

19  21; Doc. 218 at 32.) Specifically, as alleged in Claim A(5), Rienhardt argues that counsel

20  _____

21      [9] Counsel had noticed an alibi defense based on the proposed testimony of Jenny

22  Gengler and James Nielsen. (ROA 28.) Gengler would have testified that she was with
    Rienhardt from the time he left Ellis and Nadeau in Nadeau's apartment on the night of

23  September 4 until the early morning of September 5.

24      [10] Rule 15.1 of the Arizona Rules of Criminal Procedure governs the State's

25  disclosure obligations.

26      [11] *Brady v. Maryland*, 373 U.S. 83, 87 (1963), holds that a defendant's due process

27  rights are violated when a prosecutor fails to disclose favorable evidence that is material to
    guilt or punishment.

28

should have investigated and presented a defense based on Rienhardt's "extreme intoxication" to challenge the element of intent necessary to prove premeditation and kidnapping. (*Id.* at 21; *see* Doc. 218 at 32–33.)

These claims fail because, as Rienhardt acknowledges in his reply brief (Doc. 273 at 28), intoxication was not a permissible defense under Arizona law.

"Temporary intoxication resulting from the voluntary ingestion, consumption, inhalation or injection of alcohol, an illegal substance . . . or other psychoactive substances . . . does not constitute insanity and is not a defense for any criminal act or requisite state of mind." A.R.S. § 13-503. Accordingly, counsel was foreclosed from arguing that Rienhardt's intoxication negated the element of intent.  *See State v. Boyston*, 231 Ariz. 559, 550, 298 P.3d 887, 898 (2013) ("Because premeditation is a mental state and part of the *mens rea* element of premeditated first degree murder . . . , it is thus a 'requisite state of mind' of that offense. Section 13-503 therefore precludes evidence of voluntary intoxication when considering premeditation."); *see also Montana v. Egelhoff*, 518 U.S. 37, 56 (1996) (upholding statute providing that voluntary intoxication could not be considered when determining a mental state that is an element of the offense).

Rienhardt's argument that *Boyston* and *Egelhoff* were "wrongly decided" is inapposite. (Doc. 273 at 22.) Under review are two ineffective assistance of counsel claims. Because the proposed defense was impermissible under state law, counsel did not perform ineffectively in failing to offer it, and Rienhardt suffered no prejudice from that failure. *See Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) (explaining that failing to take a futile action cannot constitute deficient performance); *see also Stanley v. Schriro*, 598 F.3d 612, 620 (9th Cir. 2010) ("No prejudice is suffered when counsel declines to pursue the development of testimony that would be inadmissible at trial.").

 PCR counsel, in turn, did not perform ineffectively by failing to raise these meritless ineffective assistance claims. *See Atwood*, 870 F.3d at 1059–60; *Runningeagle*, 825 F.3d at 982; *Hooper*, 985 F.3d at 627. Claims A(4) and (5) remain procedurally defaulted and barred from federal review.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

c.      Claim A(7)

Rienhardt alleges that Larsen performed ineffectively by inadequately cross-examining James Breedlove and Teresa Martinez about inconsistencies between their trial testimony and information they provided during interviews with police. (Doc. 38 at 23; *see* Doc. 218 at 36–37.)

First, Rienhardt argues that Larsen should have questioned Breedlove about his statement to police that he could not distinguish between the voices of Nadeau and Rienhardt. (*Id.*) Next, he argues that counsel should have questioned Martinez about her trial testimony that she saw two shotguns in the car Rienhardt was driving but did not report seeing such weapons in her police interview. (*Id.*)

At trial Breedlove testified that he met Rienhardt when he and Breedlove went to the apartment where they picked up the money for the drug transaction. (RT 2/14/96 at 45.) He testified that later that night his girlfriend gave him the phone number for the apartment. (*Id.* at 54.) Breedlove called the number and spoke with Ellis, who was "scared, frantic" and told Breedlove he was bleeding and urged him to "just get back." (*Id.* at 55.) Breedlove then spoke with Rienhardt. (*Id.* at 56.) Rienhardt threatened Breedlove, told him he was going to hurt Ellis more for every ten minutes that Breedlove did not return and that he was going to take Ellis "for a hike," and stated that he had a shotgun. (*Id.*) Breedlove testified that he recognized Rienhardt's voice from "talking to Mr. Rienhardt earlier." (*Id.*)

In his interview with the police, Breedlove stated that the next morning he called the number of the apartment and was "pretty sure" the voice on the answering machine was Rienhardt's when in fact it was Nadeau's. (Doc. 218-3, Ex. 12 at 13.) Rienhardt contends that counsel's failure to cross-examine Breedlove about that statement constituted ineffective assistance. (Doc. 38 at 23; *see* Doc. 218 at 36–37.) Rienhardt asserts that with proper cross-examination, Breedlove would have conceded that he was actually speaking to Nadeau, not Rienhardt, on the night of the murder. (Doc. 273 at 24.) The Court disagrees.

On cross-examination Larsen elicited testimony from Breedlove calling into question his identification of Rienhardt as the person he had spoken to that night. Breedlove

admitted that the person did not identify himself; that he did not know there were two men named "Chuck" in the apartment that night; that he had never spoken to either Rienhardt or Nadeau before that night; that he heard a male voice in the background say "I haven't put my hands on him yet" while the person on the phone said that for every ten minutes Breedlove was gone he was going to "fuck up Mike some more"; that he had never heard Rienhardt speak in a "crazy sounding voice," which was how the person he had spoken to sounded; and that he mistakenly believed another person he spoke to was Theresa Martinez. (RT 2/14/96 at 74–76, 79.)

In his closing argument, counsel detailed the evidence suggesting it was Nadeau, not Rienhardt, who spoke with Breedlove on the night of the murder. (RT 2/22/96 at 33.)

While evidence of Breedlove's misidentification of Rienhardt's voice on Nadeau's answering machine would have bolstered this line of inquiry, counsel's failure to include such questions in his examination did not constitute deficient performance, nor was Rienhardt prejudiced by its absence. Counsel's cross-examination produced significant evidence challenging Breedlove's identification of Rienhardt's voice. *See Woods*, 764 F.3d at 1135 (finding no prejudice where counsel presented "[a]mple evidence" of witness's unreliability); *see also Range v. Schomig*, 351 F.App'x. 222 (9th Cir. 2009) (finding counsel did not perform ineffectively in failing to cross-examine witness on prior inconsistent statements where "counsel thoroughly developed these inconsistencies through cross-examination of other witnesses and closing argument"); *Card v. Dugger*, 911 F.2d 1494, 1507 (11th Cir. 1990) (finding counsel's performance not deficient where cross-examination was "sufficient to show the weaknesses in the witness's testimony"). Moreover, the evidence supported Breedlove's identification of Rienhardt's voice. Another witness, Breedlove's girlfriend Micki Rowlan, also testified that she spoke with Rienhardt who, as he did in his conversation with Breedlove, threatened to take Ellis on a "hike" if Breedlove did not return. (RT 2/16/96 at 164.) There was not a reasonable probability that questioning Breedlove about his mistaken identification of the voice on the answering machine would have resulted in a different verdict.

Rienhardt next alleges that counsel should have questioned Martinez about her trial testimony that she saw two shotguns in the car Rienhardt was driving but did not report seeing such weapons during her police interview. (Doc. 38 at 23; *see* Doc. 218 at 36–37.)

At trial Martinez testified that when Rienhardt came to pick her up that night she saw two shotguns in the car—a short one under the passenger seat and a regular one in the back seat. (RT 2/15/96 at 20–21.) This testimony was not inconsistent with the information she provided in her police interview, where she was asked only if she had seen any weapons or a shotgun "in the apartment" and she answered no. (Doc. 218-5, Ex. 22 at 11.) Because her testimony was not inconsistent with her previous statement, counsel did not perform ineffectively in failing to cross-examine Martinez about her statement to the police.

PCR counsel did not perform ineffectively by failing to raise this meritless ineffective assistance claim. *See Atwood*, 870 F.3d at 1059–60; *Runningeagle*, 825 F.3d at 982; *Hooper*, 985 F.3d at 627. Accordingly, Claim A(7) remains procedurally defaulted and barred from federal review.

### d.    Claims A(8) and A(9)

Rienhardt contends that Larsen performed ineffectively during the prosecutor's closing argument. In Claim 8(A), Rienhardt alleges that counsel performed ineffectively by not objecting when the prosecutor commented on Rienhardt's failure to testify. (Doc. 38 at 23–26; *see* Doc. 218 at 46–49.) In Claim A(9), Rienhardt alleges that counsel performed ineffectively by failing to object when the prosecutor vouched for Christina George's testimony. (Doc. 38 at 26–27; *see* Doc. 218 at 49–50.)

Claim 8(A) is based on comments the prosecutor made in response to defense counsel's argument about a letter Rienhardt wrote to a fellow inmate describing the killing.[12] Counsel suggested that the letter was not actually a confession but instead was

---

[12] In the letter, dated January 2, 1996, Rienhardt wrote: "This dude tried to rip me off for 12 thousand dollars and instead he got his arm blown off and beat for three hours before he de\sided [sic] he wanted to take flying lessions [sic] off the side of a mountain." (Doc. 259-4, Ex. G at 15.)

- 23 -

based on what Rienhardt recollected of "what he thinks he heard during the trial or during the preliminary hearing." (RT 2/22/96 at 39.)

In his rebuttal closing argument, the prosecutor responded to that argument as follows:

> You haven't heard a shred of evidence, not a shread [sic] of evidence that this Defendant had a police report in his possession, that he was at the preliminary hearing, that he saw the preliminary hearing transcript. He just wanted to make this tremendous leap of faith, that's how he got this information, members of the jury, because he was there, because this Dude [sic] ripped him off, because he was there when his arm was blown off because he was there when the rocks were dropped on his head, there's where the information in the letter comes from. There is no indication otherwise, not a drop, not a shread [sic] of evidence before you that he got it any place else.

*Id.* at 46.

Rienhardt contends that this was an impermissible comment on his failure to testify in violation of his right against self-incrimination and that Larsen performed ineffectively by failing to object. (Doc. 38 at 24; *see* Doc. 218 at 46.)

Counsel's strategy with respect to objections is entitled to deference under *Strickland*. *See, e.g.*, *United States v. Mejia–Mesa*, 153 F.3d 925, 931 (9th Cir. 1998) (explaining that "a few missed objections alone, unless on a crucial point, do not rebut the strong presumption that counsel's actions (or failures to act) were pursuant to his litigation strategy and within the wide range of reasonable performance."). Trial counsel may properly decide to "refrain from objecting during closing argument to all but the most egregious misstatements by opposing counsel on the theory that the jury may construe their objections to be a sign of desperation or hyper-technicality." *United States v. Molina*, 934 F.2d 1440, 1448 (9th Cir. 1991); *see United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993) ("Because many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct.").

The Fifth Amendment prohibits a prosecutor from commenting to the jury about a defendant's failure to testify at trial. *Griffin v. California*, 380 U.S. 609, 615 (1965).

"*Griffin* prohibits the judge and prosecutor from suggesting to the jury that it may treat the defendant's silence as substantive evidence of guilt." *United States v. Robinson*, 485 U.S. 25, 32 (1988) (quoting *Baxter v. Palmigiano*, 425 U.S. 308, 319 (1976)). A comment violates this rule "if it is manifestly intended to call attention to the defendant's failure to testify, or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify." *Lincoln v. Sunn*, 807 F.2d 805, 809 & n.1 (9th Cir. 1987) (finding comments improper where prosecutor argued, "there's only one person who can tell us" . . .  "there is only one person who can testify" . . . "there is only one person who can tell you"); *see Hovey*, 458 F.3d at 912; *Beardslee v. Woodford*, 358 F.3d 560, 586 (9th Cir. 2004).

While it is impermissible under *Griffin* to call attention to or comment on a defendant's failure to testify, "[i]t is proper for the prosecutor to address the defense's arguments." *Rhoades v. Henry*, 598 F.3d 495, 510 (9th Cir. 2010); *United States v. Mende*, 43 F.3d 1298, 1301 (9th Cir. 1995) ("There is a distinction between a comment on the defense's failure to present exculpatory evidence as opposed to a comment on the defendant's failure to testify."). "Comment is unacceptable, however, if the defendant is the sole person who could provide information on a particular issue." *Rhoades*, 598 F.3d at 510. *Griffin* is not violated where the prosecutor's comment is a "fair response" to a claim made by defense counsel. *Robinson*, 485 U.S. at 32. Finally, relief is to be granted on *Griffin* error only "where such comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis for the conviction, and where there is evidence that could have supported acquittal." *Lincoln*, 807 F.2d at 809 (quoting *United States v. Kennedy*, 714 F.2d 968, 976 (9th Cir. 1983)); *Beardslee*, 358 F.3d at 586.

Rienhardt argues that the prosecutor's comment, while not extensive, "went to a critical fact in the case." (Doc. 38 at 25; *see* Doc. 218 at 48.) He also argues that the comment was "particularly egregious" because the prosecutor knew that Rienhardt had in fact been present at the preliminary hearing. (*Id.* at 24.) Respondents counter that the prosecutor was simply commenting on Rienhardt's failure to present exculpatory evidence,

1  that the prosecutor did not directly comment on Rienhardt's failure to take the stand, and

2  there was other evidence besides testimony from Rienhardt to contest the prosecutor's

3  argument that he was absent for the preliminary hearing. (Doc. 259 at 21.) Respondents

4  also contend that the comment was permissible because Rienhardt opened the door with

5  his argument that he could have learned the details of the crime while attending the

6  preliminary hearing instead of from his participation in the murder. (*Id.* at 21–22.)

7  The prosecutor's comment was not extensive nor was it "of such a character that the

8  jury would naturally and necessarily take it to be a comment on the failure to testify."

9  *Lincoln*, 807 F.2d at 809. The comment was invited by and addressed the defense argument

10  that Rienhardt did not learn the information in his letter from being present at the crime.

11  "A natural reading of the prosecutor's comment is not that the defendant didn't testify, but

12  that there was no meaningful challenge to the government's evidence," *Rhoades*, 598 F.3d

13  at 511—in this case, the evidence being Rienhardt's letter admitting involvement in the

14  killing. The comment did not "clear[ly] signal that [Rienhardt] himself, rather than the

15  defense generally, was being discussed." *United States v. Mayans*, 17 F.3d 1174, 1185 (9th

16  Cir. 1994); s*ee Demirdjian v. Gipson*, 832 F.3d 1060, 1069–70 (9th Cir. 2016) (finding a

17  reasonable argument could be made that prosecutor's statements were not comments on

18  defendant's silence but on *defense's* failure to offer exculpatory evidence).

19  Because the prosecutor's comments did not violate *Griffin*, an objection to the

20  argument would have been futile. Trial counsel therefore did not perform ineffectively. *See*

21  *Juan H. v. Allen,* 408 F.3d 1262, 1273–74 (9th Cir. 2005) (finding that "performance of

22  counsel did not fall below an 'objective standard of reasonableness' on account of not

23  raising [a] meritless objection" (citation omitted)); *Rupe*, 93 F.3d at 1445; *James v.*

24  *Borg*, 24 F.3d 20, 27 (9th Cir. 1994).

25  PCR counsel in turn did not perform ineffectively in failing to raise this meritless

26  claim. *See Atwood*, 870 F.3d at 1059–60; *Runningeagle*, 825 F.3d at 982; *Hooper*, 985 F.3d

27  at 627. Claim A(8) remains procedurally defaulted and barred from federal review.

28

In Claim A(9), Rienhardt argues that Larsen should have objected when the prosecutor vouched for George's testimony. (Doc. 38 at 26.) During his closing argument, the prosecutor told the jury that George had entered into a plea agreement that required her to testify truthfully. (RT 2/22/96 at 51.) He continued: "The Judge who hears the trial, the Judge that's hearing her testimony decides whether she is telling the truth. If she isn't telling the truth all bets are off. Once she's required to tell the truth she told you the story." (*Id.*) According to Rienhardt, the prosecutor's argument constituted improper vouching, to which counsel should have objected, because "it puts the authority and neutrality of the court itself behind testimony that would be otherwise unbelievable." (Doc. 38 at 26; *see* Doc. 218 at 49.)

"As a general rule, a prosecutor may not express his opinion of the defendant's guilt or his belief in the credibility of government witnesses." *Molina*, 934 F.2d at 1444. "Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony." *Necoechea*, 986 F.2d at 1276; *see State v. Bible*, 175 Ariz. 549, 601, 858 P.2d 1152, 1204 (1993). "However, after the credibility of a witness for the state has been attacked by the defense, the prosecutor may attempt to bolster his witness' credibility by showing that he is testifying pursuant to a plea agreement which requires truthful testimony. Such evidence does not amount to personal vouching by the prosecutor." *State v. Vargas*, 127 Ariz. 59, 61–62, 618 P.2d 229, 231–32 (1980); *see United States v. Monroe*, 943 F.2d 1007, 1014 (9th Cir. 1991) ("[R]eferences to requirements of truthfulness in plea bargains do not constitute vouching when the references are in response to attacks on the witness' credibility because of his plea bargain.") (quoting *United States v. Shaw*, 829 F.2d 714, 716 (9th Cir. 1987)).

Larsen attacked George's truthfulness during his closing argument, stating that George "has a credibility problem," that she had lied to the prosecutor during her interview because lying is "what she does best," and that she had been "offered a deal" and therefore had "an incentive to give the State what the State needs to hear." (RT 2/22/96 at 36–38.)

1    The prosecutor's subsequent reference to the truthfulness requirement in George's plea

2    agreement was a response to defense counsel's argument and therefore did not constitute

3    impermissible vouching. *See Vargas*, 127 Ariz. at 61, 618 P.2d at 231; *Monroe*, 943 F.2d

4    at 1014 (noting that reference to plea agreement came only after witness's credibility was

5    attacked in opening statement); *Shaw*, 829 F.3d at 717 (distinguishing references to plea

6    deals "in rebuttal to an attack on credibility" from "the introduction of a requirement for

7    truthfulness . . . before any issue of credibility has been drawn").

8        Because there was no improper vouching, an objection to the prosecutor's argument

9    would have been futile. Trial counsel therefore did not perform ineffectively. *See Juan H*.

10   at 1273–74; *Rupe*, 93 F.3d at 1445; *James*, 24 F.3d at 27; *cf. Molina*, 934 F.2d at 1448

11   (finding counsel's failure to object "was not professionally unreasonable").

12       Finally, even if counsel had objected, and the objection had been sustained, there

13   was not a reasonable probability that the jury would have acquitted Rienhardt of first-

14   degree murder. The court instructed the jury that what the lawyers say in their closing

15   arguments is not evidence. (RT 2/22/96 at 55.) The court also instructed the jury to assess

16   the credibility of witnesses by taking into account "any motive or prejudice they might

17   have, any inconsistent statements they may have made." (*Id.* at 57.) Such instructions are

18   "sufficient to dispel any taint if vouching occurred." *State v. Payne*, 233 Ariz. 484, 512,

19   314 P.3d 1239, 1267 (2013). Rienhardt was not prejudiced by counsel's failure to object.

20       PCR counsel did not perform ineffectively in failing to raise this meritless claim.

21   *See Atwood*, 870 F.3d at 1059–60; *Runningeagle*, 825 F.3d at 982; *Hooper*, 985 F.3d at

22   627. Claim A(9) remains procedurally defaulted and barred from federal review.

23                        e.      Claims A(10) to A(14)

24       Rienhardt alleges that Larsen performed ineffectively by failing to object to or

25   request a number of jury instructions. These allegations are meritless.

26       In Claim A(10), Rienhardt alleges that Larsen performed ineffectively by failing to

27   object to the trial court's "misleading" voluntary intoxication instruction and to request an

28   appropriate instruction. (Doc. 38 at 27–30; *see* Doc. 218 at 37–40.) The court instructed

1   the jury that "[v]oluntary intoxication with alcohol or drugs is no defense to any criminal

2   act nor may it be considered with respect to any criminal state of mind." (RT 2/22/96 at

3   64.) As discussed above, this was a correct statement of the law, namely A.R.S. § 13-503.

4   Counsel did not perform ineffectively by failing to object to an accurate jury instruction.

5   *See James*, 24 F.3d at 27.

6        In Claim A(11), Rienhardt alleges that Larsen performed ineffectively by failing to

7   object to the premeditation instruction. (Doc. 38 at 28–30; *see* Doc. 218 at 41–44.) The

8   court instructed the jury that:

> Premeditation means when a person either intends or knows that his conduct
> resulted in a death of another person, and two, his intention or knowledge
> existed before the killing long enough to permit reflection. An act is not done
> with premeditation it [sic] is the instant effect of a sudden quarrel or heat of
> passion. But, not [sic] appreciable length of time must elapse between the
> formation of the intent to kill and the act; they maybe [sic] as instantaneous
> as successive thoughts of the mind.

14  (RT 2/22/96 at 59.) The Arizona Supreme Court has since "discouraged" use of the phrase

15  "instantaneous as successive thoughts of the mind." *State v. Thompson*, 204 Ariz. 471, 479,

16  65 P.3d 420, 428 (2003). This instruction, however, was consistent with the law at the time

17  of Rienhardt's trial, and the Arizona Supreme Court had upheld its use in previous cases.[13]

18  *See State v. Eastlack*, 180 Ariz. 243, 259, 883 P.2d 999, 1005 (1994); *State v. Guerra*, 161

19  Ariz. 289, 293–94, 778 P.2d 1185, 1189–90 (1989). Therefore, objecting to the instruction

20  would have been futile. *See James*, 24 F.3d at 27. Trial counsel did not perform

21  ineffectively.

22        In Claim A(12), Rienhardt alleges that Larsen performed ineffectively by failing to

23  request a false-imprisonment instruction. (Doc. 38 at 31–34; *see* Doc. 218 at 41–44.) The

24  Court disagrees.

25  _____

26        [13] The Court previously rejected Rienhardt's claim that the premeditation instruction
    violated his due process rights be relieving the State of its burden of showing actual
27  reflection. (Doc. 126 at 39–40.) The Court found that the instruction did not permit a
    finding of premeditation based on the passage of time and that the facts of the case were
28  sufficient to support a finding of premeditation. (*Id.*)

1    Due process requires a lesser-included offense instruction where the evidence would
2    permit a jury to rationally find a defendant guilty of the lesser offense and acquit him of
3    the greater. *Murray (Roger)*, 882 F.3d at 813 (citing *State v. Krone*, 182 Ariz. 319, 323,
4    897 P.2d 621, 625 (1995), and *Hopper v. Evans*, 456 U.S. 605, 612 (1982)). Evidence is
5    deemed "sufficient to require a lesser-included offense instruction if two conditions are
6    met. The jury must be able to find (a) that the State failed to prove an element of the greater
7    offense and (b) that the evidence is sufficient to support a conviction on the lesser
8    offense." *State v. Wall*, 212 Ariz. 1, 4, 126 P.3d 148, 151 (2006). "It is not enough that, as
9    a theoretical matter, 'the jury might simply disbelieve the state's evidence on one element
10   of the crime' because this 'would require instructions on all offenses theoretically included'
11   in every charged offense." *Id.* (quotation omitted). "[T]he evidence must be such that a
12   rational juror could conclude that the defendant committed only the lesser offense." *Id.*

13   In his petition and his supplemental *Martinez* brief, Rienhardt argues that his level
14   of intoxication negated the mental state—intent—necessary to prove kidnapping and
15   therefore an instruction on the lesser-included offense of false imprisonment was
16   appropriate.[14] In his *Martinez* reply brief, Rienhardt acknowledges that Arizona law
17   prohibited him from presenting voluntary intoxication as a defense to the mental state of
18   intent. (Doc. 273 at 31.) He argues instead that evidence did not support a finding that he,
19   as opposed to Nadeau, intended to inflict death or physical injury on Ellis or otherwise aid
20   in the commission of a felony. (*Id.* at 31–33.)

21   Because it was raised for the first time in his reply brief, Respondents have not had
22   the opportunity to directly address Rienhardt's argument that the false imprisonment
23   instruction was required because the evidence did not support the kidnapping charge. *See*
24   *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994) (explaining that a reply "is
25   not the proper pleading to raise additional grounds for relief"); *Delgadillo v. Woodford*,

26

27   [14] A person commits kidnapping by "knowingly restraining another person with the
     intent to: . . . [i]nflict death, physical injury or a sexual offense on the victim, or to otherwise
28   aid in the commission of a felony." A.R.S. § 13-1304(A). A person commits unlawful
     imprisonment by knowingly restraining another person. A.R.S. § 13-1303(A).

- 30 -

527 F.3d 919, 930 n.4 (9th Cir. 2008) ("Arguments raised for the first time in petitioner's reply brief are deemed waived."). However, in their response to Rienhardt's *Martinez* brief, Respondents do address the evidence of Rienhardt's intent to kill or injure Ellis. (Doc. 259 at 29–30.)

The Court agrees this evidence is sufficient to support the kidnapping charge. Rienhardt would have been entitled to a false imprisonment instruction only if the jury could rationally have found that he knowingly restrained Ellis but did not intend to inflict death or physical injury. *See Wall*, 212 Ariz. at 4, 126 P.3d at 151. A rational jury could not have made that finding given the testimony by Breedlove and Rowlan that Rienhardt threatened to harm and kill Ellis, that Ellis told Breedlove and Rowlan that he was bleeding, and that blood and teeth were found in the apartment.

Because Rienhardt was not entitled to a lesser-included offense instruction, trial counsel did not perform ineffectively in failing to seek one. *See James*, 24 F.3d at 27.

In Claim A(13), Rienhardt alleges that Larsen performed ineffectively by failing to object to the reasonable doubt instruction. (*Id.* at 34.) The court instructed the jury that "[p]roof beyond a reasonable doubt is proof that leaves you firmly convinced of the Defendant's guilt" and explained that if "you think that there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty." (RT 2/22/96 at 58.) This instruction was consistent with Arizona law.[15] *See State v. Portillo*, 182 Ariz. 592, 596, 898 P.2d 970, 974 (1995). There was no basis for counsel to object, and his failure to do so cannot constitute ineffective assistance. *See James*, 24 F.3d at 27.

In Claim A(14), Rienhardt alleges that Larsen performed ineffectively by failing to request a *Willits* instruction. (Doc. 38 at 35; *see* Doc. 218 at 45.) Under *State v. Willits*, 96

---

[15] The instruction is based on the pattern jury instruction adopted by the Federal Judicial Center. *See State v. Van Adams*, 194 Ariz. 408, 417–18, 984 P.2d 16, 25–26 (1999). In *Victor v. Nebraska*, Justice Ginsburg praised the instruction, 511 U.S. 1, 27 (1994) (Ginsburg, J., concurring), and the Ninth Circuit has upheld identical or substantially similar instructions, *see, e.g.*, *United States v. Artero*, 121 F.3d 1256, 1257–59 (9th Cir. 1997); *United States v. Velasquez*, 980 F.2d 1275 (9th Cir. 1992).

Ariz. 184, 186, 393 P.2d 274, 276 (1964), if the State loses or destroys material evidence, the jury may infer that the evidence was exculpatory. Rienhardt contends that he was entitled to the instruction because the State "failed to preserve evidence of [his] intoxication" when they delayed taking a blood sample until the morning after his arrest. (Doc. 38 at 35; *see* Doc. 218 at 45.) According to Rienhardt, this lost evidence was "critical to demonstrating his inability to premeditate or form the intent required for first degree murder or kidnapping." (*Id.* at 35; *see* Doc. 218 at 46.)

Rienhardt was not entitled to a *Willits* instruction for two reasons. First, the State has no duty to gather potentially exculpatory evidence. *State v. Rivera*, 152 Ariz. 507, 511, 733 P.2d 1090, 1094 (1987) (explaining that while the State has a duty to preserve blood alcohol test results, it "has no corresponding duty . . . to gather blood alcohol evidence for the defense to use in corroborating the defense's *own* evidence"). Second, for the reasons already explained, evidence of Rienhardt's intoxication was not admissible to negate intent, so his blood alcohol test results would not have been exculpatory.

Because Rienhardt was not entitled to a *Willits* instruction, counsel did not perform ineffectively in requesting one. *See James*, 24 F.3d at 27.

Larsen did not perform ineffectively in his handling of the jury instructions. Accordingly, PCR counsel did not perform ineffectively in failing to raise these meritless claims. *See Atwood*, 870 F.3d at 1059–60; *Runningeagle*, 825 F.3d at 982; *Hooper*, 985 F.3d at 627. Claims A(10)–(14) remain procedurally defaulted and barred from federal review.

f.      Claim A(15)

Rienhardt alleges that Larsen performed ineffectively by failing to ensure Rienhardt's presence during critical proceedings and failing to ensure a complete record was created. (Doc. 38 at 36–40; *see* Doc. 218 at 33–36.) This claim refers to two unrecorded in-chambers discussions between the court and counsel during trial. (*See* RT 2/21/96 at 2– 8.) From the context of the on-the-record proceedings that occurred between those meetings (and from which Rienhardt was absent), it is evident that the issue discussed was

a letter from Christina George to Rienhardt, the resulting ethical concerns expressed by defense counsel with respect to his potential alibi witnesses Gengler and Nielsen, the letter's late disclosure, and the existence of additional undisclosed letters in the possession of George's counsel. (*Id.*) As discussed above, the court later precluded the prosecutor from using the letter in his case-in-chief but ruled that if defense counsel opened the door on cross-examination the prosecutor could recall George and introduce the letter. (*Id.* at 44.)

"[A] defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). "[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (citation omitted); *State v. Christensen*, 129 Ariz. 32, 38, 628 P.2d 580, 586 (1981) (explaining that defendant's right to be present extends "only to those proceedings in open court whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." (quotation omitted)); *State v. Dann*, 205 Ariz. 557, 571, 74 P.3d 231, 245 (2003) ("[T]he right does not extend to in-chambers pretrial conferences . . . and to various other conferences characterized as relating only to the resolution of questions of law.") (citation omitted). "In confining the right to be present to critical stages, courts assume that the defendant's attorney will represent the defendant's interests in noncritical proceedings." *United States v. Mouzin*, 785 F.2d 682, 704 (9th Cir. 1986). Violation of the right to be present is subject to harmless error analysis. *Campbell v. Rice*, 408 F.3d 1166, 1172 (9th Cir. 2005) (citing *Rushen v. Spain*, 464 U.S. 114, 117 (1983) (per curiam)).

Respondents contend that the in-camera conferences addressed "purely legal issues surrounding the admission of the George letter" and therefore Rienhardt's presence was not required. (Doc. 259 at 33.) The Court agrees. A defendant generally has no right to be present at conferences discussing the admissibility of evidence. *See, e.g.*, *Clark v. Chappell*, 936 F.3d 944, 991 (9th Cir. 2019) (finding that defendant's exclusion from in-

chambers conference regarding admissibility of psychiatrist's pre-trial testimony did not violate his constitutional right to be present where defendant "has not explained how he could have done anything differently or what he would have gained had he been at the in-chambers conference"); *Stincer*, 482 U.S. at 745–47 (holding there was no right to be present at pretrial hearing to determine competence of child witnesses where hearing addressed solely the admissibility issue and defense counsel was present).

Replying to these arguments, Rienhardt contends that if he had been present at the conferences he could have "urged counsel to adopt one of [the] two approaches" required by the Rules of Professional Conduct: refusing to present testimony he knew to be perjured or moving to withdraw from the case without disclosing the reasons for the motion.[16] (Doc. 273 at 37.) The fact that Rienhardt's absence prevented this implausible scenario—Rienhardt providing legal and ethical advice to counsel—from taking place does not support a finding that the fairness of the in-camera proceedings was thwarted, *see Gagnon*, 470 U.S. at 526, or that proceedings were such that Rienhardt's presence had a reasonably substantial relation "to the fullness of his opportunity to defend against the charge," *Christensen*, 129 Ariz. at 38, 628 P.2d at 586.

The Court concludes that Rienhardt "could have done nothing had [he] been at the conference, nor would [he] have gained anything by attending." *Gagnon*, 470 U.S. at 527; *see* S*tate v. Schackart*, 190 Ariz. 238, 255, 947 P.2d 315, 332 (1997). Moreover, any error occasioned by his absence was harmless. *See Campbell*, 408 F.3d at 1172 (finding petitioner's absence from conference discussing counsel's possible conflict of interest was harmless where petition could not show he was adversely affected by the alleged conflict).

---

[16] In his reply brief Rienhardt writes that "there is no way to know why Larson believed the witnesses might perjure themselves." (Doc. 273 at 37.) This is a curious contention given Rienhardt's argument that his proposed alibi defense became "unpresentable" when Rienhardt's letter to George was disclosed. (Doc. 38 at 21; *see* Doc. 218 at 32.) In that letter Rienhardt asked George to provide a false story about what happened on the night of the murders. Larson told the court that Gengler, one of the alibi witnesses, "proposes to testify rather similarly to what is requested of Miss George in the letter." (RT 2/21/96 at 8.)

1    Because Rienhardt had no right to attend the in-camera conferences, counsel did not

2    perform ineffectively under *Strickland* by failing to secure his presence. *See James*, 24 F.3d

3    at 27.

4    PCR counsel in turn did not perform ineffectively in failing to raise this meritless

5    claim. *See Atwood*, 870 F.3d at 1059–60; *Runningeagle*, 825 F.3d at 982; *Hooper*, 985 F.3d

6    at 627. Claims A(15) remains procedurally defaulted and barred from federal review.

7    g.    Claim A(16)

8    Rienhardt alleges that he was prejudiced by the cumulative effect of Larsen's guilt-

9    phase errors. PCR counsel did not perform ineffectively in failing to raise this meritless

10   claim.

11   The United States Supreme Court has not specifically recognized the doctrine of

12   cumulative error as an independent basis for habeas relief. *See Lorraine v. Coyle*, 291 F.3d

13   416, 447 (6th Cir. 2002) ("The Supreme Court has not held that distinct constitutional

14   claims can be cumulated to grant habeas relief."); *cf. Morris v. Sec'y Dep't of Corr.,* 677

15   F.3d 1117, 1132 n.3 (11th Cir. 2012) (refusing to decide whether "under the current state

16   of Supreme Court precedent, cumulative error claims reviewed through the lens of AEDPA

17   can ever succeed in showing that the state court's decision on the merits was contrary to or

18   an unreasonable application of clearly established law").

19   The Ninth Circuit has held that in some cases, although no single trial error is

20   sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may

21   nonetheless prejudice a defendant to such a degree that his conviction must be overturned.

22   *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002), *overruled on other grounds*

23   *by Slack v. McDaniel*, 529 U.S. 473 (2000). Here, however, the Court has not identified

24   any constitutional errors arising during the guilt phase of Rienhardt's trial. Therefore,

25   "[b]ecause there is no single constitutional error in this case, there is nothing to accumulate

26   to [the] level of a constitutional violation." *Id.*; *see Boyde v. Brown*, 404 F.3d 1159, 1176

27   (9th Cir. 2005); *Morris*, 677 F.3d at 1132 & n.3.

28

Because Supreme Court precedent does not recognize the doctrine of cumulative error, and because this Court has determined that no prejudice resulted from the errors alleged by Rienhardt, the claim of cumulative prejudice is meritless.

PCR counsel did not perform ineffectively by failing to raise this claim. *See Atwood*, 870 F.3d at 1059–60; *Runningeagle*, 825 F.3d at 982; *Hooper*, 985 F.3d at 627. Claim A(16) remains procedurally defaulted and barred from federal review.

### 2.    *Sentencing-stage ineffectiveness*

#### a.    Additional background

At the presentence hearing following Rienhardt's conviction, the State presented testimony in support of the § 13-703(F)(2) aggravating factor (prior conviction for a serious offense). After the State rested, defense counsel indicated that he would not present any witnesses, explaining: "Based on conversation with my client we would decline to present mitigating information." (RT 4/22/96 at 6.) Counsel elaborated:

> My client for both personal reasons and for reasons regarding his appellate status in this particular instance believes that it is inappropriate [sic], best interest to not proceed presenting mitigating factors. I have spoken with him on three different occasions regarding this. He believes it's a reasonable strategy to proceed under and has instructed me to follow so through.

(*Id.*)

The court asked Rienhardt if he agreed with counsel's statement and Rienhardt answered that he did. (*Id.* at 7.) The court then engaged in the following colloquy:

> Court: You understand that basically today's procedure is an aggravation mitigation hearing at which the State has presented at least part of the evidence that it will use to seek to establish aggravating circumstances for the purpose of its intention to ask the Court to seek the death penalty in your case. You understand that?
>
> Rienhardt: Yes, sir, I do.
>
> Court: This is also your opportunity to present any circumstances in mitigation that you may wish to present in order to establish both statutory and nonstatutory mitigating circumstances to persuade the Court not to impose that penalty. You understand that?

1

2

Rienhardt: Yes, I do.

Court: Knowing that, you wish to proceed as [counsel] indicated?

Rienhardt: Yes, sir.

(*Id.* at 7-8.)

At the subsequent sentencing hearing, the court again discussed Rienhardt's decision not to offer mitigating evidence. (RT 5/20/96 at 14.) After noting that a capital defendant has the burden of establishing mitigating circumstances by a preponderance of the evidence, the judge explained that "[t]he defendant has made it clear to the Court that he did not wish to present any evidence in mitigation." (*Id.* at 17.) The court continued:

> The Court informed the defendant that the defendant had an opportunity to present evidence in mitigation and that it was possible that the mitigation presented might affect the sentence the defendant might receive. The Court also told the defendant that if the Court was to find that the State has proven one aggravating factor and there was no mitigating evidence to rebut it, that the defendant would be—it would be required for the Court to sentence the defendant to death.

> The defendant stated that he understood these possible ramifications if he did not present mitigating evidence, and his counsel stated it was defendant's specific request that no mitigation be presented.

> The Court has asked the defendant personally if it was his decision not to put on mitigating evidence, and the defendant has assured this Court that it was the defendant's decision not to present any evidence in mitigation.

> The Court believes based on its conversations with the defendant, after seeing defendant's demeanor, conduct when addressing the Court, that the defendant was not under the effect of any drugs, alcohol or mind altering substance, nor under any duress or other situation that would have affected the voluntary, knowing nature of his refusal to produce mitigating evidence. This Court concludes based on his conversations with defendant, viewing him in court, that the defendant's decision not to present any mitigating evidence was voluntary.

(*Id.* at 17–18.)

The court then explained that it had nevertheless "conducted an independent review of the evidence and including but not limited to the testimony at trial and the presentence

- 37 -

report . . . to see if any statutory or nonstatutory mitigating factors exist, if so whether they are sufficient to overcome any one or more of the aggravating factors in this case." (*Id.* at 18.)

The documents contained in the presentence report ("PSR") included information compiled for previous reports. (PSR 4/17/96, sealed exhibit.) These reports featured social histories detailing Rienhardt's childhood, education, family background, employment history, and substance abuse history. (*Id.*) One report stated that Rienhardt's family suffered economic hardship when his father lost his business, that his father was physically abusive when intoxicated, and that Rienhardt was an average student and involved in sports until junior high school when he was incarcerated. (PSR 9/27/89 at 4–5.) The report also indicated that Rienhardt began using alcohol and marijuana at age 11, cocaine at 17, and that he also used methamphetamine. (*Id.* at 5.) In the PSR prepared for the murder case, Rienhardt was quoted as saying that he "had a very serious drinking problem, not a drug problem." (PSR 4/17/96.)

A second report stated that Rienhardt's behavior changed in 1983. At that time, he came to the attention of juvenile authorities who noted that he was "extremely depressed" with feelings of "helplessness, alienation, and desire to be dead." (PSR 12/19/90 at 4–5.) He feared he would become a "social deviant" like his incarcerated uncle. (*Id.* at 5.) His behavior was "totally out of control" and he was expelled from junior high and high school. (*Id.*) The report also stated that Rienhardt's parents were overprotective and "unwittingly supportive" of his delinquency. (*Id.*) With respect to Rienhardt's prior assault conviction, the report indicated that the victim believed Rienhardt was easily led and that his older half-brother bore greater responsibility for the crime. (*Id.* at 4.)

In reviewing Rienhardt's sentence on direct appeal, the Arizona Supreme Court noted that "Rienhardt expressly refused to present any mitigating evidence. In anticipation of Rienhardt's appeal to this court, the trial court conducted an independent review of the evidence for statutory and nonstatutory mitigating factors." *Rienhardt*, 190 Ariz. at 591, 951 P.2d at 466.

1    In his PCR petition, Rienhardt alleged that Larsen performed ineffectively by failing

2  to present mitigating evidence. (Doc. 259-1, Ex. A at 7–8.) In support of that claim, he

3  attached a psychological evaluation completed by Dr. Gina Lang. (*Id.*, Ex. A.) The

4  evaluation discussed Rienhardt's family background, noting that despite Rienhardt's report

5  of a happy, positive childhood, records indicated that he suffered physical abuse when his

6  father was drunk and that his mother was overly controlling, protective, and an enabler.

7  (*Id.* at 2.) The report also discussed Rienhardt's substance abuse history, indicating that he

8  began using alcohol and marijuana as early as age 11, that he was drinking seriously at age

9  15 or 16, that he had used cocaine and tried heroin, and that for a year prior to the crime he

10  smoked crystal methamphetamine on a daily basis. (*Id.* at 3.) The evaluation reported that

11  Rienhardt had an average IQ with no indication of cognitive impairment. (*Id.* at 4–5.) Dr.

12  Lang diagnosed Rienhardt with "Polysubstance Dependence, In a Controlled

13  Environment" and "Personality Disorder NOS with Antisocial and Dependent Features."

14  (*Id.* at 5.)

15    The PCR court denied Rienhardt's claim of ineffective assistance at sentencing "on

16  the merits" without further comment. (Doc. 259-2, Ex. D.)

17    As discussed below, in his amended habeas petition Rienhardt alleged that counsel

18  performed ineffectively by failing to conduct a mitigation investigation, failing to

19  adequately advise Rienhardt on whether or not to present mitigating evidence, and failing

20  to present any mitigating evidence. (Doc. 38 at 41–48.) The Court denied the claims,

21  designated Claims B(1), B(3), and B(7), on the merits. (Doc. 126 at 11–20.)

22    The Court now considers whether the default of Rienhardt's remaining allegations

23  of ineffective assistance of counsel at sentencing is excused under *Martinez*.

24       b.    Claim B(2)

25    Rienhardt alleges that Larsen performed ineffectively by failing to consult a mental

26  health expert. (Doc. 38 at 41; *see* Doc. 218 at 51.) Specifically, Rienhardt faults counsel

27  for not requesting "expert assistance on the issues of neuropsychological and educational

28  testing" despite the fact that there were "indications of possible brain damage." (*Id.*)

In their response to Rienhardt's supplemental *Martinez* brief, Respondents note that Rienhardt had failed "to demonstrate that an expert would have found different information from what the sentencing court already had before it in the presentence report." (Doc. 259 at 24.) Subsequently, in his reply brief, Rienhardt offered for the first-time expert evidence in support of this claim; namely, the opinion of a neuropsychologist who diagnosed him with "Cognitive Disorder, Not Otherwise Specified."[17] (Doc. 273 at 39; *see* Doc. 273-4, Ex. 46.)

As this Court previously explained (Doc. 126 at 15–20), *Schriro v. Landrigan*, 550 U.S. 465 (2007), provides the framework for assessing trial counsel's performance at sentencing. In *Landrigan* the Supreme Court reversed the Ninth Circuit, which had found—as Rienhardt continues to argue with respect to trial counsel's performance—that "Landrigan's apparently last-minute decision [not to present mitigation] cannot excuse his counsel's failure to conduct an adequate investigation prior to the sentencing." *Landrigan v. Schriro*, 441 F.3d 638, 647 (9th Cir. 2006). The Supreme Court held, to the contrary, that: "If Landrigan issued such an instruction [that counsel not offer any mitigation evidence], counsel's failure to investigate further could not have been prejudicial under *Strickland*." 550 U.S. at 477; *see Kayer v. Ryan*, No. CV07-2120-PHX-DGC, 2009 WL 3352188, at *22 (D. Ariz. Oct. 19, 2009) (collecting cases), *on reconsideration in part*, No. CV-07-02120-PHX-DGC, 2016 WL 3254165 (D. Ariz. June 14, 2016), *aff'd in part, rev'd in part and remanded*, 923 F.3d 692 (9th Cir. 2019), *cert. granted, judgment vacated sub nom. Shinn v. Kayer*, 141 S. Ct. 517 (2020), *and aff'd sub nom. Kayer v. Shinn*, 841 F.App'x 34 (9th Cir. 2021). The Court further explained that it had "never imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce evidence" and had "never required a specific colloquy to ensure that a defendant knowingly and intelligently refused to present mitigating evidence." *Id.* at 478, 479.

---

[17] The evaluation, completed by Dr. Joette James, took place on December 11, 2015. (Doc. 273-4, Ex. 46 at 1.) In his reply brief Rienhardt gives the date of the report as June 7, 2016, or a week before the reply was filed.

Rienhardt insists that the holding in *Landrigan* is premised on the defendant's actual interference with counsel's attempt to present mitigating evidence. (*See* Doc. 218 at 96–97.) The Court disagrees. While Landrigan, unlike Rienhardt, actively interfered with counsel's attempt to offer mitigating evidence, courts have found that such behavior is not required to establish that a defendant waived the presentation of mitigating evidence. *See Taylor v. Horn*, 504 F.3d 416, 455 (3d Cir. 2007) ("We agree with Taylor that he was not belligerent and obstructive in court like the defendant in *Landrigan* . . . but the record shows that his determination not to present mitigating evidence was just as strong."); *Loden v. McCarty*, 778 F.3d 484, 500 (5th Cir. 2015) ("[W]hile Loden's instructions to his attorneys here may not have been as strident, public, or obstructive as those in *Landrigan*, the record here evidences something more resolute than a mere instruction not to present mitigation evidence.").

Rienhardt also argues that Larsen could not have competently advised him with respect to waiving mitigation because he performed no investigation. (Doc. 38 at 42; *see* Doc. 218 at 55.) *Landrigan* itself disposes of this argument. As just discussed, in overruling the Ninth Circuit the Supreme Court rejected the argument that a defendant's waiver of mitigation cannot excuse counsel's failure to investigate. 550 U.S. at 477. The Court also explained it had never imposed a knowing and intelligent requirement on a defendant's decision not to present evidence. *Id.* at 478. In the absence of such a requirement, the basis of counsel's advice about the presentation of mitigating evidence is not relevant. *See Krawczuk v. Sec'y, Fla. Dep't of Corr.*, 873 F.3d 1273, 1299–1300 (11th Cir. 2017).

Circuit courts have relied on *Landrigan* to find that prejudice from lack of investigation cannot be shown where a defendant has waived mitigations. In *Allen v. Sec'y, Fla. Dep't of Corr.*, the Eleventh Circuit rejected the petitioner's argument that "his waiver should be deemed invalid because counsel, having conducted no pre-waiver investigation, failed to inform Allen of the mitigating evidence he is giving up." 611 F.3d 740, 763 (11th Cir. 2010). The court found that *Landrigan* "forecloses that argument" by holding that *Strickland* prejudice could not be established where a defendant refuses to allow the

presentation of mitigating evidence. *Id.* (citing *Landrigan*, 550 U.S. at 478); *see Shore v. Davis*, 845 F.3d 627, 633 (5th Cir. 2017) ("If a defendant instructs his attorney not to present mitigation evidence, the failure to present this evidence does not give rise to a *Strickland* claim.").

In *Krawczuk* the court held that because the defendant "told his counsel not to present mitigation evidence, this precludes any need to examine the scope of counsel's investigation." 873 F.3d at 1299–1300. The court explained:

> Krawczuk identifies no Supreme Court authority post-*Landrigan* indicating that a competent capital defendant's decision not to present any mitigating evidence may be informed or knowing only if trial counsel first thoroughly or even adequately investigates the mitigating evidence and tells her client about it. To the contrary, there is no such investigation requirement in this type of case where the defendant instructs his counsel not to present mitigation evidence.

873 F.3d at 1300.

In *Allen* the court also noted that the record showed the petitioner "knowingly and intelligently refused to present mitigating evidence," although such a waiver was not required under *Landrigan*. 611 F.3d at 764; *cf. Jeffries v. Blodgett*, 5 F.3d 1180, 1198 (9th Cir. 1993) (holding counsel did not perform deficiently in failing to present mitigating information where petitioner's "decision not to present evidence in mitigation was informed and knowing"). The court concluded that "[b]ecause Allen has not shown that counsel could have done anything regarding mitigating circumstance evidence that would have led to the presentation of it, he has failed to establish the prejudice element of this ineffective assistance of counsel claim." *Id.* at 765.

Under *Landrigan*, therefore, Rienhardt's waiver of the presentation of mitigating evidence forecloses a showing that counsel's performance was prejudicial, notwithstanding his pre-waiver lack of investigation.

Rienhardt cites *Stankewitz v. Wong*, 698 F.3d 1163, 1170 (9th Cir. 2012), and *Hamilton v. Ayers*, 583 F.3d 1100, 1119 (9th Cir. 2009), but those cases are distinguishable. In *Stankewitz* the Ninth Circuit rejected the argument that counsel's performance was

reasonable because Stankewitz opposed the presentation of a case in mitigation. The court found that Stankewitz's "supposed opposition to 'any penalty phase defense' [was] belied by the record." *Id.* at 1169 (quoting *Stankewitz v. Woodford*, 365 F.3d 706, 721 (9th Cir. 2004)). In fact, counsel presented several penalty-phase witnesses, including a family member, and Stankewitz did not object. *Id.* at 1170. This "suggest[ed] either that Stankewitz did not object to the testimony of family members or that [counsel] could have convinced Stankewitz to accept such evidence if [counsel] had conducted a proper investigation and presented the evidence to Stankewitz." *Id.* Under those circumstances, "Stankewitz's supposed opposition to a penalty phase defense [did] not excuse [counsel's] failure to investigate and present mitigating evidence." *Id.*

Likewise, in *Hamilton* the Ninth Circuit found that the defendant "at most . . . refused to assist in his defense" but "did not impede the many other avenues of mitigating evidence available to counsel." 583 F.3d at 1119. Accordingly, counsel gathered and presented mitigating evidence at the penalty phase of trial. *Id.* There was not, as in Rienhardt's case, "a knowing and informed decision not to present mitigating evidence." *Id.*; *see Young v. Sirmons*, 551 F.3d 942, 959 (10th Cir. 2008) (distinguishing *Landrigan* because defendant did not "waive mitigation"); *Adams v. Quarterman*, 324 F. App'x 340, 347 (5th Cir. 2009) (distinguishing *Landrigan* because "there is no evidence that Adams instructed counsel not to present mitigating evidence"). These cases demonstrate that counsel's failure to present a case in mitigation does not constitute ineffective assistance when a defendant has actually waived the presentation of mitigating evidence, whether or not the defendant interfered with counsel's performance.

In Rienhardt's case, nothing in the record suggests that his decision to forgo mitigation was limited to certain types of evidence or would have been different if counsel had performed a thorough investigation. *See Allen*, 611 F.3d at 765. In contrast to the cases relied on by Rienhardt, where the defendants did not in fact waive mitigation entirely and even acquiesced in counsel's presentation of some mitigating evidence, Larsen's tactics at

1   sentencing were explained by Rienhardt's opposition to the presentation of any mitigating

2   evidence.

3        Because Rienhardt waived the presentation of mitigating evidence, counsel's failure

4   to investigate potential mental health issues was not prejudicial. *Landrigan*, 550 U.S. at

5   477. PCR counsel did not perform ineffectively by failing to raise this meritless claim of

6   ineffective assistance of trial counsel. *See Atwood*, 870 F.3d at 1059–60; *Runningeagle*,

7   825 F.3d at 982; *Hooper*, 985 F.3d at 627. Claim B(2) remains procedurally defaulted and

8   barred from federal review.

9             c.    Claim B(4)

10       Rienhardt alleges that Larsen performed ineffectively by failing to challenge the

11   aggravating factors. (Doc. 38 at 43; *see* Doc. 218 at 55.) As discussed above, the trial court

12   found three aggravating factors: that Rienhardt murdered Ellis in an especially heinous,

13   cruel or depraved manner under A.R.S. § 13-703(F)(6); that he had previously been

14   convicted of a serious offense, § 13-703(F)(2); and that he committed the murder for

15   pecuniary gain, § 13-703(F)(5). The Arizona Supreme Court struck the pecuniary gain

16   factor but upheld the other factors and affirmed Rienhardt's death sentence. *Rienhardt*, 190

17   Ariz. at 589–91, 593, 951 P.2d at 464–66, 468. The court found that the (F)(2) factor was

18   satisfied by Rienhardt's conviction for "aggravated assault committed by the use,

19   threatened use or exhibition of a deadly weapon or dangerous instrument." *Id.* at 589, 951

20   P.2d at 464.

21       Rienhardt concedes, given the Arizona Supreme Court's decision, that he was not

22   prejudiced by counsel's failure to contest the pecuniary gain factor (Doc. 38 at 43), and he

23   does not challenge counsel's performance with respect to the cruel, heinous, or depraved

24   factor. He argues, however, that trial counsel should have "mitigated" the (F)(2) prior

25   serious conviction factor with "testimony from the victims in that case" who believed that

26   Rienhardt was "easily led" and that his older half-brother was more responsible for the

27   crime. (Doc. 38 at 43; *see* Doc. 218 at 56.)

28

1   This argument is unpersuasive. First, Rienhardt does not contest that the (F)(2)
2   factor was proved though his prior conviction. Moreover, as already noted, the trial court
3   was aware through the PSR of the victim's opinion of Rienhardt's role in the assault. There
4   is not a reasonable probability that presenting testimony which repeated information the
5   judge already knew would have resulted in a different sentence.

6   PCR counsel did not perform ineffectively by failing to raise this meritless claim.
7   *See Atwood*, 870 F.3d at 1059–60; *Runningeagle*, 825 F.3d at 982; *Hooper*, 985 F.3d at
8   627. Claim B(4) remains procedurally defaulted and barred from federal review.

9           d.      Claim B(5)

10  Rienhardt alleges that Larsen performed ineffectively by failing to submit a
11  sentencing memorandum. (Doc. 38 at 44; *see* Doc. 218 at 57.) He contends that the failure
12  to provide a memorandum led the trial court to adopt, nearly verbatim, the State's proposed
13  special verdict. (*Id.*) Beyond that conclusory statement, Rienhardt offers no arguments in
14  support of his allegation of ineffective assistance, but instead focuses on the "disapproved"
15  practice of a court adopting a party's findings and arguments. (*Id.*)

16  In his *Martinez* reply brief, Rienhardt argues that a sentencing memo would have
17  countered the "errors" in the State's proposed special verdict. (Doc. 273 at 45–46.)
18  Rienhardt identifies the following "errors" in the State's filing: that he "planned and
19  intended to take Michael Ellis to this remote area in the desert for the purpose of killing
20  him"; "made threats about killing the victim"; "took steps, including attempting to burn the
21  car" and "severely beat the victim and shot the victim with a shotgun." (*Id.* at 45.) Although
22  defense counsel did not address these "errors" in a sentencing memorandum, the theory of
23  the guilt-phase defense was that Nadeau, not Rienhardt, was responsible for the victim's
24  mistreatment and death. Counsel reiterated that theory in his guilt-phase closing argument,
25  insisting that the witnesses had misidentified Rienhardt. (*See* RT 2/22/96 at 26–43.)

26  There is no basis on which to find that a memorandum would have done such an
27  effective job of countering the State's factual presentation that there was a reasonable
28  probability of a different sentence if such a document had been filed. *See United States v.*

*Labrada-Bustamante*, 428 F.3d 1252, 1261 (9th Cir. 2005) (holding that when counsel makes oral objections and arguments at sentencing, failure to file a sentencing memorandum at the sentencing hearing does not amount to ineffective assistance of counsel); *Israel v. Sec'y, Fla. Dep't of Corr.*, 517 F.App'x 694, 698 (11th Cir. 2013) (explaining, where counsel failed to file a sentencing memorandum on a mitigating circumstance, that the "negligently missed opportunity to reiterate what the trial court already knew was not prejudicial under *Strickland*").

PCR counsel did not perform ineffectively by failing to raise this claim. *See Atwood*, 870 F.3d at 1059–60; *Runningeagle*, 825 F.3d at 982; *Hooper*, 985 F.3d at 627. Claim B(5) remains procedurally defaulted and barred from federal review.

e.      Claim B(6)

Rienhardt alleges that Larsen performed ineffectively by failing to disclose a conflict of interest. (Doc. 38 at 45; *see* Doc. 218 at 57–58.) The supposed conflict arose from Larsen's former employment with the Pima County Attorney's Office at the time Rienhardt's prior offense was prosecuted. (*Id.*) Rienhardt states that Larsen never informed him of the conflict, so it was never waived. (*Id.*)

This claim is meritless. An ineffective assistance of counsel claim based on a conflict of interest requires a petitioner to show "that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980). An "actual conflict of interest" means "a conflict that affected counsel's performance—as opposed to a mere theoretical division of loyalties." *Mickens v. Taylor*, 535 U.S. 162, 171 (2002) (emphasis in original). In *Mickens* "the Supreme Court explicitly limited this presumption of prejudice for an actual conflict of interest . . . to cases involving 'concurrent representation'"—that is, simultaneous representation of two or more defendants. *Rowland v. Chappell*, 876 F.3d 1174, 1192 (9th Cir. 2017) (citing *Mickens*, 535 U.S. at 175).

This is not a matter involving concurrent representation, and Rienhardt cannot shown that Larsen's prior employment constituted an actual conflict of interest that adversely affected his performance. *See Brownlee v. Haley*, 306 F.3d 1043, 1063–64 (11th

Cir. 2002) (holding as a matter of law that no conflict existed where petitioner's defense attorney previously worked for office that had prosecuted petitioner for an earlier, unrelated crime); *Hernandez v. Johnson*, 108 F.3d 554, 559–60 (5th Cir. 1997) (finding no conflict of interest from fact that defense counsel was involved in prior prosecutions of defendant) (citing *Sullivan*, 446 U.S. at 348, 350); *cf. Rowland v. Chappell*, 902 F.Supp.2d 1296, 1320 (N.D. Cal. 2012) (citing *Sullivan* and *Mickens* and noting that "[petitioner] cannot cite to any clearly established federal law holding that a defense attorney's prior employment as a prosecutor amounts to a conflict of interest. . . .").

In his reply to the response to his supplemental brief, Rienhardt offers a different argument—that the conflict prevented Larsen from investigating the prior conviction and thus challenging the (F)(2) factor. (Doc. 273 at 47.) This argument is unpersuasive because, as just mentioned, the factor remains uncontested, and the trial judge was aware of the victim's view that Rienhardt was less culpable than his brother in committing the assault.

PCR counsel did not perform ineffectively by failing to raise this meritless claim. *See Atwood*, 870 F.3d at 1059–60; *Runningeagle*, 825 F.3d at 982; *Hooper*, 985 F.3d at 627. Claim B(6) remains procedurally defaulted and barred from federal review.

### f.      Claim B(8)

Rienhardt alleges that he was prejudiced by the cumulative effect of counsel's sentencing-phase errors. (Doc. 38 at 47; *see* Doc. 218 at 58.)

Because Supreme Court precedent does not recognize the doctrine of cumulative error, and because this Court has determined that no prejudice resulted from the errors alleged by Rienhardt, the claim of cumulative prejudice is meritless.

PCR counsel did not perform ineffectively by failing to raise this claim. *See Atwood*, 870 F.3d at 1059–60; *Runningeagle*, 825 F.3d at 982; *Hooper*, 985 F.3d at 627. Claim B(8) remains procedurally defaulted and barred from federal review.

### g.      Claim C(2)

Rienhardt alleges that Larsen's romantic interest in Anjanette Ortiz prevented him from calling her as a witness. (Doc. 38 at 51; *see* Doc. 218 at 62.) Ortiz was Rienhardt's

1   ex-girlfriend and the mother of his child. It was her car that Rienhardt and Nadeau drove

2   into the mountains with the victim. She had lied to the police about the car being stolen.

3   (*See* Doc. 218-5, Ex. 31, ¶ 6.)

4   In a 2006 affidavit, Ortiz states that she could have testified that she spoke with

5   Rienhardt on the night of the murder, that he sounded like he was crying, that he told her

6   the shooting was an accident, and that he wanted to drop the victim off somewhere, but

7   Nadeau refused and kept driving. (*Id.*, ¶ 7.)

8   According to Ortiz, Larsen demonstrated interest in her by staring at her in a way

9   that made her uncomfortable, taking her out for drinks, disparaging her boyfriend, calling

10   her and stopping by her house, and failing to take any notes during their meetings. (*Id.*, ¶

11   5.) Ortiz's mother, in her 2006 affidavit, states that she witnessed some of this behavior

12   and that Anjanette became so uncomfortable with Larsen's conduct that she began to avoid

13   him. (Doc. 218-5, Ex. 30, ¶¶ 9–10.) Rienhardt asserts that Larsen did not call Ortiz as a

14   witness because he "wished to impress her with his ability to protect her" from any

15   consequences resulting from her lie to the police. (Doc. 38 at 52; *see* Doc. 218 at 63.)

16   Respondents counter that at the time PCR counsel filed his petition in 2000 there

17   was no evidence of a conflict of interest based on Larsen's alleged interest in Ortiz. (Doc.

18   259 at 37.) Rienhardt replies that PCR counsel would have discovered the conflict if he

19   had interviewed Ortiz or Ortiz's mother. (Doc. 273 at 58–59.)

20   Assuming that PCR counsel performed deficiently by failing to interview Ortiz and

21   her mother, and making the additional assumption that the pair would have disclosed the

22   same impressions of Larsen's behavior as they attested to in 2006, the underlying claim of

23   ineffective assistance of trial counsel remains meritless. The allegation that it was his

24   romantic interest in Ortiz that caused Larsen not to call her as a witness is both conclusory

25   and purely speculative and falls far short of establishing a claim of ineffective assistance.

26   *See Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir. 2001) (explaining that conclusory

27   assertions of conflict of interest are insufficient to establish an actual conflict of interest);

28

1    *Morris v. State of Cal.*, 966 F.2d 448, 455 (9th Cir. 1991) ("The mere possibility of a

2    conflict of interest is insufficient to support a holding of ineffective assistance.").

3           Finally, even if Larsen had called Ortiz to testify about her conversation with

4    Rienhardt, and she provided the information contained in her 2006 affidavit, given the other

5    evidence establishing Rienhardt's guilt, including the blood evidence, Rienhardt's threats

6    to harm Ellis, and the letter he wrote describing the murder, there was not a reasonable

7    probability that her testimony would have resulted in a different verdict.

8           PCR counsel did not perform ineffectively by failing to raise this meritless claim of

9    ineffective assistance of trial counsel. *See Atwood*, 870 F.3d at 1059–60; *Runningeagle*,

10   825 F.3d at 982; *Hooper*, 985 F.3d at 627. Therefore, Claim C(2) remains procedurally

11   defaulted and barred from federal review.

12          ***3.       Conclusion***

13          The Court has reconsidered, in light of *Martinez*, Claims A(1)–(5), A(7)–(16), B(2),

14   B(4)–(6), B(8), and C(2). The Court finds that "cause" does not exist for the default of

15   these claims. PCR counsel did not perform at a constitutionally ineffective level. The

16   underlying claims of ineffective assistance of trial counsel are without merit. Therefore,

17   there was not a reasonable probability of a different outcome if PCR counsel had raised the

18   claims, and Rienhardt has not shown prejudice under *Strickland*. *Clabourne*, 745 F.3d at

19   377. The claims remain procedurally defaulted and barred from federal review.

20          **B.       *Dickens* Analysis**

21          On remand the Ninth Circuit directed this Court to "consider whether

22   reconsideration is warranted" as to Claims A(6), B(1), B(3), (B)(7), and C(1). (Doc. 145.)

23   The Court previously denied these claims on the merits. (Doc. 126.) Citing *Dickens*, 740

24   F.3d at 1318, Rienhardt alleges that "new facts available in federal court" have

25   fundamentally altered the claims rendering them unexhausted for purposes of *Martinez*.

26   (Doc. 218 at 65.)

27

28

1        ### 1.   *Claim A(6)*

2              #### a.   Additional background

3       Rienhardt alleges that Larsen performed ineffectively by failing to move for a

4    mistrial or request non-conflicted counsel when he became a potential witness in

5    Rienhardt's trial. (Doc. 38 at 22; *see* Doc. 218 at 69.) Larsen put himself in that position

6    by interviewing co-defendant Christina George in jail about two weeks after her arrest,

7    without any other witnesses present and without recording the conversation. George

8    disclosed the interview to the prosecutor on the night before her trial testimony. (RT

9    2/16/96 at 6.) According to the prosecutor, in her interview with Larsen, George had

10   "implicated . . . Rienhardt in everything that happened." (*Id.*) The prosecutor moved for a

11   mistrial on the grounds that Larsen had become a witness for the State. (*Id.* at 6–7.)

12      Outside the presence of the jury, George testified that she told Larsen "everything"

13   she knew about Rienhardt's involvement in the crimes. (*Id.* at 11.) She told him that she

14   had picked Rienhardt and Nadeau up that night as she had been asked to do; that Rienhardt

15   told her the victim had been killed by rocks dropped on his head and that Rienhardt said

16   "he had done it"; that they had to dislodge a car that was stuck on the rocks; and that she

17   and Rienhardt in the black car had followed Nadeau in the white car as they drove back

18   down the mountain. (*Id.* at 12–13.) Finally, she testified that she told Larsen she was willing

19   to "change her story around so that it would look better for [Rienhardt]." (*Id.* at 14.)

20      The trial court denied the prosecutor's motion for a mistrial but ruled that the

21   prosecution could question George about the interview if defense counsel opened the door

22   on cross-examination. (*Id.* at 16–17.) As described below, counsel did open the door and

23   the prosecutor questioned George about the interview. (*Id.* at 86.)

24      In her testimony before the jury, George stated that between 11:00 p.m. and 1:00 or

25   2:00 a.m. she had received an "SOS" page from Rienhardt followed by a phone call. During

26   the call Rienhardt told her there was an emergency involving a dead body in the back of

27   their car. (*Id.* at 31–33.) Rienhardt told her to go to the Circle K near Reddington Pass and

28   wait there for him. (*Id.* at 33.) When Rienhardt did not show up, George decided to drive

up Reddington Pass to a place where she and Rienhardt had been cliff diving a couple weeks earlier. (*Id.* at 34.) About half a mile up a dirt road she ran into Rienhardt and Nadeau who were walking down the road because their car had gotten stuck. (*Id.* at 35.) George picked them up. As they were driving up the mountain, Rienhardt or Nadeau—she thought it was Rienhardt—told her to stop so they could pick up a gun that was under a rock. (*Id.* at 36.) Nadeau exited the vehicle. George did not see the gun, but when Nadeau returned to the car, she could tell he was carrying something. (*Id.* at 37.)

George testified that as they were driving Rienhardt told her "that there was a rock dropped on Mike Ellis's head to kill him because he wasn't dead from the gunshot." (*Id.* at 38.) When asked to describe exactly what Rienhardt said, George testified that he told her "Dude wasn't dead. We had to drop a rock on his head to kill him. I have brains all over my pants." (*Id.*) They managed to dislodge the car, a white Buick which Nadeau then drove down the mountain followed by George driving her vehicle with Rienhardt as her passenger. (*Id.* at 40.)

They drove to a shopping center where they decided to burn the white Buick. (*Id.* at 41.) Before they could do so a sheriff's deputy arrived. (*Id.* at 43.) The trio fled in George's vehicle. (*Id.*) A chase ensued during which Rienhardt fired a shot. (*Id.* at 44.) George's vehicle broke down and the three fled on foot into an apartment complex where Nadeau was apprehended. (*Id.* at 46.) George was arrested the next day. (*Id.* at 48.)

George testified that she did not see any blood on Rienhardt, even though she could see him "fairly well" in the shopping mall parking lot. (*Id.* at 47.) She did notice blood on Nadeau. (*Id.*) She saw blood in the back seat of the white car, and blood on a towel in the vehicle. (*Id.* at 48–49.)

George testified that at the time of the crimes Rienhardt's right hand was broken. (*Id.* at 48.)

She testified that Rienhardt owned a sawed-off shotgun. (*Id.* at 49–50.) She recognized it as the gun presented to her by the prosecutor. (*Id.* at 50.)

1   Finally, the prosecutor presented George with letters written to her by Rienhardt in

2   which Rienhardt asked her to testify falsely. (*Id.* at 52.)

3   Larsen then cross-examined George. He impeached her testimony with the details

4   of her plea agreement; the inconsistent versions of the story she provided to law

5   enforcement, including her previous claims that Nadeau, not Rienhardt, had told her he had

6   dropped a rock on the victim's head; hostile letters she had written to Rienhardt; and her

7   heavy drug use. (*Id.* at 58–84.) The Arizona Supreme Court described the cross-

8   examination as "withering" and found that counsel "created a strong inference that George

9   had fabricated her story in exchange for leniency." *Rienhardt*, 190 Ariz. at 585, 586, 951

10  P.2d at 461, 462.

11  On redirect examination, the trial court found that defense counsel had opened the

12  door to testimony about prior consistent statements George had made when counsel

13  interviewed her prior to her plea agreement. (RT 2/16/96 at 86.) The prosecutor then

14  questioned George about the interview. She testified that she told Larsen that it was

15  Rienhardt who dropped the rock on the victim's head and Rienhardt who had called and

16  asked her to meet him at the Circle K. (*Id.* at 87–88.) She testified that she "believe[d]" she

17  told Larsen that Rienhardt had shot the victim, but she couldn't "remember specifically

18  everything [she] told him." (*Id.* at 88.)

19  b.      Analysis

20  In his first PCR petition, Rienhardt alleged that Larsen performed ineffectively by

21  failing to move for a mistrial or withdraw. (Doc. 259-1, Ex. A at 5–7.) The PCR court

22  denied the claim on the merits. (Doc. 259-2, Ex. D.) This Court found that the PCR court's

23  decision was not objectively unreasonable under AEDPA. (Doc. 126 at 11.) In particular,

24  the Court found that Rienhardt could not show he was prejudiced by Larsen's performance

25  as required under *Strickland*. (*Id.* at 9–11.) The Court explained that Larsen effectively

26  cross-examined George, that there was no reason to believe the trial court would have

27  granted a mistrial if Larsen had moved for one, and that the evidence of Rienhardt's guilt

28  was overwhelming. (*Id.* at 9–10.)

1    Rienhardt now argues that additional evidence has fundamentally altered the claim
2    so that, under *Dickens* and *Martinez*, it is unexhausted and subject to de novo review. (*See*
3    Doc. 218 at 65, 70.) The new evidence Rienhardt cites includes declarations from George
4    and her counsel, Steve Sonenberg, prepared during these habeas proceedings, and Larsen's
5    notes from the George interview. In her 2004 declaration, George attests that she felt
6    pressured by the prosecutor to testify as she did and that some of her trial testimony was
7    "completely made up." (Doc. 218-5, Ex. 24, ¶¶ 1–8.) In his 2007 declaration, Sonenberg
8    attests to statements made to him by George about her interview with Larsen. (*Id.*, Ex. 33.)
9    According to Sonenberg, during the interview George told Larsen that Nadeau had told her
10   that he shot the victim and dropped rocks on his head. (*Id.*, Ex. 33, ¶ 5.) Sonenberg also
11   states that his notes from a later visit show that George told him that Nadeau knew where
12   the shotgun was. (*Id.*, ¶ 6.) Larsen's interview notes indicate that George told him she saw
13   dried blood and dirt on Nadeau but not on Rienhardt and that Nadeau told her he had
14   dropped the rock on the victim's head. (Doc. 218-6, Ex. 35)

15   The premise of Rienhardt's argument that this claim has been fundamentally altered
16   is that the new evidence shows George's trial testimony was false. (*See* Doc. 273 at 62.)
17   This argument fails for two reasons. First, the new evidence is not entirely inconsistent
18   with George's trial testimony. For example, she testified that she saw blood on Nadeau but
19   not on Rienhardt, which is consistent with Larsen's interview notes. She testified that it
20   was either Rienhardt or Nadeau who told her where to stop to pick up the shotgun—she
21   didn't remember but she believed it was Rienhardt. She also testified that Rienhardt had a
22   broken right hand, from which the jury could infer that, whatever Rienhardt told George,
23   it might have been difficult for him, acting alone, to have dropped the heavy rocks on the
24   victim's head.

25   Next, George's 2004 recantation of her trial testimony eight years earlier does not
26   render that testimony false. *See Allen (Clarence)*, 395 F.3d at 994 (rejecting false-
27   testimony claim based on post-trial recantation, observing that recantation evidence may
28   properly be considered unreliable, especially when trial testimony is consistent with other

evidence and recantation is not); *Jones v. Taylor*, 763 F.3d 1242, 1246–48 (9th Cir. 2014) (discussing drawbacks of recantation testimony). In fact, while George now claims that some of her trial testimony was "completely made up," the only such testimony she cites as "invented" is her testimony that she saw Rienhardt put two guns in the white car that night.[18] (Doc. 218-5, Ex. 24, ¶ 8.) She does not specifically recant any of her other testimony about Rienhardt's involvement in the crimes. *See Washington v. Sherman*, No. 15CV2448 MMA (BGS), 2019 WL 4849196, at *22 (S.D. Cal. Sept. 30, 2019) (finding that witness's "vague, after-the-fact declaration in which she attempts to recant her testimony is insufficient to establish falsity" where witness "fail[ed] to point to anything specific in her trial testimony that was untrue" but stated "merely that she could not remember the events clearly, she felt pressure to testify, and she reviewed summaries of her previous accounts prior to testifying"), *certificate of appealability denied*, No. 19-56277, 2021 WL 1748056 (9th Cir. Apr. 20, 2021).

Finally, even assuming the new evidence demonstrated that George's trial testimony was false, such a conclusion changes neither the legal nor the factual bases of the ineffective-assistance claim. The information does not fundamentally alter Claim A(6) or put the claim in a significantly different and stronger evidentiary posture. *See Weaver v. Thompson*, 197 F.3d 359, 364 (9th Cir. 1999); *Chacon v. Wood*, 36 F.3d 1459, 1468 (9th Cir. 1994), *superseded by statue on other grounds*, 28 U.S.C. § 2253(c); *see also Escamilla v. Stephens*, 749 F.3d 380, 395 (5th Cir. 2014) (finding *Martinez* inapplicable where new evidence did not fundamentally alter but "merely provided additional evidentiary support" for already-adjudicated state court claim).

Larsen is alleged to have performed at a constitutionally ineffective level by not moving for a mistrial or seeking unconflicted counsel after meeting with George alone and making himself a potential witness. The conflict of interest and the resulting claims of ineffective assistance are the same regardless of what George told Larsen or later told

---

[18] Another witness, Theresa Martinez, testified that she saw two shotguns in the vehicle that day. (RT 2/15/96 at 10–11.)

habeas counsel. *Cf. Beaty v. Stewart*, 303 F.3d 975, 989–90 (9th Cir. 2002) (finding conflict of interest claim fundamentally altered in federal court where grounds of the alleged conflict were "vastly different") "The factual basis for the claim remain[s] rooted in the same incident" and "[t]he legal basis . . . remain[s] unchanged." *Weaver*, 197 F.3d at 364; *see Williams v. Filson*, 908 F.3d 546, 573-76 (9th Cir. 2018) (finding that a new expert report corroborating allegations in state court did not place the claim in a "significantly different and stronger evidentiary posture" or transform it "into a new and unexhausted claim"); *see also Sproule v. Taylor*, No. 2:16-CV-01592-MK, 2020 WL 718222, at *3 (D. Or. Feb. 12, 2020) (finding claim not fundamentally altered where petitioner "merely seeks to present *additional* evidence to support the same IAC claims that were rejected by the Oregon courts"); *LaPointe v. Ryan*, No. CV-15-01044-PHX-DJH (BSB), 2016 WL 11577502, at *7 (D. Ariz. Jan. 15, 2016) (explaining that new affidavits and citations to the record "d[id] not fundamentally change the nature of Petitioner's claim that trial counsel was ineffective during plea negotiations"), *report and recommendation adopted,* No. CV-15-01044-PHX-DJH, 2019 WL 1429343 (D. Ariz. Mar. 29, 2019); *Lee v. Ryan*, No. CV-04-0039-PHX-JTT, 2019 WL 1529656, at *5 (D. Ariz. Apr. 9, 2019) ("Generally, a petitioner may add factual materials supportive of those already in the record without fundamentally altering his claim and rendering it unexhausted."), *reconsideration denied,* No. CV-04-0039-PHX-JTT, 2019 WL 1932110 (D. Ariz. May 1, 2019); *Hoyos v. Cullen*, No. 09CV0388 L NLS, 2011 WL 11425, at *7 (S.D. Cal. Jan. 4, 2011) ("The new facts alleged in the federal petition do not add anything that the state court would not have already considered 'intrinsic to the consideration' of this type of claim.") (quoting *Vasquez*, 474 U.S. at 259).

The new evidence presented here does not fundamentally alter the original claim such that it constitutes a new, unexhausted claim. *See Dickens*, 740 F.3d at 1318–19. Therefore, the Court will not reconsider its denial of Claim A(6).

### 2. Claims B(1), B(3), and B(7)

Rienhardt alleges that three claims of ineffective assistance of counsel at sentencing

1    have been fundamentally altered by new evidence. (*See* Doc. 218 at 87–110.) In Claim

2    B(1), Rienhardt alleges that Larsen performed ineffectively by failing to conduct a

3    mitigation investigation. (Doc. 38 at 41.) In Claim B(3), he alleges that trial counsel

4    performed ineffectively by failing to adequately advise him about the presentation of

5    mitigating evidence. (*Id.* at 42.) In Claim B(7), he alleges that trial counsel performed

6    ineffectively by failing to present a case in mitigation. (*Id.* at 45.) Rienhardt raised these

7    claims during the PCR proceedings and the court denied them on the merits. (Doc. 259-1,

8    Ex. A at 7–8; Doc. 259-2, Ex. D.) This Court denied habeas relief, finding the PCR court's

9    rejection of the claims was not "objectively unreasonable" under AEDPA. (Doc. 126 at

10   20.) Specifically, the Court determined that because Rienhardt "expressly waived" the

11   presentation of mitigating evidence, he could not show he was prejudiced by counsel's

12   performance. (*Id.* at 15–17.)

13          Rienhardt contends that these claims have been fundamentally altered by new

14   evidence that was not before the PCR court. This evidence consists of the expert's

15   neurological findings and information from family members and from Christina George,

16   Anjanette Ortiz, and Ortiz's mother about the difficulties of Rienhardt's upbringing, his

17   drug use, mental illness in his extended family, and speculation that he had been sexually

18   abused. (*See* Doc. 218 at 99–108; Doc. 273 at 48–56.) None of this new evidence, however,

19   alters the principal legal basis for a finding that the claims lack merit, which, as discussed

20   above, is the application of the holding in *Landrigan* to Rienhardt's waiver of mitigating

21   evidence. Rienhardt has presented no new evidence that addresses the question of his

22   waiver.

23          Rienhardt's new mitigation evidence does not fundamentally alter the legal claims

24   considered by the state court or place the case in a significantly different and stronger

25   evidentiary posture than it was in when the state court considered those claims. *Dickens*,

26   740 F.3d at 1318–19. Therefore, the Court will not reconsider its denial of Claims B(1),

27   B(3), and B(7).

28

### 3.     *Claim C(1)*

In Claim C(1), Rienhardt alleges that Larsen had a conflict of interest arising from his interview with George. The Court previously denied this claim on the merits. (Doc. 126 at 20–22.) Rienhardt again argues that the claim raised in state court is fundamentally altered by new evidence purportedly showing that George lied in her trial testimony. As explained above, this information does not alter the claim, which is based on the fact that counsel made himself a potential witness by interviewing George. *Cf. Beaty*, 303 F.3d at 989–90. The Court will not reconsider its denial of Claim C(1).

### C.     "Recently Exhausted" Claims

The Ninth Circuit directed the Court to "consider in light of intervening law whether expansion of the record and leave to amend the petition are warranted as to Petitioner's recently exhausted claims." (Doc. 145.) This refers to the claims Rienhardt raised in his second PCR petition and with which he sought to amend his habeas petition in 2005. There is not a complete overlap in these claims, however, as Rienhardt added three claims to his proposed amended petition that he did not raise in his second PCR petition. (*See* Doc. 96 at 5–6.)

The claims Rienhardt raised during his second PCR proceedings are designated Claims D, F, G, H, I, L, O, R, S, T, U, CC, DD, EE, and MM.[19] (Doc. 259-2, Ex. E.) In his

---

[19] Claim D alleges that the trial court impermissibly considered evidence from co-defendant Nadeau's trial. Claim F alleges that the court's intoxication instruction misstated the law. Claim G alleges that the prosecutor committed misconduct by vouching for evidence and commenting on Rienhardt's silence. Claim H alleges that the prosecutor failed to disclose benefits to George. Claim I alleges that Rienhardt's rights were violated by the court's failure to fund a "private presentence report." Claim L alleges that Rienhardt's rights were violated by the trial court's failure to recuse itself for sentencing. Claim O alleges ineffective assistance of appellate counsel. Claim R alleges a violation of Rienhardt's right to be present and right to a complete record. Claim S alleges that the prosecutor unconstitutionally used peremptory strikes to remove women and Hispanics from the jury. Claim T alleges that the trial court unconstitutionally refused to give a false imprisonment instruction. Claim U alleges that Rienhardt's rights were violated when the judge adopted the prosecution's sentencing memorandum. Claim CC alleges that Rienhardt's rights were violated when he was forced to wear a leg brace at trial. Claim DD alleges that the trial court's "reasonable doubt instruction" was unconstitutional. Claim EE

1    motion for leave to amend, Rienhardt added Claims P, FF, and GG. (Docs. 88, 89.) He had

2    raised Claims FF and GG in his first PCR petition.[20] (Doc. 259-1, Ex. A.) The PCR court

3    found them precluded under Rule 32.3(a)(3) because they could have been raised on

4    appeal. (Doc. 259-2, Ex. D.).

5        The second PCR court found Claims D, F, G, H, I, L, O, R, S, T, U, CC, DD, EE,

6    and MM precluded and waived under Rule 32.2(a)(3) because they could have been raised

7    in earlier proceedings. (Doc. 259-3, Ex. F.) This Court, in considering Rienhardt's motion

8    for leave to amend, found the claims unexhausted and "likely" procedurally defaulted

9    because they had not yet been presented to the Arizona Supreme Court in a petition for

10   review. (Doc. 96 at 7.) Because Rienhardt made no showing of cause and prejudice or a

11   fundamental miscarriage of justice, the Court found the claims procedurally barred, thereby

12   rendering amendment futile. (*Id.* at 7–8.) The Court also found Claims FF and GG

13   procedurally defaulted and Claim P, alleging ineffective assistance of PCR counsel, non-

14   cognizable under 28 U.S.C. § 2254(i), which provides that the incompetence of counsel

15   during postconviction proceedings is not grounds for habeas relief. (*Id.* at 6–7.) The

16   Arizona Supreme Court subsequently denied review of Claims D, F, G, H, I, L, O, R, S, T,

17   U, CC, DD, EE, and MM. (Doc. 251-1, Ex. F.)

18       After the matter was remanded, Rienhardt moved for reconsideration of the Court's

19   denial of his motion to amend. (Doc. 238.) The Court denied reconsideration, finding that

20   Rienhardt's arguments were outside the scope of the limited remand, as well as untimely

21   and insufficient to warrant reconsideration under LRCiv 7.2(g). (Doc. 270 at 7–10.) The

22   Court reserved ruling on the remanded issue, Rienhardt's contention that *Martinez*

23

24

25   alleges that Rienhardt's long-term solitary confinement violates the Eighth Amendment.
     Claim MM alleges that Rienhardt's rights were violated by the introduction of involuntary
26   statements made to the police.

27       [20] Claim FF alleges that use of the death penalty discriminates against poor,
28   minority, and male defendants. Claim GG alleges that the death penalty violates
     substantive due process.

"changed the landscape for procedurally-defaulted claims in federal court." (Doc. 238 at 10; *see* Doc. 270 at 8.) The Court now addresses that argument.

Rienhardt concedes that his "recently exhausted" claims are procedurally defaulted. (Doc. 273 at 74.) He argues, however, that their default is excused under *Martinez* by the ineffective assistance of PCR counsel. (*Id.* at 74–75; Doc. 218 at 118–20.) According to Rienhardt, "the logic of *Martinez*" applies to all non-record-based claims. (Doc. 273 at 74.)

This is incorrect. As noted above, the Ninth Circuit has held that *Martinez* applies only to claims of ineffective assistance of trial counsel. *See, e.g.*, *Hurles*, 914 F.3d at 1238 n.3. It cannot be applied to excuse the default of other types of claims, including claims of ineffective assistance of appellate counsel. *See Martinez (Ernesto)*, 926 F.3d at 1225 (refusing to apply *Martinez* to defaulted claim of judicial bias); *Pizzuto*, 783 F.3d at 1177 (same); *Hunton*, 732 F.3d at 1126–27 (refusing to apply *Martinez* to defaulted *Brady* claim); *Davila*, 137 S. Ct. at 2062–63, 2065–66 (declining to extend *Martinez* to claim of ineffective assistance of appellate counsel).

Therefore, Rienhardt's "recently exhausted" claims remain procedurally defaulted and barred from federal review. Amendment would be futile. *See Murray (Robert) v. Schriro*, 745 F.3d 984, 1017 (9th Cir. 2014) (finding amendment futile where petitioner failed to demonstrate cause and prejudice for default under *Martinez*); *Bonin*, 59 F.3d at 845.

## IV.   EVIDENTIARY DEVELOPMENT

Reinhardt seeks discovery, expansion of the record, and an evidentiary hearing. (Doc. 218 at 159–68.) As noted above, a petitioner may present evidence in support of his argument that "cause" and "prejudice" exist under *Martinez* to excuse the default of a claim of ineffective assistance of trial counsel. *Dickens*, 740 F.3d at 1321; *see Woods*, 764 F.3d at 1138 n.16.

Rienhardt seeks to depose the prosecutor on her use of peremptory strikes and the facts surrounding the State's possession of the Christina George letters. (*Id.* at 162.) He seeks to depose one of the case detectives on the issue of the George letters. (*Id.*) He seeks

an informal interview of trial counsel Larsen. (*Id.* at 162–63.) He also seeks discovery of "all information relating to Tucson Police Department and Pima County Sheriff's Office practices in gathering evidence where an apparently-intoxicated individual is involved"; disclosure by the Pima County Attorney's Office and any other state agency of Larsen's personnel files; and discovery of "all documents in the possession or control of the Tucson Police Department and/or Pima County Sheriff's Office, including police reports, notes or other material regarding evidence of sexual crimes . . . committed by Larsen. . . ." (*Id.* at 164.)

A habeas petitioner is not entitled to discovery "as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Rule 6 of the Rules Governing Section 2254 Cases provides that:

> A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery. . . . A party requesting discovery must provide reasons for the request. The request must also include any proposed interrogatories and requests for admission, and must specify any requested documents.

R. 6(a), (b), Rules Governing Sec. 2254 Cases in the U.S. Dist. Cts. (2010).

"[A] district court abuse[s] its discretion in not ordering Rule 6(a) discovery when discovery [i]s 'essential' for the habeas petitioner to 'develop fully' his underlying claim." *Dung The Pham v. Terhune*, 400 F.3d 740, 743 (9th Cir. 2005) (quoting *Jones v. Wood*, 114 F.3d 1002, 1009 (9th Cir. 1997)). However, courts should not allow a petitioner to "use federal discovery for fishing expeditions to investigate mere speculation." *Calderon v. U.S. Dist. Ct. for the N. Dist. of Cal. (Nicolaus)*, 98 F.3d 1102, 1106 (9th Cir. 1996); *see also Rich v. Calderon*, 187 F.3d 1064, 1067 (9th Cir. 1999) (recognizing that habeas corpus "was never meant to be a fishing expedition for habeas petitioners to 'explore their case in search of its existence.'") (quoting *Aubut v. Maine*, 431 F.2d 688, 689 (1st Cir. 1970)).

Whether a petitioner has established "good cause" for discovery under Rule 6(a) requires a court to determine the essential elements of the petitioner's substantive claim

1    and evaluate whether "specific allegations before the court show reason to believe that the

2    petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled

3    to relief." *Bracy*, 520 U.S. at 908–09 (quoting *Harris v. Nelson*, 394 U.S. 286, 299 (1969)).

4         Rienhardt fails to show good cause for the requested discovery. His request lacks

5    the specificity required by Rule 6. He does not allege specific, relevant facts that might be

6    found in the requested depositions and disclosures. *See Hooper v. Ryan*, No. CV-98-02164-

7    PHX-SMM, 2018 WL 2426176, at *16 (D. Ariz. May 30, 2018), *aff'd, Hooper*, 985 F.3d

8    594; *Djerf v. Ryan*, No. CV-02-00358-PHX-JAT, 2017 WL 1233808, at *14 (D. Ariz. Apr.

9    4, 2017), *aff'd*, 931 F.3d 870 (9th Cir. 2019). Thus, the discovery request constitutes the

10   type of "fishing expedition" Rule 6 does not sanction. *See Kemp v. Ryan*, 638 F.3d 1245,

11   1260 (9th Cir. 2011) ("[T]he desire to engage in [an improper fishing] expedition cannot

12   supply 'good cause' sufficient to justify discovery."); *see also Teti v. Bender*, 507 F.3d 50,

13   60 (1st Cir. 2007) (denying a discovery request because the petitioner "did not comply with

14   the specific requirements of Rule (6)(b); his request for discovery is generalized and does

15   not indicate exactly what information he seeks to obtain").

16        Good cause is also absent because the record is sufficient for the Court to carry out

17   its analysis of the remanded issues and Rienhardt has not shown how further discovery

18   would benefit his claims. Additional evidence is unnecessary with respect to allegations

19   that trial counsel performed ineffectively by failing to challenge or object to the

20   prosecutor's use of peremptory strikes or the disclosure of the George letters or by failing

21   to seek a *Willets* instruction. The existing record is complete with respect to Larsen's

22   performance at trial.

23        Rienhardt seeks to expand the record to include the transcripts from Nadeau's trial

24   and Exhibits 26, 35, 38, and 39 of his supplemental *Martinez* brief.[21] (Doc. 218 at 164.)

25   Respondents do not object (Doc. 259 at 69), and the request will be granted.

26

27   _____

28   [21] These exhibits consist of trial counsel Larsen's billing records (Ex. 26), Larsen's
     notes of his interview with George (Ex. 35), appellate counsel Harriette Levitt's billing
     records (Ex. 38), and PCR counsel's billing records (Ex. 39). (*See* Docs 218-5, 218-6, and

1    Finally, Rienhardt seeks an evidentiary hearing on all of the remanded claims and

2    all allegations of cause under *Martinez*. (Doc. 218 at 168.) Again, the record provides

3    sufficient evidence for the Court to undertake its analysis under *Martinez* and *Dickens*. *See*

4    *Phillips v. Ornoski*, 673 F.3d 1168, 1179 (9th Cir. 2012) (explaining that a court has the

5    discretion to deny an evidentiary hearing where the documentary evidence is sufficient to

6    decide the issue). Rienhardt does not identify what witnesses would testify at a hearing, let

7    alone suggest that their testimony would differ from the contents of their declarations. *See*

8    *Hooper*, 985 F.3d at 632–33; *Runningeagle*, 825 F.3d at 990 (concluding that the district

9    court did not abuse its discretion in denying an evidentiary hearing where "[t]he expanded

10   record included the declarations of witnesses who would testify at a live hearing, and [the

11   petitioner] made no showing that their testimony would differ materially from their

12   declarations"); *Williams v. Woodford*, 384 F.3d 567, 591 (9th Cir. 2004) (explaining that

13   "oral testimony and cross-examination were not necessary because the documentary

14   evidence submitted fully presented the relevant facts").

15   **V.      CERTIFICATE OF APPEALABILITY**

16   Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, a petitioner

17   cannot take an appeal unless a certificate of appealability has been issued by an appropriate

18   judicial officer. Rule 11(a) of the Rules Governing Section 2254 Cases provides that the

19   district judge must either issue or deny a certificate of appealability when it enters a final

20   order adverse to the applicant. If a certificate is issued, the court must state the specific

21   issue or issues that satisfy 28 U.S.C. § 2253(c)(2).

22   Under § 2253(c)(2), a certificate of appealability may issue only when the petitioner

23   "has made a substantial showing of the denial of a constitutional right." This showing can

24   be established by demonstrating that "reasonable jurists could debate whether (or, for that

25   matter, agree that) the petition should have been resolved in a different manner" or that the

26   issues were "adequate to deserve encouragement to proceed further." *Slack*, 529 U.S. at

27   484 (citation and internal quotation marks omitted). For procedural rulings, a certificate of

28   _____

218-7.)

1    appealability will issue only if reasonable jurists could debate whether the petition states a
2    valid claim of the denial of a constitutional right and whether the court's procedural ruling
3    was correct. *Id.*

4    The Court finds that reasonable jurists could debate its application of *Martinez* in
5    claim (C)(2), alleging ineffective assistance of trial counsel, and *Martinez* and *Dickens* in
6    Claims B(1), B(2), B(3), B(5), B(7), alleging ineffective assistance of counsel at
7    sentencing.

8    **VI.    CONCLUSION**

9    For the reasons stated above, the default of Claims A(1)–(5), A(7)–(16), B(2), B(4)–
10   (6), B(8), and C(2) is not excused under *Martinez*. The claims remain defaulted and barred
11   from federal review. Claims A(6), B(1), B(3), (B)(7), and C(1) are not fundamentally
12   altered under *Dickens*, and the Court will not reconsider its denial of the claims on the
13   merits. Finally, the "recently exhausted" claims are defaulted and barred from federal
14   review so amendment would be futile.

15   **Accordingly**,

16   **IT IS HEREBY ORDERED** as set forth above that Rienhardt is not entitled to
17   relief on any of the remanded claims.

18   **IT IS FURTHER ORDERED** granting Rienhardt's request to expand the record.
19   The record is expanded to include Exhibits 26, 35, 38, and Ex. 39. (*See* Docs 218-5, 218-
20   6, and 218-7.) Rienhardt's requests for discovery and an evidentiary hearing are denied.

21   **IT IS FURTHER ORDERED** granting a Certificate of Appealability as to Claims
22   B(1), B(2), B(3), B(5), B(7), and C(2).

23   **IT IS FURTHER ORDERED** that Petitioner's Amended Petition for Writ of
24   Habeas Corpus (Doc. 273) is DENIED. The Clerk of Court shall enter judgment
25   accordingly.

26   Dated this 8th day of November, 2021.

27

28



Honorable David C. Bury
United States District Judge